**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **GREGORY LUTZ and DOROTHY BECKER, on behalf of themselves and all others similarly situated,** | : : : : | |
| Plaintiffs, | : : | Case No. 2:12-CV-1091 |
| v. | : : : | Judge Gregory L. Frost |
| **HUNTINGTON BANCSHARES INC. and HUNTINGTON NATIONAL BANK,** | : : : : | Magistrate Judge Norah McCann King |
| Defendants. | : : : | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, DEFENDANTS' MOTION TO DECERTIFY THE COLLECTIVE ACTION CLASS

---

<u>Dated</u>:  April 1, 2014

Tracy Stott Pyles, OH Bar. No. 0074241
Kaila M. Krausz, OH Bar. No. 0085517
LITTLER MENDELSON, P.C.
21 East State Street, 16th Floor
Columbus, OH  43215
Telephone:  614.463.4201
Facsimile:  614.221.3301
tpyles@littler.com
kkrausz@littler.com

Andrew J. Voss, MN Bar No. 0241556*
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:  612.630.1000
Facsimile:  612.630.9626
avoss@littler.com

*Attorneys for Defendants*

**Admitted Pro Hac Vice*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................ vi

I.    INTRODUCTION ............................................................................................ 1

II.   STATEMENT OF THE LEGAL ISSUES ...................................................... 2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS .............................. 3

    A.    Huntington and its Home Lending Underwriters ................................. 3

    B.    Huntington's Wage and Hour Compliance Reviews ........................... 7

    C.    Home Lending Underwriters' Duties and Responsibilities ................. 9

        1.    Overview of the Home Lending Underwriters' Function ......... 9

            a.    Home Lending Underwriters Analyze Applications, Determine Creditworthiness and Decide Whether Huntington Will Accept The Loan Risk ..................................... 9

            b.    Home Lending Underwriters Are Minimally Supervised ........... 10

            c.    Home Lending Underwriters Provide Training, Serve as Subject Matter Experts and Work on Special Projects ............... 10

        2.    Underwriting a Loan Application ........................................... 13

            a.    Evaluating All Aspects of Loan Applications and Due Diligence ................................................................... 13

            b.    Discretion to Put Stipulations on Loan Applications ................. 15

            c.    Discretion to Make Exceptions and Identify Compensating Factors and Counter-Offers ........................................... 16

            d.    Acting in Customer's Best Interest ............................... 18

            e.    Binding Huntington to Requested Risk ....................... 20

            f.    Defending Risk Decisions and Identifying Decline Reasons ...... 23

IV.   LEGAL ARGUMENT .................................................................................. 24

    A.    Legal Standard for Proving the Administrative Exemption ............... 24

i

# TABLE OF CONTENTS
## (CONTINUED)

PAGE

The FLSA's administrative exemption exempts from overtime employees who are compensated on a salary or fee basis of not less than $455 per week and have a primary duty of performing office or non-manual work directly related to the management or general business operations of the employer or its customers that includes the exercise of discretion and independent judgment with respect to matters of significance.  *See* 29 C.F.R. § 541.200(a).

B.      Huntington's Home Lending Underwriters Fall Squarely Within the FLSA's Administrative Exemption from the Act's Overtime Requirement ....... 25

    1.      The Statutory and Regulatory Framework................................................ 25

    2.      Huntington Satisfies the Salary Basis Test ............................................. 26

The Representative Plaintiffs received a salary every week, regardless of the number of hours worked, ranging from $52,376.50 to $71,000.00 annually, not less than $455 per week.[1]

    3.      Huntington Satisfies the Primary Duty Test ........................................... 26

        a.      Identifying the Primary Duty of Huntington's Home Lending Underwriters .................................................... 26

The Home Lending Underwriters' "primary duty" is evaluating the creditworthiness of customers applying for home loans, and deciding whether the Bank will take on the risk of the loan.  *Edwards v. Audubon Ins. Group, Inc.*, 2004 U.S. Dist. LEXIS 27562 at **14-15 (S.D. Miss. Aug. 31, 2004).

        b.      Home Lending Underwriters' Primary Duty Consists of Office or Non-Manual Work That Is Directly Related to Huntington's General Business Operations ................................ 29

        (1)      The Regulatory Guidelines ............................................. 29

Duties "directly related to the management or general business operations" are "related to assisting with the running or servicing of the business [administrative employees], as distinguished . . . from working on a manufacturing production line or selling a product in a retail or service establishment [production employees]."  *See* 29 C.F.R. § 541.201(a); 69 Fed. Reg. at 22141; *Murray v. Ohio Casualty Corp.*, 2005 U.S. Dist. LEXIS 41374, at *14 (S.D. Ohio Sept. 27, 2005).  Federal regulations specifically classify the rendering of credit decisions as exempt, administrative work.  29 C.F.R. § 541.703(b)(7).

---

[1] *See* Becker pp. 34-36, 104, 112, 110-111; Miller pp. 29-30, 165-166; Lutz pp. 25-26, 129, 131; Whitacre pp. 42-43. 65-67; Becker Ex. 8; Lutz Ex. 11; Miller Ex. 9; Whitacre pp. 182-183.

## TABLE OF CONTENTS
### (CONTINUED)

PAGE

    (2)    Home Lending Underwriters Service Huntington's General Business Operations ........................................... 30

Huntington is in the business of providing home loans to customers. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006). Huntington's Home Lending Underwriters service its core business function by analyzing customer requests for loan products, and deciding whether the bank will accept the risk of the requested loan, which is administrative work. *See Maddox*, 2011 U.S. Dist. LEXIS 151085 at *13. Home Lending Underwriters do not create, market nor sell home loan products, and thus, are not "production employees." *See Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 645 (6th Cir. 2013).

    c.    Home Lending Underwriters' Primary Duty Includes the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance ............................................. 34

    (1)    The Regulatory Guidelines ............................................. 34

"The exercise of discretion and independent judgment" is defined as "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Home Lending Underwriters satisfy the administrative exemption because they affect, interpret and implement management policies; carry out major assignments; perform work that affects business operations to a substantial degree; have the authority to commit Huntington in matters that have significant financial impact; have the authority to deviate from policies and procedures without prior approval; and have the authority to negotiate and bind the company on significant matters. *See* 29 C.F.R. § 541.202(b); Section II.C., *supra*; *In Re Novartis*, 593 F. Supp. 2d 637, 646.

    (2)    The Undisputed Material Facts Establish that Home Lending Underwriters Routinely Exercise Their Judgment and Discretion in the Performance of Their Primary Duty ........................................................ 36

Huntington's Home Lending Underwriters are minimally supervised and independently decide when loan applications are suspicious and require investigation, when to make risk approval exceptions for customers that may not otherwise qualify, and render the ultimate decision of whether the Bank will accept the risk of the requested loans when they approve, conditionally approve, or decline a loan. They also exercise judgment and discretion serving on special project teams that search for more stream-lined underwriting processes to implement. These duties are the same as those of other Underwriters found to exercise the judgment and discretion required to satisfy the administrative exemption. *Havey v. Homebound Mortgage, Inc.*, 2005 U.S. Dist. LEXIS 27036 at **21-22 (D. Vt. July 21, 2005); *Edwards*, 2004 U.S. Dist. LEXIS 27562, at *20.

# TABLE OF CONTENTS
### (CONTINUED)

PAGE

(3)    Plaintiffs Cannot Point to Guidelines and Automated Underwriting Software as Evidence of Restraint on Their Discretion........................................... 40

In the Sixth Circuit, employees who utilize guidelines and procedures in the performance of their duties still exercise discretion or independent judgment where those guidelines contemplate independent judgment calls or allow for deviations. *Renfro*, 497 F.3d at 577. It is undisputed that Huntington's Home Lending Underwriters use various guidelines and automated underwriting software as tools to <u>assist</u> in their evaluation of risk, but none of these tools <u>replace</u> the Underwriter's independent judgment.

(i)    Home Lending Underwriters Deviate From Automated Underwriting Software Suggestions............................... 42

As in *Edwards, Havey* and *Maddox*, Huntington's Home Lending Underwriters analyze information and make their decisions within compliance and regulatory guidelines, but these guidelines do not dictate their decisions and they are not required to follow the software's suggestion.

(4)    The Home Lending Underwriters' Judgment and Discretion Affects Matters of Extraordinary Significance to Huntington ............................................. 43

The term "matters of significance" refers to "the level of importance or consequence of the work performed." 29 C.F.R. § 202(a). Home Lending Underwriters possess lending authority ranging from <u>$250,000.00 up to one million dollars</u>[2] and clearly affect "matters of significance." *See Harper*, 2013 U.S. Dist. LEXIS 157938 at *40-41; *Maddox*, at *17.

C.    As a Matter of Law, Plaintiffs' Claim for Straight Time Wages for Hours Worked in Excess of Forty in a Workweek Should Be Dismissed..................... 44

When a salaried employee challenges his exempt status, and the parties had a mutual understanding – as the Plaintiffs here testified – that their fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number,[3] courts hold that the employee is <u>only</u> entitled to recover his half-time overtime premium, calculated based upon the salary paid for each individual week divided by the total number of hours worked, week by week. *See, e.g.*, *Clements v. Serco, Inc.*, 530 F.3d 1224, 1230-31 (10th Cir.

---

[2] *See* Becker pp. 48, 72; Miller p. 56; Lutz p. 54; Whitacre p. 143.
[3] *See* Becker pp. 34-36, 104, 112, 110-111; Miller pp. 29-30, 165-166; Lutz pp. 25-26, 129, 131; Whitacre pp. 42-43. 65-67.

**TABLE OF CONTENTS**

(CONTINUED)

**PAGE**

2008); *Schneider v. City of Springfield*, 2000 U.S. Dist. LEXIS 6217, at *25-26, *37-38 (S.D. Ohio, March 30, 2000).

D.     The Undisputed Facts Establish that Huntington Acted in Good Faith ............... 46

Under the FLSA, misclassified employees cannot receive liquidated damages if the employer's classification of the employees "was in good faith and that [it] had reasonable grounds for believing that [the classification] . . . was not a violation of the [FLSA.]" 29 U.S.C. § 260.   This defense is available where an employer relied upon counsel, or otherwise demonstrates "an honest intention" to comply with the FLSA.  *Featsent v. City of Youngstown*, 70 F.3d 900, 906-07 (6th Cir. 1995); *Cobb v. Contract Transport, Inc.*, 2007 U.S. Dist. LEXIS 45043, at *5-6 (E.D. Ky. June 21, 2007).

Huntington reasonably relied upon the advice of its specialized compensation team – a Compensation Consultant who met with corporate employment counsel, Human Resources and Home Lending Underwriting management – to analyze the duties and responsibilities of the position in 2010 and again in 2012.  (*See* Reveal  pp. 21, 28-42).  Thus, Huntington has met its burden to establish good faith.  *Hoge*, 2002 U.S. Dist. LEXIS 28312 at *12.

E.     Plaintiffs Have No Evidence to Support Their Claim that Huntington "Willfully" Violated the FLSA ........................................................................... 48

The FLSA's two-year statute of limitations may be extended to three years only if the employer willfully violates the FLSA by knowing, or showing reckless disregard for whether, its conduct was prohibited by the FLSA.  29 U.S.C. § 255(a).  Huntington's classification of the Home Lending Underwriter position involved reliance upon the advice of its specialized compensation team, and is the type of evidence warranting dismissal of willful violation claims. *See Hoffman v. Professional Med Team*, 394 F.3d 414, 419-20 (6th Cir. 2005).

V.     DEFENDANTS' MOTION TO DECERTIFY THE COLLECTIVE ACTION CLASS .................................................................................................................. 50

To avoid decertification the named plaintiffs must prove that the putative plaintiffs are similarly situated.  *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 986 (W.D. Tenn. Feb. 2011). Factors considered include (1) the factual and employment settings of the plaintiffs; (2) the various individualized defenses available; and (3) fairness and procedural considerations.  *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009).  Because of the wide variances in testimony between just the four Representational Plaintiffs, and the numerous defenses applicable to individual class members' claims, the members of the conditionally certified class are not similarly situated, and proceeding on a collective basis is unmanageable and procedurally unfair.

VI.     CONCLUSION .......................................................................................................... 52

# TABLE OF AUTHORITIES

PAGE

## CASES

*Adams v. United States*,
    78 Fed. Cl. 536 (Fed. Cl. 2007) ........................................................32

*Auer v. Robbins*,
    519 U.S. 452 (1997) ...........................................................................45

*Bailey v. County of Georgetown*,
    94 F.3d 152 (4th Cir. 1996) ...............................................................45

*Blackmon v. Brookshire Grocery Co.*,
    835 F.2d 1135 (5th Cir. 1988) ...........................................................46

*Brock v. Wilamowsky*,
    833 F.2d 11 (2d Cir. 1987) .................................................................47

*Cameron v. Abercrombie & Fitch Co.*,
    Case No. 2:10-cv-631, 2012 U.S. Dist. LEXIS 131557 (S.D. Ohio Sept. 14, 2012) ........29, 31

*Caveness v. Vogely & Todd, Inc.*,
    Case No. 3:10-0650, 2011 U.S. Dist. LEXIS 98144 ........................33

*Cheatham v. Allstate Ins. Co.*,
    465 F.3d 578 (5th Cir. 2006) .........................................................30, 41

*Clements v. Serco, Inc.*,
    530 F.3d 1224 (10th Cir. 2008) .........................................................45

*Cobb v. Contract Transport, Inc.*,
    Case No. 04-305-KSF, 2007 U.S. Dist. LEXIS 45043 (E.D. Ky. June 21, 2007)..................47

*Comer v. Wal-Mart Stores, Inc.*,
    454 F.3d 544 (6th Cir. 2006) .............................................................50

*Davis v. J.P. Morgan Chase & Co.*,
    587 F.3d 529 (2d Cir. 2009) .................................................................8

*Douglas v. Argo-Tech Corp.*,
    113 F.3d ..............................................................................................49

*Edwards v. Audubon Ins. Group, Inc.*,
    Case No. 02-cv-1618, 2004 U.S. Dist. LEXIS 27562 .................. passim

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*Featsent v. City of Youngstown,*
70 F.3d 900 (6th Cir. 1995) .......................................................46, 47

*Foster v. Nationwide Mut. Ins. Co.,*
710 F.3d 640 (6th Cir. 2013) .................................................................31

*Harper v. GEICO,*
Case No. 09-cv-2254, 2013 U.S. Dist. LEXIS 15793 ...............................33, 43, 44

*Havey v. Homebound Mortgage, Inc.,*
Case No. 03-cv-313, 2005 U.S. Dist. LEXIS 27036 ...................................... passim

*Hill v. J.C. Penney Co.,*
688 F.2d 370 (5th Cir. 1982) ...............................................................47

*Hoffman v. Professional Med Team,*
394 F.3d 414 (6th Cir. 2005) ...............................................................49

*Hoffman-La Roche, Inc. v. Sperling,*
493 U.S. 165 (1989)............................................................................0

*Hoge v. Honda of America Mfg., Inc.,*
Case No. 2:00-CV-995, 2002 U.S. Dist. LEXIS 28312 (S.D. Ohio May 3, 2002) ..........47, 48

*Icicle Seafoods, Inc. v. Worthington,*
475 U.S. 709 (1986)........................................................................25

*In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litigation,*
481 F.3d 1119 (9th Cir. 2007) .............................................................42

*In Re Novartis Wage and Hour Litigation,*
593 F. Supp.2d ...........................................................................34, 35

*Jastremski v. Safeco Ins. Cos.,*
243 F. Supp.2d 743 (N.D. Ohio 2003)..............................................24, 25, 29, 38

*Koppinger v. American Interiors, Inc.,*
295 F. Supp. 2d 797 (N.D. Ohio 2003)....................................................40

*Maddox v. Continental Casualty Co.,*
Case No. 11-cv-2451, 2011 U.S. Dist. LEXIS 151085 (C.D. Cal. Dec. 22, 2011) ......... passim

*McAllister v. Transamerica Occidental Life Ins. Co.,*
325 F.3d 997 (8th Cir. 2003) ...............................................................41

vii

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE

*McLaughlin v. Richland Shoe Co.*,
    486 U.S. 128 (1988)..................................................................................49

*Mechmet v. Four Seasons Hotels, Ltd.*,
    825 F.2d 1173 (7th Cir. 1987) ................................................................24

*Monroe v. FTS USA, LLC*,
    763 F. Supp. 2d 979 (W.D. Tenn. Feb. 2011)........................................50

*Morisky v. Public Serv. Elec. & Gas Co.*,
    111 F.Supp.2d 493 (D. N.J. 2000)..........................................................50

*Murray v. Ohio Casualty Corp.*,
    No. 2:04 CR 539, 2005 U.S. Dist. LEXIS 41374 (S.D. Ohio Sept. 27, 2005) ......25, 29, 39, 41

*O'Brien v. Ed Donnelly Enterprises, Inc.*,
    575 F.3d 567 (6th Cir. 2009) ...................................................................50

*Oetinger v. First Residential Mortgage Network, Inc.*,
    Case No. 3:06-CV-381-H, 2009 U.S. Dist. LEXIS 61877 (W.D. Ky. July 16, 2009) ............51

*Piscione v. Ernst & Young, L.L.P.*,
    171 F.3d 527, 537 (7th Cir. 1999) ......................................................28, 40

*Renfro v. Indiana Mich. Power Co. (Renfro I)*,
    370 F.3d 512 (6th Cir. 2004) ...................................................................32

*Renfro v. Indiana Michigan Power Co.*,
    497 F.3d 573 (6th Cir. 2007) ........................................................24,  40, 43

*Rieve v. Coventry Health Care, Inc.*,
    870 F. Supp. 2d 856 (C.D. Cal. 2012) ....................................................31

*Roy v. County of Lexington*,
    141 F.3d 533 (4th Cir. 1998) ...................................................................47

*Rutlin v. Prime Succession, Inc.*,
    220 F.3d 737 (6th Cir. 2000) ...................................................................24

*Schneider v. City of Springfield*,
    Case No. C-3-96-62, 2000 U.S. Dist. LEXIS 6217 (S.D. Ohio March 30, 2000)........... 45, 46

*Shaw v. Prentice Hall Computer Publ'g*,
    151 F.3d 640 (7th Cir. 1998) ...................................................................30

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ................................................................................................25

*Valerio v. Putnam Assoc. Inc.*,
173 F.3d 35 (1ˢᵗ Cir. 1999) ....................................................................................45

*White v. Baptist Mem. Health Care Corp.*,
Case No. 08-2478, 2011 U.S. Dist. LEXIS 52928 ................................................51

*Zoltek v. Safelite Glass Corp.*,
884 F. Supp. 283 (N.D. Ill. 1995) ..........................................................................46

## STATUTES

29 U.S.C. § 207(a)(1) ........................................................................................................25

29 U.S.C. § 213(a)(1) ........................................................................................................25

29 U.S.C. § 216(b) ...............................................................................................................0

29 U.S.C. § 255(a) .....................................................................................................11, 48

29 U.S.C. § 260 ................................................................................................................46

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ..........................................................1

O.R.C. Section 4111.03(A) .................................................................................................1

## OTHER AUTHORITIES

29 C.F.R. § 202(a) ............................................................................................................43

29 C.F.R. § 541.200-03 ......................................................................................................2

29 C.F.R. § 541.200(a) ..................................................................................................2, 25

29 C.F.R. § 541.201(a) ................................................................................................29, 33

29 C.F.R. § 541.201(b) .....................................................................................................31

29 C.F.R. § 541.202(a) .....................................................................................................34

29 C.F.R. § 541.202(b) .....................................................................................................35

29 C.F.R. § 541.202(c) .....................................................................................................35

ix

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE**

29 C.F.R. § 541.203(b) .................................................................................30

29 C.F.R. § 541.203(f) ..................................................................................30

29 C.F.R. § 541.205(a) .................................................................................29

29 C.F.R. § 541.602 ......................................................................................44

29 C.F.R. § 541.700 ......................................................................................27

29 C.F.R. § 541.700(a) .................................................................................28

29 C.F.R. § 541.703(b)(7) ............................................................................30

29 C.F.R. § 541.704 ......................................................................................41

29 C.F.R. § 778.114(a) .................................................................................45

69 Fed. Reg. at 22141 ..................................................................................29

69 Fed. Reg. at 22142 ..................................................................................34

69 Fed. Reg. at 22143 ..................................................................................35

69 Fed. Reg. at 22144 .............................................................................34, 35

DOL Wage & Hour Div. Op. Ltr., FLSA2009-3 .........................................45

Rule 56 of the Federal Rules of Civil Procedure ...........................................0

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GREGORY LUTZ and DOROTHY BECKER, on behalf of themselves and all others similarly situated, | : : : : | |
| Plaintiffs, | : : | Case No. 2:12-CV-1091 |
| v. | : : | Judge Gregory L. Frost |
| HUNTINGTON BANCSHARES INC. and HUNTINGTON NATIONAL BANK, | : : : | Magistrate Judge Norah McCann King |
| Defendants. | : : : : | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, DEFENDANTS' MOTION TO DECERTIFY THE COLLECTIVE ACTION CLASS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Huntington Bancshares Incorporated and The Huntington National Bank respectfully move this Court for an Order granting them summary judgment on all claims. No genuine issues of material fact exist as to any of Plaintiffs' claims and Defendants are entitled to summary judgment as a matter of law.

In the alternative, should Defendants' Motion for Summary Judgment be denied, and pursuant to 29 U.S.C. § 216(b), and the two-step collective action certification procedure set forth in *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989), Defendants respectfully move this Court to decertify the collective action class conditionally certified on April 19, 2013, because Plaintiffs are dissimilarly situated with respect to key factual issues underlying their claims and, thus, adjudicating Plaintiffs' claims would require individualized proceedings that are inherently incompatible with collective treatment.

A Memorandum in Support of Defendants' instant Motion is filed simultaneously herewith and incorporated herein by reference.

Respectfully submitted,

*s/ Tracy Stott Pyles*

Tracy Stott Pyles, OH Bar. No. 0074241
Kaila M. Krausz, OH Bar. No. 0085517
LITTLER MENDELSON, P.C.
21 East State Street
16th Floor
Columbus, OH  43215
Telephone:  614.463.4201
Facsimile:  614.221.3301
tpyles@littler.com
kkrausz@littler.com

Andrew J. Voss, MN Bar No. 0241556*
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:  612.630.1000
Facsimile:  612.630.9626
avoss@littler.com

*Attorneys for Defendants*

*Admitted Pro Hac Vice*

<u>MEMORANDUM IN SUPPORT</u>

I.       <u>INTRODUCTION</u>

Plaintiffs in this collective action are current and former Consumer and Mortgage Home Lending Underwriters employed by Defendant, The Huntington National Bank.[4]  Plaintiffs challenge their status as "exempt" administrative employees under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and seek to recover overtime pay for hours worked in excess of forty in a workweek.[5]  On November 28, 2012, Plaintiffs moved for conditional certification of all employees with underwriting as their primary duty (Doc. #3, p. 3).  This Court denied Plaintiffs' request, and instead conditionally certified a smaller class of Home Lending Underwriters – consisting of both Consumer and Mortgage Underwriters (referred to collectively as "Home Lending Underwriters") (Doc. #24, p. 13).  Only 22 out of almost 140 members of the potential class opted-in to this lawsuit.  In order to establish an evidentiary record for dispositive motion purposes, the parties selected four plaintiffs ("Representative Plaintiffs") to represent the rest of the alleged "similarly situated" class.[6]

All of the Representative Plaintiffs were deposed regarding their duties and responsibilities as Home Lending Underwriters, what they do, and why they do it.  This undisputed evidence establishes that Huntington has properly relied upon the administrative

_____

[4] Plaintiffs have named both Huntington Bancshares Incorporated and The Huntington National Bank as Defendants in this matter.  Defendants are referred to herein collectively as "Huntington" or "the Bank."

[5] Plaintiffs also allege claims under Ohio law, which follows federal law on such exemption issues.  *See* O.R.C. Section 4111.03(A).

[6] Named Plaintiffs Gregory Lutz and Dorothy Becker (both former Consumer Home Lending Underwriters), and Opt-In Plaintiffs George Miller (former Consumer Home Lending Underwriter) and Amy Whitacre (current Mortgage Home Lending Underwriter) are the "Representative Plaintiffs."  Deposition testimony is cited herein by deponent last name and page numbers of the transcript.  The deposition transcripts, and deposition exhibits cited herein, were filed simultaneously with the instant Motion.

exemption to exclude these employees from the FLSA's overtime rule.  First, Plaintiffs do not dispute that they were or are paid on a salary basis in excess of $455/week and, therefore, satisfy the salary basis test.  Second, Plaintiffs' admissions at their depositions establish that they satisfy the job duties test for the administrative exemption, 29 C.F.R. § 541.200-03.  This testimony proves that Home Lending Underwriters (a) perform office or nonmanual work "directly related to [Huntington's] management or general business operations[,]" and (b) their work "includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

Plaintiffs' admissions establish that the primary duty of Huntington's Home Lending Underwriters is to analyze home lending customer creditworthiness, and to decide whether the Bank will take on the requested loan risk.  Home Lending Underwriters have substantial underwriting authority, up to one million dollars, allowing them to independently bind Huntington to millions of dollars in lending exposure.  Although Home Lending Underwriters use various tools to assist in their work, they are nonetheless expected to reach their own conclusions and make decisions based upon those conclusions.  Huntington's Home Lending Underwriters have at least three years of prior underwriting or related experience, and often have much more – the Representative Plaintiffs had 3.5 to 14 years of underwriting experience before joining Huntington.  Plaintiffs work under minimal supervision, and are empowered and expected to defend the credit decisions they independently make.  Plaintiffs candidly admit that, "you had to make your own decision," and that their jobs require them to "question[]," "compar[e]," and "exercise appropriate judgment," to "mak[e] the right decision on whether to approve or decline a loan."  This is an exempt job.

## II.    <u>STATEMENT OF THE LEGAL ISSUES</u>

A.    Whether, as a matter of law, based upon the undisputed material facts, Huntington

has met its burden of proof to establish that its Home Lending Underwriters are properly considered exempt from the FLSA's and state law overtime requirements as "administrative" employees.

B.      Whether, even if considered non-exempt employees, Plaintiffs are entitled to "straight-time" wages for hours worked in excess of forty in a workweek, in addition to a half-time overtime premium, calculated in accordance with the "fluctuating workweek" method.

C.      Whether, as a matter of law, Huntington has established that it affirmatively acted in good faith and reasonably relied upon its professional review of the Home Lending Underwriters' duties and responsibilities in determining the exempt status of this position.

D.      Whether Plaintiffs have failed to meet their burden of proof to establish that Huntington willfully violated the FLSA when it concluded that Home Lending Underwriters are exempt from the overtime rule.

## III.      STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      Huntington and its Home Lending Underwriters.

Huntington Bancshares Incorporated is the parent corporation of The Huntington National Bank.  (Cline Decl., ¶ 2.)[7]  The Huntington National Bank provides full-service commercial, small business, and consumer banking services; mortgage banking services; treasury management and foreign exchange services; equipment leasing; wealth and investment management services; trust services; brokerage services; customized insurance brokerage and service programs; and other financial products and services.  (Cline Decl., ¶ 2.)  Huntington

---

[7] The Declaration of Huntington's former Loan Center Credit Manager Mary Cline was previously filed with this Court on January 17, 2013, as Exhibit 1 to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Conditional Certification.  (Doc. #15-1).

primarily operates in six states: Ohio, Michigan, Pennsylvania, Indiana, West Virginia, and Kentucky.

The Bank's home lending underwriting business is divided between the Consumer group and the Mortgage group.  (*Id.*, ¶ 4.)  There is a Loan Center Credit Manager who manages the credit function for both the Consumer and Mortgage groups.  (Cline pp. 11-12; Cline Ex. 2).[8] The next level of management consists of Home Lending Credit Section Managers who manage Mortgage Underwriters, and Consumer Credit Section Managers who manage Consumer Underwriters.  (Cline p. 18; Cline Ex. 2.)  Huntington's Home Lending Underwriters work out of its Crosswoods building in Columbus, Ohio; but, the Consumer and Mortgage groups work in different areas of the building.  (Whitacre pp. 50-51; Becker pp. 37-39; Lutz p. 39; Miller pp. 44-45.)  They are not familiar with each other's job duties.  (Miller Dep. p. 46; Whitacre Dep. p. 50.) There are also a few Home Lending Underwriters in Findlay, Ohio, and Grand Rapids, Michigan. (Cline pp. 20-21.)  There are two levels of Home Lending Underwriters: (1) Underwriter – Home Lending; and (2) Underwriter Senior – Home Lending.  (Cline p. 19; Reveal Exs. 2-3).  Home Lending Underwriters at Huntington are classified as exempt "administrative" employees. (Cline pp. 23-24.)

There are several differences between Consumer Underwriters and Mortgage Underwriters, beginning with the type of loan products and loan solutions offered by the Underwriters.  (Cline p. 15.)  Consumer Home Lending Underwriters underwrite loans originating from various sources, including banking offices, the "huntington.com" channel, the

---

[8] Transcripts from the depositions of Huntington's former Credit Center Loan Manager, and current Program Manager, Mary Cline, and Huntington's Compensation Consultant, Jason Reveal, and the deposition exhibits cited herein, were filed simultaneously with the instant Motion.  Deposition testimony is cited herein by deponent last name and page numbers of the transcript.

phone bank, and Huntington's Private Financial Group. (Cline Decl. ¶ 4.) The primary bulk of business for Consumer Home Lending Underwriters is the equity business – typically a type of home equity installment loan, a consumer first mortgage refinance, or a secured personal credit line. (Cline Decl., ¶ 5). Consumer Home Lending Underwriters also have responsibilities over non-equity loans, like auto loans, titled vehicles and consumer checking reserves as well as unsecured loans – like a customer personal loan. (*Id.*) These Underwriters use the ACAPS loan origination system to assist them with the performance of their job. (*Id.*, ¶ 6.)

In approximately 2010, the Bank began the segmentation of the Consumer Home Lending underwriting process into phases – initial approval and final approval – with Underwriters assigned to perform the duties specific to a single phase. (Cline Decl., ¶ 7.) Currently, the Consumer Home Lending Underwriters have compensation and incentive plans that are distinct to them, and their performance is measured against criteria specific to their job within the consumer group. (*Id.*, ¶ 8; Cline Dep Exs.7-9, 11.)

In contrast, the Mortgage Home Lending group Underwriters primarily underwrite new and refinanced mortgage loans and are assigned to the "residential" or "third-party" channel, with the difference based upon the origination from a Huntington Mortgage Loan Officer or a Mortgage Broker. (*Id.*, ¶ 9.) The Mortgage Home Lending Underwriters work a loan from start to finish – i.e., they perform the initial review, the income analysis and the final review. (*Id.*, ¶ 10.) The Mortgage Home Lending group uses the UNIFI loan origination system, rather than ACAPS. (*Id.*) There are three Mortgage Home Lending Underwriters who are primarily responsible for covering the Bank's "resource help desk," which is the go-to source for employees who need guidance on the mortgage loan process, underwriting, and related policies and procedures. (*Id.*, ¶ 11.) Currently, Mortgage Home Lending Underwriters have

compensation and incentive plans that are distinct to them, and their performance is measured against criteria specific to their job within the mortgage group.  (*Id.*, ¶ 12; Cline Dep. Exs. 7-9, 11.)

Both Consumer Home Lending and Mortgage Home Lending Underwriters work with automated underwriting software programs.  STRATA is the automated underwriting software incorporated into ACAPS and used by Consumer Underwriters (Becker pp. 50-51, 60-61), while Huntington's Mortgage Underwriters use a variety of desktop underwriting programs that vary based upon loan product.  (Whitacre pp. 93-95.)  As a point of comparison, the consumer group's home lending assets are maintained in Huntington's portfolio.  Accordingly, Consumer Home Lending Underwriters exercise discretion during the underwriting process that is different from the discretion exercised by Mortgage Home Lending Underwriters who are often working with government agency programs and exercising the types of discretion applicable to those unique programs.  (Cline Decl. at ¶ 13.)

Huntington's Home Lending Underwriters are not involved in the creation or sale of home loan products.  They analyze loan applications originated by other personnel and have absolutely no contact with potential customers.  Home Lending Underwriters exist as a separate function within the Loan Center and are charged with analyzing credit qualification, customer risk and deciding whether Huntington will accept the risk of the requested loan.  (Whitacre pp. 80-81, 173-175; Becker pp. 45, 83, 120; Miller pp. 52-53, 80, 88; Cline pp. 91-92, 147-152.)

Home Lending Underwriters serve as subject matter experts for the Bank.  In this respect, they work on special projects to create new underwriting processes and to streamline and improve existing processes, train Bank personnel on underwriting procedures, and serve as the go-to resource for Bank personnel with underwriting questions.  (Becker pp. 124-127; Miller pp.

115-116; Lutz pp. 27-28, 66-68, 78-81, 87-88, 106-107, 117-121, 124-125, 127-128.)

Home Lending Underwriters' hours fluctuate from week to week. (Becker pp. 34-36, 104, 112, 110-111; Miller pp. 29-30, 165-166; Lutz pp. 25-26, 129, 131; Whitacre pp. 42-43. 65-67.) Some weeks, Home Lending Underwriters work over forty hours in a week, other weeks they work less. (*Id.*) When hours fluctuated from week to week, Home Lending Underwriters understood that their pay would remain the same. (*Id.*)

### B.     Huntington's Wage and Hour Compliance Reviews.

For the purpose of wage and hour compliance, decisions with respect to Home Lending Underwriters are made by a specialized and trained Compensation Consultant together with Home Lending Underwriting management, Human Resources, and Huntington's in-house legal counsel. (Reveal pp. 14-16.) The Compensation Consultant assigned to the Home Lending business segment, Jason Reveal, reviews classification decisions whenever there is a change in job duties or responsibilities, or in governing regulations. (*Id.* at 29-30.) Huntington also periodically conducts market studies that can trigger a wage and hour compliance review. (*Id.* at 31-32, 44.)[9]

Prompted by the issuance of a decision by the United States Court of Appeals for the Second Circuit in November 2009, which found mortgage Underwriters employed by J.P. Morgan Chase Bank non-exempt under the FLSA, and the Department of Labor's issuance of an Administrative Interpretation in March 2010 about the exempt status of mortgage loan officers, Huntington conducted a review of its Home Lending Underwriter positions in 2010, to confirm

---

[9] Huntington Compensation Consultant Jason Reveal has 16 years of experience in human resources, including 10 years of compensation specialization. (Reveal pp. 54-57). Reveal is a member of the Columbus Compensation Association, which has quarterly meetings that include discussions about FLSA topics. (Reveal pp. 55-56). Reveal has attended seminars specific to the FLSA, including the 2004 changes in the administrative exemption regulations, and has presented on the FLSA. (Reveal pp. 54-55).

their exempt status under the administrative exemption. (Reveal pp. 13, 27-28.)[10] To conduct this review, Compensation Consultant Reveal conferred with Huntington's in-house employment counsel, Human Resources and Home Lending Underwriting management to discuss the classification of the Home Lending Underwriters. (*Id.,* pp. 14-16, 27-29.) The discussions included a review of the duties and responsibilities of the Home Lending Underwriters, the critical nature of their job to analyze and make credit decisions, and how Huntington's Home Lending Underwriters' duties differed from the Chase Underwriters reviewed by the Second Circuit. (*Id.*, pp. 15-20, 28-31.) As a result of these discussions, a consensus was reached that Home Lending Underwriters would remain exempt from the FLSA's overtime requirements. (*Id.*, pp. 21, 30-31.)

About two years later, in 2012, Compensation Consultant Reveal met with Huntington corporate employment counsel, Human Resources, and Home Lending Underwriting management to take another look at the Home Lending Underwriter job duties, this time prompted by an internal review of market pay data and salary information. (Reveal pp. 31-33.) As part of this review, the team did a deeper dive, and completed and analyzed Position Description Questionnaire, which set forth the various job duties for the Home Lending Underwriter positions. (*Id.*, pp. 32-34; Reveal Ex. 1.) The team reviewed the information derived from the Questionnaires and discussed the job duties as compared to the administrative

---

[10] In 2009, the Second Circuit issued its decision in *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009), finding that Chase's mortgage underwriters were non-exempt "production" employees pursuant to the administrative/production dichotomy, discussed *infra*. The *Davis* case is not controlling in the Sixth Circuit. Moreover, Defendants have not found any judicial decisions outside the Second Circuit applying the administrative/production dichotomy to underwriters. As discussed herein, Huntington's Home Lending Underwriters do not "produce" anything – they do not market, create, nor sell the loans they underwrite. Defendants anticipate having the full opportunity to explain their position, and why *Davis* is inapplicable here, in their Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment.

exemption, and again a consensus decision was reached that Home Lending Underwriters would remain exempt from the FLSA's overtime rule.  (Reveal pp. 35-42.)

 **C. Home Lending Underwriters' Duties and Responsibilities.**

  **1. Overview of the Home Lending Underwriters' Function.**

   **a. Home Lending Underwriters Analyze Applications, Determine Creditworthiness and Decide Whether Huntington Will Accept the Loan Risk.**

The Home Lending Underwriter job primarily exists to protect Huntington, and its customers and investors, from taking on the wrong kind of risk.  Each Home Lending Underwriter is charged with thoroughly analyzing complex customer loan applications, determining creditworthiness, and deciding whether Huntington will accept the requested loan risk.  (Becker p. 125; Miller pp. 141-142.)  Plaintiffs admitted that properly assessing risk is important to Huntington, and accepting too much or bad risk is detrimental to Huntington's business.  (Becker p. 140; Whitacre pp. 173-174.)  Significantly, Home Lending Underwriters must "look at all the information" (Becker p. 44), "make a decision based off everything that you pull up, that pulls up, with the applications" (Becker p. 49), "make sure the findings are accurate, meets all of the requirements" (Whitacre p. 98), and ultimately decide if the loan is the kind of risk the Bank will accept.  (Miller p. 142.)

Substantively, analyzing complex loan applications involves a wide array of skills and knowledge.  As Whitacre confirmed, "[e]very deal is unique."  (Whitacre p. 179.)  Becker explained that "it takes years of experience, you can't just sit down and read an application and be an Underwriter."  (Becker p. 145.)  Simply put, Home Lending Underwriters are not blindly funneling applications through a checklist procedure and rubber stamping suggestions from the automated underwriting software; rather, the Home Lending Underwriters' job is to <u>analyze</u> the information, and to <u>make</u> the ultimate credit decision.  (*Id.*, pp. 120.)

          **b.**       **Home Lending Underwriters Are Minimally Supervised.**

Plaintiffs admitted that they work independently, and under minimal supervision. (Becker pp. 129-139.)   Indeed, Underwriters are disciplined when they fail to work independently.  (Miller pp. 139-140; Miller Ex. 7.)  Home Lending Underwriters work out of an office, but can, and sometimes do, perform their job out of their homes.  (Whitacre pp. 50-51; Becker pp. 102-103.)  On average, Home Lending Underwriters interact with their supervisors about their job duties on a weekly basis, but sometimes not even that often.  (Whitacre, pp. 172-173; Becker p. 140.)

          **c.**       **Home Lending Underwriters Provide Training, Serve as Subject Matter Experts and Work on Special Projects.**

In addition to analyzing loan applications and deciding whether Huntington will take on the requested risk, another major component of the Home Lending Underwriter job, consistent with their primary duty of helping to control the amount and type of risk assumed by Huntington, is to provide underwriting training to Bank personnel, serve as subject matter experts and work on special project teams.  With respect to training, three of the Representative Plaintiffs made significant contributions:  Becker was part of the Sky Integration project, and as such, trained Sky Bank Underwriters who joined Huntington after a corporate acquisition (Becker pp. 124-125; Becker Ex. 10), Miller was a member of the Bank's "shadow" program where Home Lending Underwriters teach Bank Branch Managers about the different steps involved in underwriting, in an effort to make the process more transparent and streamlined (Miller pp. 115-116; Miller Ex. 5), and Lutz went to Huntington's Morse Road location once a week, for about three months, to train its Loss Mitigation personnel on underwriting, the federal government's Home Affordability Modification Program ("HAMP") and income calculations.  (Lutz pp. 106-107; Lutz Ex. 7.)

Home Lending Underwriters also serve as subject matter experts.  For example, Becker was the "go-to" person for Bank personnel outside the Consumer Group who had underwriting questions, and "was the go-to person that other branches would come to" for assistance with certain kinds of loans, "like, special mobile home loans, blind trusts, lands in trust, and different kinds of loans that other branches have never handled."  (Becker p. 126; Becker Ex. 10.) According to Becker, she would tell  Bank personnel:

> **How to set it up.  How to handle it legally.  What to do legally**.  Where to go in legal because there's [SIC] certain areas in southern Ohio that you have to handle loans.  They have to go through four different legal areas.  And so I would show them what areas that they need to handle, how they need to handle those.  And so I would do all that for those.

(Becker p. 127 (emphasis added).)

Because of their subject matter expertise, Home Lending Underwriters are prime candidates for special projects.  Lutz served on three high profile projects during his last few years of employment with Huntington.  (Lutz pp. 66-68, 127-128.)[11]  In 2009, Lutz was tapped to be part of an 8-member specialized underwriting team formed to review a high risk portfolio that came to Huntington as part of the Sky Bank acquisition.  (Lutz pp. 27-28.)  The specialized team was tasked with analyzing the portfolio, determining whether loans were in compliance with guidelines, and "trying to figure out what we were needing to do with this whole program of loans that were high risk."  (Lutz pp. 27-28, 124-125.)  As Lutz explained:

> I think we were all very excited at that point because **it was a high-profile situation** at the time and had a lot of upper management very involved in what we were doing and **wanting to know the resolutions we were coming up** with or

---

[11] The FLSA's statute of limitations is 2 years, unless Plaintiffs establish a "willful" violation extending the statute of limitations to 3 years.  29 U.S.C. § 255(a).  Plaintiffs filed their Complaint on November 28, 2012; thus, the relevant time period in this case is November 28, 2010, under a 2-year statute of limitations, or November 28, 2009, under a 3-year statute of limitations.  Under either scenario, Lutz was working in a special project role during the timeframe relevant to this lawsuit.

**what direction we were goin**g – or the **path we were taking to make these decisions and figure out** what we could do with these loans.

(Lutz pp. 125-126 (emphasis added).)

After Lutz finished the Sky Bank high-risk portfolio project, he transitioned to Huntington's HAMP team, where he was "trying to figure out what the government wanted us to do," under the new program.  (Lutz pp. 78-81.)  Lutz participated in conference calls with HAMP government agencies, Freddie Mac and Fannie Mae, to learn their guidelines and determine how to underwrite them.  (Lutz pp. 78-79.)  Part of this process was figuring out how to implement HAMP at Huntington, and Lutz assisted by testing and improving the underwriting waterfall and Excel spreadsheets Huntington eventually implemented to underwrite the program.  (Lutz pp. 78-79, 87-88, 102-106; Lutz Exs. 3, 7.)

Lutz next transitioned to Primary Lead Underwriter for the Consumer Underwriting Pilot, which was a program to restructure the consumer group to underwrite by stage (initial approval and final approval), rather than underwriting by geographic assignment.  (Lutz pp. 117-121.)  Lutz was selected as Primary Lead Underwriter for the project because of his "ability to minimize the risk" for the Bank.  (Lutz Ex. 8, p. 2.)  Lutz's role in the Consumer Underwriting Pilot "was telling them what was working successfully and what wasn't."  (Lutz p. 121.)  Lutz further explained that:

> We actually had meetings.  I believe that the sales manager, my manager – I believe both Bamy and Lori were involved in it.  Maybe [Loan Center Credit Manager] Mary Cline.  But, yeah, everybody, even the top managers that were involved in the whole transition or the whole pilot were in those meetings **and I gave them my feedback.  And they would ask me questions, too, of what was working and what wasn't.**

(Lutz pp. 121-122 (emphasis added).)  Lutz's recommendations were implemented, and resulted in changes that improved the flow of the underwriting process.  (Lutz Dep. 121-122; Lutz Ex. 8.)

Lutz continued on the Consumer Underwriting Pilot until he resigned from Huntington in December 2010.  (Lutz pp. 66-68, 127-128.)

### 2. Underwriting a Loan Application.

While training and special projects can constitute a major component of their responsibilities, Home Lending Underwriters spend the majority of their workday analyzing customer loan applications, and deciding whether Huntington will take on the loan risk. Plaintiffs' deposition testimony firmly establishes that Home Lending Underwriters make numerous judgment calls during the course of their analysis and must, in the quest to make the right risk decision, exercise discretion with respect to matters of significance.  (Becker pp. 44, 48-49, 50-51,70-71, 79, 120; Lutz pp. 92-93; Miller pp. 64-65, 67-68, 71-72, 76, 80, 91-93, 156.)

### a. Evaluating All Aspects of Loan Applications and Due Diligence.

Home Loan Underwriters are responsible for evaluating all aspects of the loan application, and conducting due diligence to confirm that the applications are complete, the information therein is accurate, and the requested loan has all of the necessary components to support the Home Lending Underwriters' risk decision.  (Miller pp. 58-59; Whitacre pp. 90-92; Whitacre Ex. 9.)[12]  The loan originator works with the customer and creates the application in either ACAPS (Consumer) or UNIFI (Mortgage).  (Whitacre p. 81.)  Loans are placed in the Consumer or Mortgage virtual underwriting queues for required underwriting analysis and decision. (Becker p. 45; Whitacre p. 84.)

Home Lending Underwriters review the loan information loaded into ACAPS and UNIFI,

---

[12] As Whitacre noted in her 2011 Performance Review "The PFG loans that I am currently doing are never easy, slam dunk loans.  They almost always require in depth review and calculations of self-employed income, and additional scanning and e-mailing for exception approval." (Whitacre Ex. 9, p. 6).

and compare it to the actual documents supporting the loan, to confirm accuracy. (Whitacre p. 91-92.) They "question" and "compare" information on the credit bureau with the application to confirm the customer has been truthful. (Becker Dep. 44, 51-52, 120.) For example, Home Lending Underwriters analyze various pieces of information to confirm the property address is truly the customer's primary residence, and not a rental property, because rental properties require different pricing and risk analysis. (Becker pp. 51-52; Whitacre pp. 149-150.)[13] They also confirm that all information necessary to make and support their underwriting decision is part of the application and identify certain materials to add to the file. (Miller pp. 57-58 ("Then you would have to decide if an appraisal is required. If so, then you had to make sure that an appraisal was ordered."))

Home Lending Underwriters note in ACAPS or UNIFI the information that still needs to be compiled for the file, and that information will vary based upon Underwriter, requested loan and customer. (Miller pp. 57-60; Lutz pp. 60-62; Whitacre pp. 121-122.) While ACAPS and UNIFI will automatically populate some information needed for the file, Home Lending Underwriters are responsible for identifying additional "conditions" that must be satisfied by the customer. (Lutz Dep. pp. 65-66.) These conditions come from a number of sources, including Huntington guidelines, investor guidelines and product profiles. (Whitacre pp. 121-122; Miller pp. 62-63.)[14]

---

[13] As Becker explained, "[y]ou check via the credit bureau report, you're **checking** whether there's other mortgages out there. You're **questioning** that. You're **questioning** whether there – the customer, if they've had multiple mortgages. You're **questioning** things like that. If this is possibly a rental property, if it's a first mortgage, so you're **checking** a lot of things off the credit report, **comparing** whether this customer is telling you this is their primary residence, **comparing** on the credit bureau their address versus what the credit bureau is telling you." (Becker pp. 51-52).

[14] Miller explained that a release of lien is an example of a condition that Underwriters put on files. (Miller Dep. pp. 60-61).

*Loan Processors*, who are not exempted from the FLSA's overtime requirements, are responsible for working with the loan originator and customer to collect the materials to satisfy the conditions Underwriters place on loan applications, *i.e.*, confirm the additional materials have been added to the file.  (Lutz pp. 61-62; Miller p. 62; Whitacre pp. 81-82, 117-118.)  If a customer cannot satisfy the underwriting "condition" the requested loan will not proceed, unless a different solution can be identified for the customer.  (Whitacre pp. 131-132.)  After the Loan Processor confirms that the additional information has been gathered, the application goes back to the Underwriter for further analysis.  (*Id.*, pp. 121-124; Becker pp. 67-66.)  Home Lending Underwriters must confirm that all conditions have been collected, "clear" the conditions and confirm that the loan can be further analyzed.  (Whitacre pp. 129-130; Becker pp. 67-68.)  Home Lending Underwriters will typically work on a loan application 4 to 5 times, sometimes 6 times, before making a final risk decision.  (Whitacre pp. 116-117.)

### b.  Discretion to Put Stipulations on Loan Applications

Home Lending Underwriters independently decide whether to put "stipulations" on files that must be satisfied by customers in order to proceed with the requested loan.  (Becker pp. 60-61.)  Stipulations are not on a checklist or set forth in other materials – **stipulations are based on Underwriter experience and preference**.  (Miller Dep. pp. 72-73 ("No, [stipulations] are not in guidelines.  But, yes, they are experiences from the number of years.")  Accordingly, not all Home Lending Underwriters will put the same stipulations on a file.  (Miller, pp. 67-68.)  Experienced Underwriters often require more stipulations for "safeguard."  (Becker pp. 53-54; Miller p. 72.)  As Becker explained:

> Q:     And how did you know those additional stips that you would want to have in the application that were not designated by STRATA?
>
> A:     **It was something that because of the application that I felt that I needed on top of it, that I felt that I needed extra – that I needed backup**

**for.**

> Q:    Do you ultimately have to be in a position to defend your underwriting decision?
>
> A:    Yes.
>
> Q:    So does it come back to this notion of wanting to have backup because it's going to go into the decision that you make and your ability to defend it?
>
> A:    Yes.

(Becker p. 61 (emphasis added).)  Stipulations are not set forth in guidelines, but rather are items that Home Lending Underwriters feel are "warranted."  (Miller p. 64.)  For example, if a customer has a delinquent credit card, Miller might stipulate that they must pay off the credit card to continue with the loan review.  (*Id.*)  Miller views stipulations as an opportunity to "help the customer in the long run."  (*Id.*, p. 68).  Stipulations independently placed on files by Underwriters **cannot be ignored**.  (*Id.*, pp. 68-70).

### c.    Discretion to Make Exceptions and Identify Compensating Factors and Counter-Offers.

Keeping in mind the ultimate goal to make the right risk decision, Consumer Underwriters can exercise discretion to make "exceptions," and approve a requested risk, even though the customer may not otherwise satisfy all criteria for a particular loan.  (Becker pp. 57-58.)  Consumer Underwriters can independently exercise 2 to 3 exceptions on each application without consulting their managers.  (*Id.*, pp. 56-57, 70-71; Miller pp. 157-158; Cline Ex. 12).[15] Thus, if a customer does not quite meet all criteria for a particular loan, a Consumer Underwriter

---

[15] The terms "exception" and "adjustment" are used interchangeably by some of the Representative Plaintiffs to describe the same exercise of discretion.  (Miller Dep. pp. 156-157). Becker confirmed that she could make up to two exceptions on a file, and that she never had a manager come and question her about the exceptions.  (Becker Dep. p. 82).  Miller confirmed that he had authority to make up to three adjustments on a file without seeking supervisor input. (Miller Dep. p. 157).

can still approve the request. (*Id.*)  Consumer Underwriters review certain factors when considering whether they will exercise their exception discretion, including customer history with Huntington, reserves, reasons for derogatory credit, assets with Huntington, pay history and time at residence and job. (Becker pp. 57-58; Miller p. 92; Lutz pp. 95-97.)[16]

Consumer Underwriters **do not have to** exercise their exception discretion in any particular situation.  Whether Consumer Underwriters make an exception comes down to whether they think it is appropriate.  (Becker pp. 58, 125; Becker Ex. 10; Miller pp. 91-92.)  Thus, as Becker testified, she would exercise her exception discretion "[i]f it was something I felt comfortable with."  (Becker pp. 71-72.)  In July 2010, Miller received a 30-day Individual Improvement Plan (IIP), in part, because he was not exercising his exception authority.  (Miller pp. 136-137; Miller Ex. 7.)  The IIP instructed Miller to improve his performance by implementing "behavior goals," including using his exception authority.  (Miller Ex. 7.)  Miller confirmed that he started exercising his exception authority, and met the expectation set forth in the IIP.  (Miller pp. 137-139; Miller Ex. 8.)  In sum, exercising exception discretion in appropriate circumstances is absolutely a job expectation for Consumer Underwriters.

Home Lending Underwriters also have the ability to identify compensating factors that might make up for a loan application deficiency.  (Whitacre pp. 111-112; Lutz pp. 95-97.)  For instance, United States Department of Agriculture (USDA) loans have certain debt-to-income (DTI) parameters, but if a customer's DTI is too high, there may be compensating factors that Mortgage Underwriters identify.  (Whitacre pp. 110-111.)  Such compensating factors include high reserves, high credit score, and recent college graduate starting a new job.  (Whitacre p.

---

[16] Whitacre recalls that a few years ago Mortgage Underwriters could independently exercise exceptions, but is uncertain whether she can do so any longer.  (Whitacre pp. 108-109).  Whitacre confirmed, however, that Mortgage Underwriters exercise their discretion to *recommend* exceptions to their supervisors.  (Whitacre pp. 107-108).

114.)  Mortgage Underwriters identify compensating factors as both a means to approve a loan, and to supplement support for their credit decisions.  (Whitacre pp. 113-116.)

The ability to identify and make counter-offers of acceptable risk is also within Home Lending Underwriters' discretion.  More specifically, after analyzing loan applications, Home Lending Underwriters sometimes determine that Huntington will not accept risk under X terms but, instead, will accept risk under Y terms.  (Becker pp. 79-80; Lutz pp. 56-57.)  As Miller explained:

> So a counteroffer[] would be anything that would change the initial loan application that was – that will still give the customer the best advantage of the loan that they were requesting.

(Miller p. 76.)  The counter-offer is not suggested by ACAPS, UNIFI or any other reference material; rather, Home Lending Underwriters identify an appropriate counter-offer based upon their experience and knowledge, and what they deem as acceptable risk that best matches the customer's needs.  (Whitacre pp. 146-147; Miller p. 141.)  The Loan Processor or loan originator is responsible for working directly with customers to see whether the counter-offer is acceptable to them.  (Becker p. 79; Whitacre pp. 145-146.)

### d.      Acting in Customer's Best Interest.

As the loan analysis progressives, Home Lending Underwriters are responsible for identifying suspicious loan applications and applications that do not otherwise appear to be in the customer's best interest:

> Q:      Well, was part of your job at Huntington looking at what was in the customer's best interest?
>
> A:      It was looking at – **well, you were trying to make sure that we were looking out for the customer's and the bank's best interests as well.**
>
> Q:      And with respect to a customer and the customer's best interest, did you ever see any loan applications that you felt were not in the customer's best interest as they were currently presented, but something else might work

better for the customer?

> A:      Well, you're always having to – I mean, **there were certain regulations that you have to look after for certain people, like the elderly**.  If they've got two years left to pay off their loan and they were being put on a 30-year note, that's going to raise a red flag and a concern of why are they doing that.  Does the customer realize what they're doing.  Also it might be something that the bank might not want to take that risk on for either.

(Lutz Dep. pp. 72-73 (emphasis added).)  In such circumstances, Home Lending Underwriters must inquire further to get a legitimate explanation for the loan request; otherwise, they should not proceed with considering whether the Bank will accept that loan.  (Becker Dep. pp.77-78.)

Other times, the Home Lending Underwriters' analysis identifies collateral that does not fit the requested loan, and requires modification:

> Q:      Did you ever have an experience where the collateral did not fit the application?

> A:      Yes.

> Q:      Can you tell me about that?

> A:      Sometimes the collateral would be a mobile home without land, and the application would be a consumer first, which you could not have a mobile home without land for a consumer first.  **So that product did not fit that type of application.**  That happened a lot.  And so that application would have to be denied.  And sometimes you would put in a mobile home with land as a consumer first and it would not be in a mobile home park and it had to be in a park.  **And so there were a lot of different things with mobile homes, especially with mobile homes.  They were always put on wrong.**

(Becker Dep. pp. 54-55 (emphasis added).)  This underscores the critical nature of the Home Lending Underwriters' due diligence.  Their careful analysis allows them to identify inaccuracies not picked up by ACAPS or UNIFI, because those programs cannot see nor understand details like Home Loan Underwriters can, and do.  (Becker pp. 55-57, 120; Whitacre pp. 93-94).

The Home Loan Underwriters' job does not stop after the wrong collateral is identified; they also work to find potential solutions to the problems.  (Becker p. 55; Miller pp. 66-67):

Q:     But could you ultimately process a loan application with a mobile home as collateral?

A:     Only if we could confirm it was deeded real estate, because it had to be on what they call a permanent foundation to be deeded as real estate.

Q:     And are these alternatives that you would discuss with the branch personnel?

A:     Yes.

(Miller p. 67.)   Thus, the Home Lending Underwriters' analysis is critical to protecting Huntington's and its customers' best interests, spotting potential fraud, and identifying inaccuracies that substantially impact the analysis.

### e.      Binding Huntington to Requested Risk.

The Representative Plaintiffs admitted that they make complex credit decisions and ultimately decide whether to bind Huntington to the requested loan risk.   Home Lending Underwriters' decisions are significant to both Huntington and its customers:

- Becker:  "[ACAPS] is a system that's used to run between the branches and the bank to initialize the loans.  The branches put the applications on, and the applications are actually entered in and they come directly to the bank, and the bank looks at the actual application and the applications are entered.  We look at the applications, we look at the credit, we look at all the information.  **We make a decision**.  The decision is made.  At that point we either approve the loan based on the credit, the information that we have as far as income.  **You either approve it, turn it down**.  If you turn it down it goes back to the branch as a turndown.  If you approve it then it goes under processing where they order the vendor work." (Becker p. 44 (emphasis added).)

    "Everything is on ACAPS.  So when they pull the applications they pull everything.  So everything is there for you to look at. **So you make a decision based off everything that you pull up that pulls with the application.  So you're making a decision based off that**. (Becker p. 49 (emphasis added).)

    Properly assessing risk is very important to Huntington, accepting too much risk or bad risk effects Huntington's business, and credit decisions can negatively impact Huntington's customers.  (Becker p. 140; Becker Exs. 12, 14.)

- Miller:  Admitting that he was ultimately responsible for making the right decision on whether to approve or deny a loan, and making the determination of whether the loan is

the kind of risk that the Bank will accept, or not accept. (Miller p. 142.)

- Lutz: Testifying that he was "[u]ltimately making the [underwriting] decisions based on the guidelines that Huntington had," and admitting that he made "**complex credit decisions**" including for "self-employed people. A lot of the Underwriters didn't have the knowledge to look at tax returns or were afraid to, they weren't comfortable. **I felt like I was comfortable. I looked at enough of them to feel that I was able to look at them and make a decision.**" (Lutz pp. 92-93 (emphasis added).)

- Whitacre: Admitting that she has to put her own approval decision on a file, it cannot just be run through an automated underwriting system. (Whitacre pp. 181-182.) Confirming that her underwriting role is critical because she makes decisions about the risk the Bank will accept, and has authority to bind the Bank up to one million dollars. (*Id.*, pp. 173-174).

Plaintiffs testified about the variety of resource tools that assist them in the performance of their jobs, including Huntington and agency guidelines and product profiles. (Lutz pp. 51-52, 57, 78-79, 92-93; Becker pp. 42-43; Whitacre pp. 75-96.) Home Lending Underwriters are required to understand and work within the parameters of these nuanced, and high-level guideline materials, even though they change on a weekly, and sometimes, daily basis. (*Id.*) As Becker confirmed, however, these materials are "guidelines" – Home Lending Underwriters are still required to use their discretion and independent judgment when making their ultimate risk decisions. (Becker Dep. pp. 120, 144.)

Plaintiffs also testified about the automated underwriting software that provides *suggested actions* on loan applications. Regardless of the specific automated underwriting software, the effect is the same – these programs provide Home Lending Underwriters with *suggestions*, their discretion and independent judgment is not replaced. The Representative Plaintiffs admitted they **override the automated underwriting software suggestion**. As Becker explained:

> Q: And then **you had to override it and make your own decision** because with mortgage loans it was more complicated because you needed to look at the credit, you needed to look at the income, you needed to order more stips on it. **So you**

21

**had to make your own decision. And there's lots of time that ACAPs would tell you to conditionally approve it, but when you were looking at it the credit wouldn't work, or the income wouldn't work based – the debt to income would be too high so you would have to turn it down**.

Q:     And so that's when you would override it?

A:     Yeah. You would override it and turn it down.

Q:     And what was the process for overriding it?

A:     You would just turn it down.

Q:     **Did that prompt any kind of review by a manager?**

A:     **No.**

(Becker pp. 120-121; Cline Ex. 12 (emphasis added).)  Miller confirmed there were times that he would decide to decline a loan, even though ACAPS suggested he could approve the loan (Miller pp. 158-160), and Whitacre further confirmed that Mortgage Underwriters can override an "approved" suggestion from the automated desktop software, and ultimately deny the loan application.  (Whitacre, pp. 160-161.)  Thus, Home Lending Underwriters are not required to, and do not always, follow the automated underwriting software suggestion.

Finally, not all loan applications go through an automated underwriting program and, at times, even if they do, Mortgage Underwriters must still manually underwrite the file.  (Whitacre pp. 93-94.)  For example, applications for Huntington's "Doctors Only" program are not run through an automated underwriting program; rather, the Mortgage Underwriter manually underwrites the file pursuant to the product profile, and approves the risk after determining the requested loan meets all of the guidelines.  (*Id.* pp. 83-84, 105-107.)  In addition, FHA's automated underwriting program will give a "refer" or "refer eligible" suggestion, stating that the "loan is being referred to a DE Underwriter for complete review."  (Whitacre, p. 93.)  The "refer" requires the Mortgage Underwriter to "make sure [the loan] really does meet their

22

guidelines because they can't see from the information they have that it's okay." (*Id.*, pp. 93-94). A "refer" from FHA's automated underwriting software also means it is "[le[ft] to the Underwriter's discretion to determine whether [the loan] is insurable or not." (*Id.*, p. 95).

        **f.**      **Defending Risk Decisions and Identifying Decline Reasons**

Home Lending Underwriters are ultimately responsible for defending the risk decisions they make, regardless of whether they approve or deny the requested loan:

> Q:    Do you ultimately have to be in a position to defend your underwriting decision?
>
> A:    Yes.
>
> Q:    So does [having stipulations] come back to this notion of wanting to have backup because it's going to go into the decision that you make and your ability to defend it?
>
> A:    Yes. (Becker p. 61.)
>
> ***
>
> Q:    Were you responsible for being able to defend the decisions that you were making?
>
> A:    Yes, you should be responsible for those, yes. That's what an Underwriter's job is. (Lutz p. 77.)
>
> ***
>
> Q:    And do you feel that you need to be able to personally defend the decisions that you make?
>
> A:    Yes.
>
> Q:    And why is it important that you can defend the decisions you make?
>
> Q:    Well, if I can't, then I'm not doing my job. It's just as simple as that. (Whitacre p. 175.)

Home Lending Underwriters input notes in ACAPS and UNIFI detailing the thought process supporting their decisions, which later assists them to recall the basis for their decisions

if questioned, and allows others access to their thought process in the event that loans to which they bind Huntington, do not go as planned.  (Whitacre pp. 118-120.)

Home Lending Underwriters also independently select the reasons why they deny a requested loan, which is reported to the federal government and set forth in customer denial letters.  (Whitacre pp. 154-156, Becker pp. 69-70.)  It is critical that Home Lending Underwriters choose the right reasons for the denial, and will rely upon their experience in the industry to identify the strongest reasons for the denial.  (*Id.*)

## IV.     **LEGAL ARGUMENT**

### A.     **Legal Standard for Proving the Administrative Exemption.**

Exemptions under the FLSA are an affirmative defense to overtime liability, and accordingly, Huntington bears the burden of proof.  *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 740 (6th Cir. 2000).  Although exemptions to the FLSA are "narrowly construed,"[17] *Jastremski v. Safeco Ins. Cos.*, 243 F. Supp.2d 743, 747 (N.D. Ohio 2003), Huntington does not bear a "higher" burden of proof with respect to this defense.  *Id.*; *see Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 575-76 (6th Cir. 2007) (reversing summary judgment for plaintiff, granting summary judgment to defendant and holding that previous case law "does not heighten [defendant's] burden when moving for summary judgment" in an exemption case).  Rather, Huntington need only show by a preponderance of the evidence that its Home Lending Underwriters are properly considered exempt from the FLSA's overtime rule.  *Id.* at 576.  Once the parties establish the undisputed facts regarding an employee's primary duty, "the question of whether [those] activities fall within an exemption is a question of law" for the Court.

---

[17]  "[G]eneralizations about interpretation, such as that exemptions from remedial statutes should be narrowly construed, are at best tie-breakers[.]"  *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177 (7th Cir. 1987).

*Jastremski*, 243 F. Supp.2d at 747; *see also Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

The fact that the parties may dispute the legal consequences of undisputed facts does not create an issue for trial. *Jastremski*, 243 F. Supp.2d at 747. Plaintiffs' testimony, consistent with Huntington's view of the Home Lending Underwriters' purpose, establishes this job's primary duty. The Court must only apply the law to these undisputed facts to determine Plaintiffs' exempt status. *See Murray v. Ohio Casualty Corp.*, No. 2:04 CR 539, 2005 U.S. Dist. LEXIS 41374, at *9 (S.D. Ohio Sept. 27, 2005) (granting summary judgment to defendant; "Whether or not Plaintiff is properly designated as an administrative exempt employee is a decision within the sole province of this Court to make.").

### B. Huntington's Home Lending Underwriters Fall Squarely Within the FLSA's Administrative Exemption from the Act's Overtime Requirement.

#### 1. The Statutory and Regulatory Framework.

The FLSA provides that an employee must receive overtime pay if he works more than forty hours in a week. 29 U.S.C. § 207(a)(1). The statute exempts from the maximum hours requirement, however, "any employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). By interpretive regulation, *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), the DOL has further described the scope of the administrative exemption as follows:

(1)  An employee must be compensated on a salary or fee basis at a rate of not less than $455 per week, exclusive of board, lodging, or other facilities;

(2)  The employee's primary duty must be the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3)  The employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

The first "prong" of this administrative test focuses on how Huntington compensates its Home Lending Underwriters.  The second two prongs of the test consider the Home Lending Underwriters' function within Huntington − what they do, and why they do it.  Both questions focus on the position's "primary duty," and accordingly, the Court's analysis, based upon this undisputed record, must first define the Underwriter's "primary," "main," or "principal" responsibility.  Once the primary duty is identified, the Court first considers the *type* of work, whether Home Lending Underwriters support Huntington's general business operations, and second, the *level* or *nature* of the work performed, analyzed in terms of the Home Lending Underwriters' ability to exercise independent judgment and discretion with respect to matters of significance.  Each prong of this administrative test is discussed below.

**2.      Huntington Satisfies the Salary Basis Test.**

First, Huntington must meet the salary basis test.  Here, the Representative Plaintiffs testified unequivocally that they received a salary every week, regardless of the number of hours worked.  (Becker pp. 34-36, 104, 112, 110-111; Miller pp. 29-30, 165-166; Lutz pp. 25-26, 129, 131; Whitacre pp. 42-43, 65-67.)  On an annual basis, these salaries ranged from $52,376.50 to $71,000.00 -- plainly rates not less than $455 per week.  (Becker Ex. 8, Lutz Ex. 11, Miller Ex. 9, Whitacre pp. 182-183.)  The first prong of the administrative exemption is satisfied.

**3.      Huntington Satisfies the Primary Duty Test.**

**a.      Identifying the Primary Duty of Huntington's Home Lending Underwriters.**

As noted above, the "primary duty" drives the Court's consideration of the second and third prong of the administrative test.  The regulations define "primary duty" as "the principal, main, major, or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, **with the major**

26

**emphasis on the character of the employee's job as a whole**." 29 C.F.R. § 541.700 (emphasis added). Factors to consider include: (1) the importance of the employee's primary duty compared with other duties; (2) the amount of time the employee spends performing exempt work; (3) the employees' relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for other duties performed by the employee. *Id.*

The undisputed record here establishes that the Home Lending Underwriters' "primary duty" is evaluating the creditworthiness of customers applying for home loans, and deciding whether the Bank will take on the risk of the loan. *See, e.g., Edwards v. Audubon Ins. Group, Inc.*, Case No. 02-cv-1618, 2004 U.S. Dist. LEXIS 27562 at **14-15 (S.D. Miss. Aug. 31, 2004) (granting summary judgment to defendant; Underwriter's decisions resulting in providing millions of dollars in insurance coverage, thereby exposing employer to millions in losses, was the "primary duty" of "substantial importance"); *see also Maddox v. Continental Casualty Co.*, Case No. 11-cv-2451, 2011 U.S. Dist. LEXIS 151085 at *12 (C.D. Cal. Dec. 22, 2011) (granting summary judgment to defendant; recognizing the Underwriter's duties of "substantial importance" to include assessing insurance risk and determining whether those risks were acceptable to the company).

With respect to their decisions, Plaintiffs may claim that they merely apply various guidelines and follow suggestions from the automated underwriting software, but, as they admitted at their depositions, their decisions to bind Huntington to millions of dollars of risk require much more than that. This primary duty consists of multiple tasks and responsibilities, including evaluating all aspects of the loan applications; due diligence to ensure accuracy and completeness; identifying stipulations to be satisfied by potential customers to support risk

decisions; deciding whether to make exceptions for customers who may not otherwise qualify for the requested loan; deciding whether Huntington can make counter-offers if the requested risk is too great, and the terms of any counter-offer; understanding ever-changing protocols applicable to home lending, and working within those parameters; assessing whether the loan will be sellable on the secondary market; identifying suspicious loan applications and flagging them for investigation; applying guidelines to determine whether the loan product selected by the loan originator fits the customer; documenting support for their credit decisions; deciding whether Huntington will accept the risk of the requested loan; and, selecting appropriate decline reasons for government and customer reporting purposes.  Home Lending Underwriters also serve on special project teams that search for solutions to improve the underwriting process, train Loss Mitigation and other Bank personnel on underwriting, and serve as subject matter experts.  *See* Section II. C, *supra*.

Home Lending Underwriters spend virtually all of their time engaged in activities associated with their primary duty, and they do so under minimum supervisory control.  *See Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 537 (7th Cir. 1999) (plaintiff's admission that he received very little supervision relevant to primary duty inquiry).  In sum, and looking at the job as a whole as required by 29 C.F.R. § 541.700(a), the reason the Home Lending Underwriter job exists is because of the inherent risk in extending credit to home purchasers who are seeking mortgage financing and, to control the risk to Huntington and its investors, Home Lending Underwriters evaluate these potential borrowers' creditworthiness, make sound credit decisions, and decide what risk Huntington will assume in the best interest of the Bank.

### b. Home Lending Underwriters' Primary Duty Consists of Office or Non-Manual Work That Is Directly Related to Huntington's General Business Operations.

#### (1) The Regulatory Guidelines.

The first "duties" prong of the administrative exemption examines the "*type* of work" performed by the employee.[18]  *See* 29 C.F.R. § 541.201(a) (italics added).  Duties that are "directly related to the management or general business operations" are described as work that is "related to assisting with the running or servicing of the business, as distinguished . . . from working on a manufacturing production line or selling a product in a retail or service establishment."  *Id.*  Illustratively, this test sets forth the "so-called administrative/production dichotomy," *see Jastremski*, 243 F. Supp.2d at 753,[19] which distinguishes between (1) employees who service the business, by "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control[,]" and (2) "those employees whose duties are related to the day-to-day production of the goods or services the employer sells."  69 Fed. Reg. at 22141.  *See also Murray*, No. 2:04 CR 539, 2005 U.S. Dist. LEXIS 41374, at *14.

Notably, the regulations specifically address the rendering of credit decisions, and classify such work as exempt, administrative work:

> A credit manager who makes and administers the credit policy of the employer, establishes credit limits for customers, authorizes the shipment of orders on credit,

---

[18]  Plaintiffs cannot reasonably argue that they do not perform "non-manual" work.  *Cameron v. Abercrombie & Fitch Co*., Case No. 2:10-cv-631, 2012 U.S. Dist. LEXIS 131557 (S.D. Ohio Sept. 14, 2012) (no genuine issue of material fact that primary duty was non-manual work where employee admitted that during "the entirety of [her] employment, [she] performed office-type work primarily . . . paperwork, working on a computer, meetings, those sorts of things").

[19]  The *Jastremski* court discussed this dichotomy by reference to the pre-August 2004 regulations, *see* 243 F. Supp. 2d at 753 (citing 29 C.F.R. § 541.205(a)), which contained the same language distinguishing between "administrative operations" and "production" duties.  *Id.* at 751.

and makes decisions on whether to exceed credit limits would be performing work exempt under § 541.200.

*See* 29 C.F.R. § 541.703(b)(7).

The regulations further explain that "[p]urchasing agents with authority to bind the company on significant purchases generally meet the duties requirements for the administrative exemption even if they must consult with top management officials when making a purchase commitment for raw materials in excess of the contemplated plant needs." *See* 29 C.F.R. § 541.203(f).

The DOL's illustration of exempt financial services employees provides that:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.

29 C.F.R. § 541.203(b).  While none of these positions are "Underwriters," analogies need not be perfect; the position need only be "somewhat analogous" to an occupation exempted in the regulations.  *Shaw v. Prentice Hall Computer Publ'g*, 151 F.3d 640, 645 (7th Cir. 1998) (affirming summary judgment for defendant; systems analyst interpretive guidance supported finding that production editor was bona fide administrative employee).

### (2)  Home Lending Underwriters Service Huntington's General Business Operations.

Based upon this factual record, there can be no reasonable dispute regarding the "type of work" performed by Home Lending Underwriters, and whether that work relates to Huntington's "general business operations."  Huntington is in the business of, among other things, providing home loans to customers.  *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (holding insurance company's business is to produce insurance policies).  Home Lending

Underwriters do not create, market nor sell these loan products; thus, they cannot be fairly characterized as "production employees."  *See Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 645 (6th Cir. 2013) (affirming judgment for defendant; where employer was in the business of creating and marketing insurance policies to the public, Special Investigators who did not create or sell insurance policies could not be characterized as "production" employees); *see also Cameron*, 2012 U.S. Dist. LEXIS 131557, at *14 (quality control employee who did not work on a production line, and who was not involved in the manufacturing or selling of products as contemplated by the regulations, was not a "production" employee, but rather her primary duty fell within the administrative exemption).

The regulations describe work "directly related to" management or business operations as including, but not limited to, "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).  Home Lending Underwriters' credit evaluations and decisions – which help ensure that Huntington's loan portfolio does not exceed specific risk levels – is similar to a number of these functional areas.  Each of these functional areas includes the ability to make decisions affecting the company's business, policies and customers.  The ability to take action on behalf of an employer is a logical narrowing principle for these functional areas.  *See Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 874 (C.D. Cal. 2012) (noting that, for an employee's work to affect policy or for him to carry out policy, he would likely be tasked with decision-making authority).  Functionally, Huntington's Home Lending Underwriters apply Huntington's

credit policy, evaluate risks and determine the acceptability of those risks. Their work binds Huntington and its investors to millions of dollars of potential loss – akin to the administratively exempt Credit Manager and Purchasing Agent positions in the regulations. 29 C.F.R. §§ 541.203(f); 541.703(b)(7).

Furthermore, work that "services" or is "ancillary" to an employer's principal production activity is deemed exempt administrative work. *See Renfro v. Indiana Mich. Power Co. (Renfro I)*, 370 F.3d 512, 517 (6th Cir. 2004) ("When employees engage in work that is 'ancillary to an employer's [or the employer's customer's] principal production activity,' those employees are administrative."). In *Renfro*, the Sixth Circuit determined that the planners' primary duty was to create plans for maintaining electrical equipment and systems at the nuclear power plant. *Id.* Because this primary duty was ancillary to AEP's principal production activity, which was generating electricity, the court in Renfro held it to be administrative. *Id.*; *Adams v. United States*, 78 Fed. Cl. 536, 542 (Fed. Cl. 2007) (indicating that administrative exemption applies to employees whose position provides a service ancillary to the primary function of the organization for which they work).

Here, Plaintiffs cannot establish a triable issue of fact with respect to Huntington's home lending business, and the Home Lending Underwriters' role. Huntington is in the business of providing home loans to customers. Office work performed by Home Lending Underwriters that is "directly related" to the management of its business, including work that "services" the home lending business, is properly characterized as administrative, rather than "production" work. Huntington's Home Lending Underwriters service its core business function by analyzing customer requests for loan products, and deciding whether the bank will accept the risk of the requested loan. This is administrative work. *See Maddox*, 2011 U.S. Dist. LEXIS 151085 at *13

(Underwriter administratively exempt; concluding Underwriter performed work "directly related to management policies or general business operations," and that Underwriter performed work "akin" to "servicing" a business); *see also Edwards*, 2004 U.S. Dist. LEXIS 27562 *19 ("The undisputed evidence establishes that Underwriters have significant autonomy and a primary duty directly related to general business operations and a substantial importance to Audubon and its customers.  Underwriters decide what risks the Company would take and at what price, which is clearly exempt work."); *Harper v. GEICO*, 09-cv-2254, 2013 U.S. Dist. LEXIS 15793, **25-26 (E.D.N.Y. Nov. 4, 2013) (granting summary judgment to defendant; Telephone Claims Representatives who reviewed claims and made decisions and recommendations about amounts GEICO paid on claims performed an administrative function "servicing" GEICO's general insurance business operations).

The industrial age production/administrative dichotomy offers only limited analytical usefulness in the modern service-industry context.  *See Caveness v. Vogely & Todd, Inc.*, Case No. 3:10-0650, 2011 U.S. Dist. LEXIS 98144, **9-10 (M.D. Tenn. Aug. 30, 2011) (concluding that the antiquated production/administrative dichotomy is of limited use).  Indeed, the DOL regulations, as revised in 2004, suggest a more traditional meaning of "production" and state that "directly related" means employees who "assist[] with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Home Lending Underwriters are obviously neither working on a manufacturing line nor "producing" anything in the literal sense.  They are service Huntington's business, and the service they provide is evaluating and making risk decisions for the Bank.

          **c.**     **Home Lending Underwriters' Primary Duty Includes the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance.**

          **(1)**     **The Regulatory Guidelines.**

The final administrative test examines "the *level* or *nature* of the work performed." 69 Fed. Reg. at 22144 (italics added). Plaintiffs will likely minimize their role, arguing that they had no authority to act independently or exercise their own judgment, and therefore, Huntington cannot meet its burden with respect to this test.[20] The application of the administrative exemption cannot turn on how a plaintiff chooses to characterize his job. The DOL itself concedes that the "judgment and discretion" test is confusing and causes unnecessary litigation, 69 Fed. Reg. at 22142, and its most recent regulatory revisions were intended to "make the standard easier to understand and apply to the 21st Century workplace." *Id.* Under the revised regulations, "the exercise of discretion and independent judgment" is generally defined as "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). This general concept "must be applied in the light of all the facts involved in the particular employment situation," *id.*, and the DOL has identified the following factors that may be considered in this assessment:

> Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree . . .; whether the employee has authority to commit the employer in matters that have

---

[20] Plaintiffs must do more than simply argue that they were "automatons" or "robots" that never exercised their own judgment when making risk decisions. *See, e.g., In Re Novartis Wage and Hour Litigation*, 593 F. Supp.2d at 657 (rejecting plaintiffs' argument that they acted "as mere 'robots' or 'automatons' who enjoy[ed] no room to act with discretion or independent judgment within the stringent confines" of the employer's rules; "[t]hese labels are not facts, but merely arguments designed to avoid the overtime exemptions.").

significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handing complaints, arbitrating disputes or resolving grievances.[21]

29 C.F.R. § 541.202(b).  Furthermore, although the exercise of discretion and judgment "implies" that the employee has the right to "make an independent choice, free from immediate direction or supervision[,]" employees may still exercise discretion even if their decisions or recommendations are reviewed at a higher level.  29 C.F.R. § 541.202(c).

The question as to whether Home Lending Underwriters exercise independent judgment and discretion cannot be answered by reference to job titles alone.  *See* 69 Fed. Reg. at 22144 (DOL regulations do not rely on job titles alone to determine whether a position is exempt; "[r]ather, there must be a case-by-case assessment to determine whether the employee's duties meet the requirement for exemption.").  Here, Plaintiffs' admissions demonstrate by at least a preponderance that Home Lending Underwriters at Huntington affect, interpret and implement management policies or operating practices; carry out major assignments; perform work that affects business operations to a substantial degree; have the authority to commit Huntington in matters that have significant financial impact; have the authority to deviate from policies and procedures without prior approval; and have the authority to negotiate and bind the company on significant matters − *i.e.*, they routinely exercise a high level of discretion and independent judgment and, therefore, are exempt administrative employees.  *See* Section II.C., *supra*; *see also In Re Novartis*, 593 F. Supp. 2d at 646 ("'Federal courts generally find that employees who meet

---

[21] As noted by the DOL, "[f]ederal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment[.]"  69 Fed. Reg. at 22143.

at least two or three of these factors are exercising discretion and independent judgment")
(quoting DOL 2004 Final Rule, 69 Fed.Reg. at 22143).

> **(2)  The Undisputed Material Facts Establish that Home Lending Underwriters Routinely Exercise Their Judgment and Discretion in the Performance of Their Primary Duty.**

Huntington's Home Lending Underwriters share the same duties as other Underwriters who federal courts have found exercised the required judgment and discretion for the administrative exemption, including "discretion in utilizing underwriting authority;" "committing [employer] in substantial respects financially;" "mak[ing] the ultimate decision to approve the loan;" "when a loan did not meet certain criteria . . . offer[ing] other information that might make the loan work;" "analyzing mortgage applications to determine whether a particular application matched a particular lender;" and "deciding whether a particular loan . . . could be accepted or rejected outright, or whether it needed additional approval." *Havey v. Homebound Mortgage, Inc.*, Case No. 03-cv-313, 2005 U.S. Dist. LEXIS 27036 **21-22 (D. Vt. July 21, 2005) (granting summary judgment to employer finding mortgage Underwriter administratively exempt); *Edwards*, 2004 U.S. Dist. LEXIS 27562 *20 (same).

In *Havey*, the federal court found the mortgage Underwriters administratively exempt, and rejected claims that their job was automatic because they had to abide by guidelines; input information into the automatic underwriting software; and, check boxes on a form which determined whether a loan would be approved or denied.  2005 U.S. Dist. LEXIS 27036 *18. The court was instead persuaded by plaintiff's admission that "sometimes you just need to percolate on it for a while and, you know, think about what's in the file to be sure that you are meeting the guidelines."  *Id*. at *21.  Per the court, "[i]f the process were truly automatic, there would be no need to 'percolate.'"  *Id*.  Similarly, in this case, Becker testified that"

> **with mortgage loans it was more complicated** because you **needed to look at
> the credit**, you **needed to look at the income**, you **needed to order more stips**
> on it.  **So you had to make your own decision**.

(Becker p. 120 (emphasis added).)

Ultimately, the *Havey* court concluded that mortgage Underwriters responsible for
"reviewing and clearing credit, income and asset conditions by determining that documentation
provided meets Investor Guidelines;' determining the reasonableness of a specific appraisal by
comparing it with comparable properties; determining the degree of risk of each loan; analyzing
new loans to ensure proper programs were selected; making counter-offers if necessary; advising
processing and sales staff if additional documentation was required; and recommended action on
each loan" were administratively exempt because:

> [A]lthough the Underwriters relied on the procedures to guide their decisions,
> they still had to determine into which guidelines a particular loan fit, seek
> additional information as necessary, and ensure that the proper program was
> selected.  The fact that an automated program guided their decision-making
> process or directed loan approval is not sufficient to permit a jury to find that
> Plaintiffs exercised no judgment and discretion in their duties. All of these
> decisions were made with relatively little supervision, and are sufficient to meet
> the duties test.

*Id.* at *22-23.

In *Edwards*, a federal court determined that an insurance Underwriter exercised the
requisite discretion and independent judgment because, "[b]y his own admission, Edwards had
discretion in utilizing his underwriting authority, which he used to commit Audubon 'in
substantial respects financially."  2004 U.S. Dist. LEXIS 27562 *20.  In finding that "[i]nsurance
underwriting clearly involves the exercise of discretion and independent judgment," the *Edwards*
court analyzed the issue of risk – inherent in both insurance and mortgage underwriting.
*Edwards*, 2004 U.S. Dist. LEXIS 27562 *22.  For Underwriters, "risk is the 'possibility of
financial loss,'" and, since no one can predict the future, Underwriters are tasked with making

37

good risk decisions to hopefully prevent financial loss. This "hope" demonstrates that an Underwriter job inherently includes the exercise of discretion and independent judgment. *Edwards*, 2004 U.S. Dist. LEXIS 27562 *22.

In another federal case, the court determined that a "middle market" insurance Underwriter regularly exercised discretion and independent judgment with respect to matters of great significance, and with potentially significant consequences to his employer. *Maddox*, 2011 U.S. Dist. LEXIS 151085, *16. Specifically, "in making underwriting decisions within the scope of his authority," the insurance Underwriter "had exclusive discretion to evaluate risks," "determine their acceptability," used "a variety of resources and tools in order to assist [him] in [his] making of underwriting decisions," "determine the appropriate premium to quote to the broker," and "ultimately bind CNA to policies which could expose CNA to significant losses." *Id.* at *17. For matters outside his authority level, Maddox was still "responsible for evaluating the risk and making a recommendation to a manager or director with final authority on whether to accept the risk." *Id.* The court determined that "simply because [Maddox] was required to seek approval . . . when the decision exceeded his underwriting authority . . . did not change the fact that [he] continued to exercise the same degree of discretion and independent judgment." *Id.* at *21.

The conclusion that Huntington's Home Lending Underwriters fall squarely within the parameters of the administrative exemption is perfectly consistent with the analysis of the Underwriter positions in *Havey*, *Edwards*, and *Maddox* and, also, similar insurance-industry positions that courts in this Circuit find to be exempt. *Jastremski*, 243 F. Supp.2d at 753 (senior claims representative was responsible for reviewing the policy to determine if covered loss existed, determined the dollar value of the claim, set a reserve, and negotiated a settlement within

a certain authority range); *Murray*, 2005 U.S. Dist. LEXIS 41374 at *28 (claims specialist identified cases where coverage issues existed, determined scope of investigation, evaluated level of fault, and negotiated settlements).

Home Lending Underwriters are charged with evaluating all aspects of the loan application for due diligence in accuracy and completeness. They are minimally supervised. They independently make counter-offers and the terms of the offers, put stipulations on files that must be satisfied before they render a credit decision, and decide when loan applications are suspicious and require investigation, when to make risk approval exceptions for customers that may not otherwise qualify, and whether to approve, conditionally approve, decline or place a loan on hold until additional information is received. Most importantly, Plaintiffs' admissions establish that Home Lending Underwriters are charged with rendering the ultimate decision of whether the Bank will accept the risk of the requested loans. These tasks are similar, and in some respects, the same, as the Underwriters in *Havey, Edwards* and *Maddox*, tasks that are "sufficient to meet the duties test," *Havey*, 2005 U.S. Dist. LEXIS 27036 at *23, "clearly include[] the exercise of discretion and independent judgment," *Edwards*, 2004 U.S. Dist. LEXIS 27562, *20, and demonstrate that Plaintiffs "customarily and regularly exercised discretion and independent judgment with respect to matters of significance." *Maddox*, 2011 U.S. Dist. LEXIS 151085, *20.

Home Lending Underwriters also exercise judgment and discretion when serving on special project teams that search for solutions and better more stream-lined underwriting processes to implement at Huntington. Home Lending Underwriters conduct underwriting training for Bank personnel, and serve as subject matter experts for the Bank. The undisputed fact that many receive the benefit of the Home Lending Underwriters' subject-matter expertise

demonstrates that Plaintiffs perform exempt administrative work.  *See Koppinger v. American Interiors, Inc.*, 295 F. Supp. 2d 797, 805 (N.D. Ohio 2003) (fact that others within the company sought plaintiff's judgment in matters which they considered within his expertise supported conclusion that plaintiff was exempt); *see also Piscione*, 171 F.3d at 535-36 (consulting and "training responsibilities ... are evidence of duties that are administrative in nature.").

> **(3)** **Plaintiffs Cannot Point to Guidelines and Automated Underwriting Software as Evidence of Restraint on Their Discretion.**

Plaintiffs here will likely claim that various guidelines and automated underwriting software restrained their ability to exercise discretion and independent judgment.  These tools, however, <u>assist</u> Home Lending Underwriters in their evaluation of risk, none of these tools <u>replace</u> an Underwriter's judgment.  Plaintiffs' anticipated focus on available tools and resources ignores the key decisions and judgments that Home Lending Underwriters undisputedly do make – evaluating customer creditworthiness, and determining whether the Bank will take on the requested risk.

To determine whether an employee, constrained by guidelines and procedures, actually exercises discretion or independent judgment, the Sixth Circuit considers whether those guidelines contemplate independent judgment calls or allow for deviations.  *Renfro*, 497 F.3d at 577.  The undisputed facts here establish that guidelines, product profiles and various agency and investor materials, are intended to provide Home Lending Underwriters with information about compliance, finance and the nuances of the business – all of which they <u>consider</u> when exercising their judgment and discretion.  The undisputed facts further establish that the automated underwriting software provides suggested actions with respect to a loan application – which Home Lending Underwriters <u>consider</u> when exercising their judgment and discretion.  As Plaintiffs admitted at their depositions, neither the written guidelines or policies, nor the

automated underwriting software, remove their discretion or judgment from the underwriting process. *See* Section. II.C.2., *supra*.

The plaintiff in *Edwards* made a very similar argument, claiming that Audubon's "underwriting manual" constrained his exercise of judgment and discretion. 2005 U.S. Dist. LEXIS 27562, **22-23. The court rejected the idea, noting that the underwriting manual did not tell him which accounts to write or not to write. *Id.* at *23. As the *Edwards* court observed, even if he "was required to follow detailed manuals, that does not mean he did not exercise discretion and independent judgment." *Id.* On this point, the DOL regulations explain:

> The use of manuals, guidelines, or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part. Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status.

29 C.F.R. § 541.704. *Id.; see also Cheatham*, 465 F.3d 578, 585) (requirement that claims adjusters consult with manuals or guidelines does not preclude exercise of discretion and independent judgment); *Murray*, 2005 U.S. Dist. LEXIS 41374 at **29 (rejecting plaintiff's argument that because she was bound by internal procedures and computer programs, she did not exercise discretion and independent judgment); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) (claims adjuster exercised discretion and independent judgment even though she was required to follow state law and procedures in the claims manual).

Indeed, the various resources and tools provided to Home Lending Underwriters are high-level materials, which constantly evolve, and cannot be understood or interpreted without specialized knowledge or skills. (Becker Dep. p. 145 "[I]t takes years of experience. You can't

just sit down and read an application and be an Underwriter.")  Home Lending Underwriters are required to understand and apply the current version of the resource materials – even though they change on a weekly, and sometimes daily, basis.  The fact that the Underwriter "analysis is guided by standards does not mean that the Underwriters exercised no discretion or judgment." *See Havey*, 2005 U.S. Dist. LEXIS 27036 at *22; *Maddox*, 2011 U.S. Dist. LEXIS 151085 at *23 (finding that the plaintiff's employment as an insurance Underwriter "required him to use special training, experience or knowledge.").

The realities of home lending, particularly after the recent housing market crisis, illustrate why it would be neither in Huntington's, its customers, nor the greater financial economy's interest, to have home lending risk decisions made according to the unguided whim of a particular Underwriter.  As the Ninth Circuit analogized, the use of software does not "eliminate the need for discretion and judgment any more than does resort to other reference works or the opinions of appraisers and other experts."  *See In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litigation*, 481 F.3d 1119, 1130 (9th Cir. 2007).  Indeed, the vast resource materials available underscores the critical importance that Home Lending Underwriters make the right decisions when exercising their discretion and independent judgment.

(i)     **Home Lending Underwriters Deviate From Automated Underwriting Software Suggestions**

Here, as in *Edwards, Havey* and *Maddox*, Home Lending Underwriters must analyze information and make their decisions within compliance and regulatory guidelines, but these guidelines admittedly do not dictate to them what must be done, or their decisions.  For instance, while some conditions may automatically populate in ACAPS or UNIFI, Home Lending Underwriters admittedly can, and do, independently select additional conditions and stipulations to place on a file.  (Becker, pp. 52-54, 60-61; Miller Dep. pp. 68-69, 72-73).  Not all Home

Lending Underwriters stipulate the same, with the more experienced Home Lending Underwriters typically requiring more stipulations.  (Becker, p. 44, 52-54, 60-61; Miller Dep. p. 73).  Consumer Home Lending Underwriters can also exercise exceptions.  *See* Section II.C.2.c., *supra*.  It is the Underwriter's decision whether to exercise, or recommend, an exception.  *Id*.

Furthermore, while the automated underwriting software provides Home Lending Underwriters with *suggestions*, they admittedly still make their own decisions.  Home Lending Underwriters are not required to follow the software's suggestion.  *See* Section II.C.2.e., *supra*.  In sum, neither the reference tools nor the testimony regarding how they were used establishes a material restraint on the ability of the Home Lending Underwriters to exercise judgment and discretion in the performance of their job.  *See Renfro*, *supra*, 497 F.3d at 577 ("[c]hanneling discretion through a manual ... does not eliminate the existence of that discretion"); *see also Harper*, 2013 U.S. Dist. LEXIS 157938 at 39 (finding that the existence of guides and claims evaluation software did not take the exercise of discretion away from claims adjusters).

> **(4)    The Home Lending Underwriters' Judgment and Discretion Affects Matters of Extraordinary Significance to Huntington.**

Finally, there can be no reasonable dispute that Home Lending Underwriters make decisions regarding "matters of significance."   In this context, [t]he term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R.  § 202(a).   Home Lending Underwriters possess lending authority ranging from $250,000.00, up to one million dollars.  (Becker pp. 48, 72; Miller p. 56; Lutz p. 54; Whitacre p. 143.)  Thus, in the aggregate, the loan requests that Home Lending Underwriters independently review and decide whether to accept, total hundreds of millions of dollars of risk, each year.  The analysis and risk decisions rendered by Home Lending Underwriters may result in the denial of a loan – which is very significant to the customer, and ultimately impacts customer service – or the

acceptance of a loan – which binds the Bank to risk. These are both serious, consequential matters. Home Lending Underwriters are viewed as subject-matter experts, and it is undisputed that Bank personnel relies upon their expertise. Plainly, Home Lending Underwriters' decisions affect "matters of significance." *See Harper*, 2013 U.S. Dist. LEXIS 157938 at *40-41 (recognizing that impacting customers "is a significant matter to the company's overall business reputation and, consequently, its financial health and potential for growth."); *Maddox*, 2011 U.S. Dist. LEXIS 151085 at *17 (insurance Underwriter who evaluated risks, determined their acceptability, and made pricing decisions and recommendations exercised discretion and independent judgment with respect to matters of significance).

### C. As a Matter of Law, Plaintiffs' Claim for Straight Time Wages for Hours Worked in Excess of Forty in a Workweek Should Be Dismissed.

As part of their claim for overtime under the FLSA, Plaintiffs seek overtime "at a rate not less than one-and-a-half times their regular rate of pay for all hours worked in excess of forty per week." *See* Class Action Complaint, ¶44 (Doc. #1). Even if Huntington erroneously classified its Home Lending Underwriters as exempt from the FLSA's overtime requirement, Plaintiffs here are plainly seeking straight-time wages for overtime hours in excess of forty hours per week, in addition to the overtime premium.

This straight-time wage claim raises the legal question as to how damages are calculated when an employer has misclassified an employee as exempt, and on the basis of that conclusion, pays that employee a salary for all hours worked. *See* 29 C.F.R. § 541.602. The DOL regulations specifically contemplate that overtime may be calculated according to the half-time "fluctuating workweek" method when "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly

44

work period." 29 C.F.R. § 778.114(a). When a salaried employee challenges his exempt status and such a mutual understanding exists, courts hold that the employee is only entitled to recover his half-time overtime premium, calculated based upon the salary paid for each individual week divided by the total number of hours worked, week by week. *See, e.g.*, *Clements v. Serco, Inc.*, 530 F.3d 1224, 1230-31 (10th Cir. 2008).[22] This Court calculates damages in FLSA cases similarly. *See Schneider v. City of Springfield*, No. C-3-96-62, 2000 U.S. Dist. LEXIS 6217, *25-26, *37-38 (S.D. Ohio March 30, 2000). The DOL likewise advises that employees are only entitled to the half-time premium payment when their employer determines that they have been misclassified as exempt from the FLSA's overtime requirement, if the employees "received and accepted the salary knowing that it covered whatever hours they worked." *See* DOL Wage & Hour Div. Op. Ltr., FLSA2009-3, at 2 (January 14, 2009) (citing *Clements*).[23]

All Plaintiffs testified that they have always been paid their weekly salary, regardless of the number of hours that they worked, and that the understood their salary was intended to compensate them for all hours worked, no matter how many. (Becker pp. 34-36, 104, 112, 110-111; Miller pp. 29-30, 165-166; Lutz pp. 25-26, 129, 131; Whitacre pp. 42-43. 65-67.) Based upon this testimony and the undisputed record, there was a "mutual understanding" between the parties that their weekly salary was intended to compensate them for all hours worked, whether many or few. *See, e.g.*, *Valerio v. Putnam Assoc. Inc.*, 173 F.3d 35, 39 (1st Cir. 1999) (where plaintiff routinely worked more than 40 hours per week without overtime pay, she understood

---

[22] This "mutual agreement" does not extend to how overtime will be calculated. *Clements*, 530 F.3d at 1230; *Bailey v. County of Georgetown*, 94 F.3d 152, 156-57 (4th Cir. 1996) (rejecting the proposition that "employees must understand the manner in which their overtime pay is calculated" as contrary to the regulation).

[23] As an opinion letter executed by the Acting Administrator, the DOL's direction regarding the proper method of calculating overtime in the case of a misclassified employee is entitled to substantial deference. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

that her salary was to compensate her for fluctuating hours); *Schneider*, 2000 U.S. Dist. LEXIS 6217 at *27 (plaintiff agreed that compensation he received "covered all of the hours that he worked"; therefore, fluctuating workweek method of calculating overtime applied to determine damages).[24]  Plaintiffs have not disputed that they have always been paid on a salary basis, regardless of the number of hours they worked.  As a matter of law, Plaintiffs have no claim to an entitlement to additional straight time wages.[25]

### D.  The Undisputed Facts Establish that Huntington Acted in Good Faith.

As part of their claims, Plaintiffs seek liquidated damages under the FLSA.  *See* Class Action Complaint, Wherefore Clause, p. 7 (Doc. #1).  Liquidated damages may be awarded under the FLSA unless an employer demonstrates that "the act or omission giving rise to such action was in good faith and that [it] had reasonable grounds for believing that [the] act or omission was not a violation of the [FLSA.]"  29 U.S.C. § 260.  The Section 11 good faith defense is available if the employer proves that it acted "in good faith" and "had reasonable grounds" for its actions.  *Schneider*, 2000 U.S. Dist. LEXIS 6217 at *4 n. 4.

Courts have specifically found the Section 11 defense to be available where an employer relied on the advice of counsel in determining whether an employee is correctly classified as exempt from the FLSA overtime requirements.  *Featsent v. City of Youngstown*, 70 F.3d 900,

---

[24]  *See also Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138-39 (5th Cir. 1988) (where plaintiffs were paid a fixed salary for whatever number of hours were required to get the job done, their overtime entitlement was properly calculated by dividing their fixed salary by the actual number of hours worked per week); *Zoltek v. Safelite Glass Corp.*, 884 F. Supp. 283, 286 (N.D. Ill. 1995) (applying fluctuating workweek method of overtime payment to determine damages for misclassified employee).

[25]  As this Court has noted in *Schneider*, this is a "significant" issue because "it dramatically impacts" the amount of alleged damages by *tripling* the sum that Plaintiffs claim they are due. 2000 U.S. Dist. LEXIS at *25 n.13 (illustrating the calculation).

906-07 (6th Cir. 1995).[26]  Other cases in this Circuit find good faith even where an employer does not consult with counsel, but otherwise demonstrates "an honest intention to ascertain what the Act requires and to comply with it."  *Cobb v. Contract Transport, Inc.*, No. 04-305-KSF, 2007 U.S. Dist. LEXIS 45043, at *5-6 (E.D. Ky. June 21, 2007) (citing *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987)) (good faith found where employer's owner consulted the statute and implementing regulations before concluding that the employee was not eligible for FMLA leave).  In *Featsent*, the Sixth Circuit held that the employer acted reasonably when it relied upon its attorney's *silence* with respect to whether the manner in which it compensated its employees violated the FLSA.  70 F.3d at 906-07 (finding "no evidence" that "the City's attorney advised the City that the Agreement's method of calculating overtime compensation violated the FLSA. From its attorney's silence, the City was entitled to the reasonable belief that the Agreement did not violate the law[.]").  *See also Hoge v. Honda of America Mfg., Inc.*, No. 2:00-CV-995, 2002 U.S. Dist. LEXIS 28312, at *12 (S.D. Ohio May 3, 2002) (on a motion for summary judgment, finding that employer acted in good faith when it investigated the factual circumstances before making a decision that, although contrary to law, was objectively reasonable).

Huntington delegates the decision-making process regarding the exempt classification of its employees to a specialized compensation team.  Classification decisions are reviewed whenever there is a change in job duties and responsibilities or a change in governing regulations.  With respect to the relevant time period here, and prompted by a November 2009 Second Circuit decision regarding the exempt classification of Underwriters employed by J.P.Morgan Chase, and the DOL's March 2010 Administrator's Interpretation regarding the classification of mortgage loan officers, the Compensation Consultant assigned to this segment

---

[26]  *See also Roy v. County of Lexington*, 141 F.3d 533, 548 (4th Cir. 1998) (same); *Hill v. J.C. Penney Co.*, 688 F.2d 370, 375 (5th Cir. 1982) (same).

of the business met with Huntington corporate employment counsel, Human Resources and Home Lending Underwriting management, to discuss the classification of Home Lending Underwriter.  (Reveal p. 28-30).  In light of these developments, the team analyzed the duties and responsibilities of the Home Lending Underwriters and the critical nature of their job to analyze and make credit decisions on loan applications, as compared to the duties found determinative by the Second Circuit and the Administrator's Interpretation.  (Reveal p. 21).  The decision was made that Home Lending Underwriters would remain exempt from the FLSA's overtime rule.  (Reveal pp. 21, 30-31.)

Just two years later, in 2012, the same Compensation Consultant met with Huntington corporate employment counsel, Human Resources, and Home Lending Underwriting management to take a closer look at the Home Lending Underwriter job duties, this time prompted by an internal review of market pay data and salary information.  (Reveal Dep. p. 32.)  The team did a deeper dive, and completed and analyzed Position Description Questionnaires, which set forth the various job duties for the Home Lending Underwriter positions.  (Reveal pp. 32-34; Reveal Ex. 1.)  The team reviewed the information derived from the Questionnaires and discussed the job duties, and again a consensus decision was made that Home Lending Underwriters would remain exempt from the FLSA's overtime rule.  (Reveal pp. 35-42).  Based upon this undisputed record, Huntington has met its burden to establish good faith.  *Hoge*, 2002 U.S. Dist. LEXIS 28312, *12.

### E.    Plaintiffs Have No Evidence to Support Their Claim that Huntington "Willfully" Violated the FLSA.

The FLSA provides a two-year statute of limitations, which may be extended to three years if the violations of the Act are found to be willful.  29 U.S.C. § 255(a).  An employer willfully violates the FLSA if it either knew its actions were prohibited by the FLSA or showed

reckless disregard for whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988). "Reckless disregard" means more than simply an error in judgment, or an "unreasonable" decision to classify Home Lending Underwriters as exempt from the overtime rule. *Id.* at 135 n.13. Plaintiffs bear the burden of proof to show that Huntington willfully violated the Act. *Id.* at 133. The determination of "willfulness" for the purpose of Section 255(a) is an appropriate issue for decision by the Court on a motion for summary judgment. *Douglas v. Argo-Tech Corp.*, 113 F.3d at 69-70.

Initially, it follows reasonably that if Huntington successfully establishes that it has acted in good faith, that plaintiffs cannot meet their affirmative burden to show a willful violation of the Act. As discussed above, Huntington's compensation team evaluated the proper classification of the Underwriter position, most recently in 2010 and again in 2012. This process involved a trained and experienced Compensation Consultant gathering information regarding the position's duties and responsibilities, and conferring with executive management, Human Resources, and counsel to assist in the consideration of governing legal requirements. This is precisely the type of evidence that courts in this Circuit rely upon to dismiss willful violation claims. *See Hoffman v. Professional Med Team*, 394 F.3d 414, 419-20 (6th Cir. 2005) (affirming court's dismissal of willfulness claim based upon evidence that the employer consulted with counsel regarding its legal obligations, finding that "[c]ases under the ADEA and FLSA have found willfulness most frequently in situations in which the employer deliberately chose to avoid researching the law's terms or affirmatively evaded them."). Plaintiffs' claim that Huntington "willfully" violated the FLSA has no factual foundation and should be dismissed.

## V.     DEFENDANTS' MOTION TO DECERTIFY THE COLLECTIVE ACTION CLASS

Courts in the Sixth Circuit use a two-stage inquiry to address whether members of the collective action are similarly situated. *See Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). At the initial stage, which occurs before the parties have conducted discovery, courts use a "fairly lenient standard, [which] typically results in 'conditional certification of a representative class.'" *Id*. at 547. Because the plaintiffs bear only a modest factual burden at the initial stage, courts have emphasized that "the certification is conditional ***and by no means final***." *Id.* at 546 (emphasis added).

Once the parties have had an opportunity to conduct discovery and adduce evidence bearing on the "similarly situated" analysis, courts conduct a second, more stringent inquiry to determine whether to decertify the conditionally certified class or allow the plaintiffs to continue to proceed collectively. *Id*. at 547. At the second stage, "'the court has much more information on which to base its decision and, as a result, [it] employs a stricter standard.'" *Id*. (quoting *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F.Supp.2d 493, 497 (D. N.J. 2000)). To avoid decertification under this "more demanding and factually-intensive inquiry," the named plaintiffs "must meet a stricter standard of proving that the putative plaintiffs are similarly situated," and their burden at this stage is "significantly higher." *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 986 (W.D. Tenn. Feb. 2011). Courts consider several relevant factors at this second stage, including: (1) the factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations associated with proceeding as a collective action. *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009). At the second stage, "the question is simply whether the differences among the plaintiffs outweigh the

similarities of the practices to which they were allegedly subjected." *White v. Baptist Mem.*

*Health Care Corp.*, No. 08-2478, 2011 U.S. Dist. LEXIS 52928, *12 (W.D. Tenn. May 17, 2011

(*aff'd*, *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012)).

Applying the three-factor test set forth above, a U.S. District Court within the Sixth

Circuit decertified a class of mortgage bankers alleging that they were misclassified as exempt in

violation of the FLSA because the individual class members were not similarly situated with

regard to the work they performed.  *Oetinger v. First Residential Mortgage Network, Inc.*, Case

No. 3:06-CV-381-H, 2009 U.S. Dist. LEXIS 61877, *9-10 (W.D. Ky. July 16, 2009).   In

*Oetinger*, the court noted that individual general managers who directed teams of mortgage

bankers had "broad discretion in running their teams, which [meant that] an employee's work

may vary depending on which team she works." *Id.* at *10.  Moreover, the employer had "highly

individualized defenses to the various claims," and "[i]n order to assess . . . the administrative or

executive exemptions as a defense to a given plaintiff's claim, the Court would have to go

through an individualized appraisal of the employee's duties and responsibilities." *Id.*

> The court held that:

> This goes to the heart of Plaintiffs' argument that they are similarly situated. At
> the most basic level, Plaintiffs are claiming that they are all similarly situated,
> because [their employer] incorrectly classified them as exempt employees.
> However, to determine whether an employee is correctly classified as exempt, the
> Court must look at each individual's duties and responsibilities, which vary
> according to which general manager the mortgage banker worked.   Thus, the
> central question in the case, whether Plaintiffs are properly classified as exempt,
> cannot be determined on a class-wide basis.

*Id.* at *10-11.

With regard to the third factor, the court also found that fairness and procedural

considerations favored decertification because "the disparity between the duties, responsibilities,

and amount of work performed by individual [plaintiffs] . . .negate[d] [the] benefits of a collective action." *Id.* at *11.

In this case, the evidence set forth, *supra*, clearly demonstrates that the members of the conditionally certified class are not similarly situated. Indeed, wide variances in testimony existed between just the four Representational Plaintiffs – let alone what the variances must be between all members of the conditionally certified class. Based upon the evidence developed during discovery, Huntington has numerous defenses to the individual class members' claims, and proceeding on a collective basis is unmanageable and cannot be accomplished in a way that is procedurally fair. The differences set forth herein between the Home Lending Underwriters simply outweigh the similarities. The class must be decertified.

## VI.  CONCLUSION

Huntington properly classified its Home Lending Underwriters as exempt from the overtime requirements imposed by federal and state law. These employees perform a critical analysis of loan applications and ultimately decide whether to bind Huntington to the risk of the requested loan. The undisputed factual record belies any attempt by Plaintiffs to portray themselves as merely "cogs in the wheel," who perform inconsequential duties according to mandated guidelines and computer programs. All claims should be dismissed with prejudice.

In the event this case is not dismissed in its entirety, at a minimum, the class should be decertified because adjudicating Plaintiffs' claims would require individualized proceedings that are inherently incompatible with collective treatment.

Respectfully submitted,


s/ Tracy Stott Pyles
Tracy Stott Pyles, OH Bar. No. 0074241
Kaila M. Krausz, OH Bar. No. 0085517
LITTLER MENDELSON, P.C.
21 East State Street
16th Floor
Columbus, OH  43215
Telephone:  614.463.4201
Facsimile:  614.221.3301
tpyles@littler.com
KKrausz@littler.com

Andrew J. Voss, MN Bar No. 0241556*
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:  612.630.1000
Facsimile:  612.630.9626
avoss@littler.com

Attorneys for Defendants

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing has been filed via the electronic filing system on April 1, 2014.  Notice of filing will be performed by the Court's electronic filing system and Parties may access the document through the electronic filing system.

*/s/ Tracy Stott Pyles*
Tracy Stott Pyles

Firmwide:125997696.1 067629.1005