**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY LUTZ and DOROTHY BECKER, on behalf of themselves and all others similarly situated,** | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:12-cv-1091 |
| | : | |
| v. | : | Judge Gregory L. Frost |
| | : | |
| **HUNTINGTON BANCSHARES INCORPORATED and THE HUNTINGTON NATIONAL BANK,** | : | Magistrate Judge Norah McCann King |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

---

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION PURSUANT TO RULE 23**
**OF THE FEDERAL RULES OF CIVIL PROCEDURE**

---

Tracy Stott Pyles, OH Bar. No. 0074241
Kaila M. Krausz, OH Bar. No. 0085517
LITTLER MENDELSON, P.C.
21 East State Street, 16th Floor
Columbus, OH 43215
Telephone: 614.463.4201
Facsimile: 614.221.3301
E-mail:tpyles@littler.com
          kkrausz@littler.com

Andrew J. Voss, MN Bar No. 0241556*
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.630.1000
Facsimile: 612.630.9626
E-mail:avoss@littler.com

*Attorneys for Defendants*

*Admitted *Pro Hac Vice*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................................ iii

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
    FOR CLASS CERTIFICATION PURSUANT TO RULE 23 OF THE FEDERAL
    RULES OF CIVIL PROCEDURE ..................................................................................1

I.     INTRODUCTION ...........................................................................................................1

II.     BACKGROUND AND SUMMARY OF ARGUMENT ..................................................1

III.     FACTUAL SUMMARY ..................................................................................................5

    A.     Huntington And Its Home Lending Underwriters ...................................................5

    B.     Home Lending Underwriters' Duties And Responsibilities ...................................8

        1.     Home Lending Underwriters Analyze Applications, Determine
            Creditworthiness And Decide Whether Huntington Will Accept
            The Loan Risk.........................................................................................8

        2.     Home Lending Underwriters Provide Training, Serve As Subject
            Matter Experts And Work On Special Projects.........................................9

        3.     Underwriting A Loan Application ..........................................................10

IV.     LAW AND ARGUMENT ..............................................................................................11

    A.     Plaintiffs' Class Allegations Cannot Survive The Required Rigorous
        Analysis Under Rules 23(a) And 23(b) ...............................................................11

        1.     The Standard Governing Class Certification Under Rule 23....................11

Before certifying a class action, a district court must conduct a "rigorous analysis" into whether the requirements of Rule 23 of the Federal Rules of Civil Procedure have been satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (*en banc*).  The U.S. Supreme Court has long established that a class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)).

To obtain class certification under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs must establish, after a rigorous analysis, each of the four prerequisites under Rule 23(a) and the prerequisites of one of the three types of class actions provided for by Rule 23(b).  *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945-946 (6th Cir. 2011).  Under Rule 23(a), a party seeking class certification must show by a preponderance of the evidence that

# TABLE OF CONTENTS
## (CONTD.)

PAGE

(1) the class is so numerous that joinder of all members is impracticable (numerosity), (2) there are questions of law or fact common to the class (commonality), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality), and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). *Pilgrim,* 660 F.3d at 945; *Falcon,* 457 U.S. at 160-61 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable.").

The analysis required under Rule 23(b) is even more demanding, and Plaintiffs' showing is lacking. Plaintiffs here rely on Rule 23(b)(3), which provides that a class action may be maintained only where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Dukes,* 131 S. Ct. at 2549 (citing Fed. R. Civ. P. 23(b)(3)).

2.    *Dukes* And Its Application In Wage And Hour Litigation ........................13

The Supreme Court's landmark decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), guides the Court's consideration of Plaintiffs' request for class certification. *Dukes* held that the presence of common questions in any given case is insufficient to establish "commonality" as required under Rule 23 because every case will have common questions such as whether the employer exempted plaintiffs from overtime, and whether the employer's reliance upon that exemption was lawful. *See, e.g.*, *Dukes*, 131 S.Ct. at 2551.

B.    Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The
        Numerosity Prong Of Rule 23(a) ..........................................................................16

This is not a case where there are several hundred Home Lending Underwriters scattered across the country who cannot possibly join the litigation save for the extraordinary remedy of class certification. Rather, of the 92 Ohio Home Lending Underwriters who were already invited to join this litigation, all live in Central Ohio and within this Court's jurisdiction but for 6 who live elsewhere in Ohio. Although referred to as "numerosity," the real inquiry under Rule 23(a)(1) is whether joinder would be impracticable. Fed. R. Civ. P. 23(a); *see In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("There is no strict numerical test" for determining numerosity because it turns on the impracticability of joinder). Because joinder is not impracticable, Plaintiffs cannot establish numerosity and their Motion should be denied.

C.    Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The
        Adequacy Prong In Rule 23(a) ..............................................................................19

        1.    Plaintiffs Cannot Adequately Represent The Ill-Defined Class ...............19

Plaintiffs' class definition is impermissibly overbroad because it includes Home Lending Underwriters whose claims are time-barred. While over breadth of the proposed class alone may

## TABLE OF CONTENTS
### (CONTD.)

not be fatal, "when coupled with failure to meet the remaining requirements," class certification must be denied. *Anderson v. United Fin. Sys. Corp.*, 281 F.R.D. 292, 296 (N.D. Ohio) (denying class certification in part because ill-defined class included individuals with time-barred claims).

2. Plaintiff Lutz Lacks Standing To Represent The Class ............................21

Plaintiff Lutz's claims under Ohio law must be dismissed as untimely. Consequently, he lacks standing not only in his individual claim, but in his ability to bring a class action. Because Lutz has no viable individual claim, he cannot pursue relief on behalf of a class for which he is not a member. *Anderson*, 281 F.R.D. at 295. Furthermore, even if Lutz now claims, contrary to his testimony, that he does have viable claims, he is still an inadequate class representative because he worked for Huntington for only five weeks during the statutory period, and was interviewing for a new job and winding down in preparation for his departure during this limited timeframe. Plaintiff Lutz's very absence from the workplace for the overwhelming majority of the relevant period of time makes him an unsuitable representative.

D. Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The Commonality Prong Of Rule 23(A) Because A Classwide Proceeding Will Not Generate Common Answers To Any Purported Common Questions ............22

1. Central Questions Concerning Alleged Wage And Hour Liability Cannot Be Determined Based On Representational Proof ........................22

This Court has recognized that "the Supreme Court has made it more difficult to certify any class action by focusing on the commonality requirement set forth in Rule 23(a)(2)." *Reed Elsevier, Inc. v. Craig M. Crockett*, Case No. 3:10-cv-248, 2012 U.S. Dist. LEXIS 23947, *30 n.11 (S.D. Ohio, Feb. 24, 2012) (citing *Dukes*). In support of their burden to prove "commonality" here, Plaintiffs point to an obvious question as "common" to the class—that is, whether Home Lending Underwriters qualify as administratively exempt. (Plfs. Mot. pp. 1-2, 13-14). The fact that this question is "common" to each member of the proposed class, however, does not establish "commonality" under *Dukes*.

While Plaintiffs claim that "common proof" will answer the issues of whether Home Lending Underwriters are production employees and whether they exercise discretion and independent judgment "in one stroke," and will allow liability to be determined on a class-wide basis, Plaintiffs certainly do not intend to establish Huntington's liability under the FLSA and Ohio law solely in reliance upon this alleged "common proof." The key question here is whether Plaintiffs and the putative class members are entitled to overtime under state law. Consistent with the requirements of 29 U.S.C. §207(a) and Ohio law, in order to meet their *prima facie* burden of proof, each Plaintiff and opt-in plaintiff must establish that he or she worked hours in excess of 40 in a workweek, and as an affirmative defense to such liability, Huntington will seek to prove that each Home Lending Underwriter qualified as administratively exempt, based upon their actual job duties and managers' expectations. Plaintiffs fail to demonstrate a "common

TABLE OF CONTENTS
(CONTD.)

policy" that required each Home Lending Underwriter to work hours in excess of 40 in any particular workweek—which they must establish to prove a violation of the FLSA and state law in the first instance.

2.      Whether Plaintiffs Exercised Sufficient Discretion And Independent Judgment To Meet The Administrative Exemption Cannot Be Answered By "Common Proof" ..............................................26

The Representative Plaintiffs testified that, with respect to issues germane to the exemption analyses, each absolutely exercised the requisite independent judgment and discretion, but did so in their own distinct ways.  The differences among just the four Representative Plaintiffs are *fundamental* to the exemption analyses, and Huntington's due process rights demand that such evidence be developed.  Plaintiffs' contention that "whether underwriters exercise discretion and independent judgment [] is common to the class as a whole, and, therefore, can be answered in one stroke," clearly misses the mark.

E.      Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The Typicality Prong Of Rule 23(a) ............................................................................29

The proof required to establish an actual violation of state law, meaning that Huntington does not prevail on its exemption defense, will be particularized to each Plaintiff—and each member of the putative class.  For instance, the overwhelming majority of Home Lending Underwriters have chosen *not* to join this litigation, and may very well have different views regarding their primary job responsibilities, and how they performed the day-to-day tasks on the job.  Plaintiffs' claims are not "typical" of the class as a whole because they base their theory of overtime eligibility upon their personal assessment slanted to support their legal theories.  Therefore, Plaintiffs cannot establish typicality and their Motion should be denied for this reason.

F.      Plaintiffs Cannot Satisfy The Requirements Of Rule 23(b)(3)..............................31

1.      Class Members' Individual Claims Establishing Both Liability And Damages Predominate Over Class Issues ..........................................31

The predominance inquiry required under Rule 23(b)(3) is "far more demanding" than the 23(a)(2) commonality prerequisite.  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997).  Plaintiffs must show that the questions of law or fact common to the entire class predominate over any questions affecting only individual members.  Fed. R. Civ. P. 23(b)(3).  Plaintiffs do not dispute that their individual damages claims cannot be determined representationally, conceding that the amount of any potential recovery by any claimant would necessarily be determined based upon his or her own hours worked and compensation—both variables which vary considerably from one Home Lending Underwriter to another.  Although individualized damages claims standing alone will not defeat class certification, *see Sterling v.*

TABLE OF CONTENTS
(CONTD.)

PAGE

*Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988), if the defendant's potential liability to the entire class, as well as damages, cannot be determined in a single proceeding, than a class should not be certified.

In *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013), the Supreme Court held that the question of individual damages must be assessed as an integral part of the requirement of *Dukes* that plaintiffs seeking class certification must "affirmatively demonstrate" with "significant proof" that class members "suffered the same injury." Whether the Home Lending Underwriters actually meet the requirements for the applicable exemption based upon what they actually do at work is the crux of the inquiry for the predominant overtime claim in this litigation. In consideration of the dramatically different views of individual class members regarding their primary duty, Plaintiffs have offered no reasoned basis for extrapolating their own selective testimony to the class as a whole.

2. Huntington's Exempt Classification Decision Does Not Establish Predominance ................................................................................. 33

While Plaintiffs claim that Huntington's classification of its Home Lending Underwriters as exempt from overtime eligibility is somehow dispositive of whether common questions predominate over individual issues in this litigation, the "existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common issues.'" *Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010).

G. A Statewide Class Action Is Not A Superior Method Of Resolving The Claims Of The Class ................................................................................. 34

The record before the Court establishes that each Home Lending Underwriter views his or her role and responsibilities very differently, and the parties plainly dispute not only the actual facts, but the characterization of those facts for the purpose of assessing the Bank's affirmative exemption defense. "Given the necessary number of individual inquiries, a class action cannot be a superior form of adjudication." *Tartt v. Wilson County, Tennessee*, Case No. 3:09-01179, 2012 U.S. Dist. LEXIS 7764, *24 (M.D. Tenn., January 24, 2012).

V. CONCLUSION ................................................................................. 36

CERTIFICATE OF SERVICE ................................................................................. 38

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Aburto v. Verizon California, Inc.*,
  Case No. CV 11-03683-ODW, 2012 U.S. Dist. LEXIS 329
  (C.D. Cal., Jan. 3, 2012) ........................................................................................................15

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................................31

*Anderson v. United Fin. Sys. Corp.*,
  281 F.R.D. 292 (N.D. Ohio) ........................................................................................20, 21, 22

*Bacon v. Honda of America, Mfg., Inc.*,
  370 F.3d 565 (6th Cir. 2004) ..................................................................................................30

*Beattie v. Century Tel. Inc.*,
  511 F.3d 554 (6th Cir. 2007) ..................................................................................................13

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)................................................................................................................12

*Chase v. Aimco Props., L.P.*,
  374 F. Supp.2d 196 (D.D.C. 2005) .........................................................................................19

*Chaz Concrete Co., LLC v. Codell*,
  Case No. 3:03-52-KKC, 2006 U.S. Dist. LEXIS 60013
  (E.D. Ky. Aug. 23, 2006)........................................................................................................20

*Claeys v. Gandalf Ltd.*,
  303 F. Supp.2d 890 (S.D. Ohio 2004) ....................................................................................20

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) ...........................................................................32

*Corwin v. Lawyers Title Insurance Co.*,
  276 F.R.D. 484 (E.D. Mich. 2011) ...................................................................................23, 25

*Cruz v. Dollar Tree Stores*,
  Case No. 3:07-cv-04012-SC, 2011 U.S. Dist. LEXIS 73938
  (N.D. Cal., July 8, 2011).............................................................................................15, 24, 32

*Daigle v. Shell Oil Co.*,
  133 F.R.D. 600 (D. Colo. 1990) .............................................................................................18

*Donovan v. Burger King Corp.*,
  675 F.2d 516 (2d Cir. 1982)....................................................................................................29

# TABLE OF AUTHORITIES
## (CONTD.)

PAGE(S)

CASES

*Edwards v. City of Long Beach,*
467 F. Supp.2d 986 (C.D. Cal. 2006) ................................................................. 19

*Elizabeth M. v. Montenez,*
458 F.3d 779 (8th Cir. 2006) ............................................................................ 30

*Fieger v. Michigan Supreme Court,*
553 F.3d 955 (6th Cir. 2009) ........................................................................... 21

*Garcia v. Gloor,*
618 F.2d 264 (5th Cir. 1980), *cert. denied*, 449 U.S. 1113 .............................. 16

*Gen. Tel. Co. v. Falcon,*
457 U.S. 147, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) .......................... 11, 13, 29

*Gerstein v. Pugh,*
420 U.S. 103 (1975) ........................................................................................ 21

*Glazer v. Whirlpool Corp.,*
722 F.3d 838, 860 (6th Cir. 2013) ................................................................... 32

*In re Am. Med. Sys., Inc.,*
75 F.3d 1069 (6th Cir. 1996) .................................................................. 16, 19, 30

*In re Bank of Am. Wage & Hour Empl. Litig.,*
Case No. 10-MD-2138-JWL, 2012 U.S. Dist. LEXIS 140701
(D. Kan. Sept. 27, 2012) ............................................................................ 2, 15

*Johnson v. Big Lots Stores, Inc.,*
561 F. Supp.2d 567 (E.D. La. 2008) ............................................................... 29

*Kennedy v. Commonwealth Edison Co.,*
410 F.3d 365 (7th Cir. 2005) ........................................................................... 29

*Khadera v. ABM Indus.,*
701 F. Supp.2d 1190 (W.D. Wash. 2010) .......................................................... 2

*Klay v. Humana, Inc.,*
382 F.3d 1241 (11th Cir. 2004) ....................................................................... 34

*Kopera v. Home Depot U.S.A.,*
Case No. 1:09-cv-8337, 2011 U.S. Dist. LEXIS 3382
(S.D.N.Y. Jan. 11, 2011) ................................................................................. 33

# TABLE OF AUTHORITIES
## (CONTD.)

PAGE(S)

CASES

*Levels v. Akzo Nobel Salt, Inc.*,
178 F.R.D. 171 (N.D. Ohio 1998) ............................................................................16, 17, 18

*Marlo v. UPS, Inc.*,
639 F.3d 942 (9th Cir. 2011) ...............................................................................................33

*McAllister v. Transamerica Occidental Life Ins. Co.*,
325 F.3d 997 (8th Cir. 2003) ...............................................................................................29

*v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010)...........................................................................15, 23, 24, 33

*O'Brien v. Ed Donnelly Enterprises, Inc.*,
575 F.3d 567 (6th Cir. 2009) ...............................................................................................12

*Oakley v. Verizon Communications, Inc.*,
Case No. 1:09-cv-09175, 2012 U.S. Dist. LEXIS 12975
(S.D.N.Y., February 1, 2012)................................................................................................35

*Oetinger v. First Residential Mortgage Network, Inc.*,
Case No. 3:06-cv-381-H, 2009 U.S. Dist. LEXIS 61877
(W.D. Ky., July 16, 2009)......................................................................................................30

*Petty v. Russell Cellular, Inc.*,
Case No. 2:13-cv-1110, 2014 U.S. Dist. LEXIS 42185
(S.D. Ohio Mar. 28, 2014) ....................................................................................................11

*Pilgrim v. Universal Health Card, LLC*,
660 F.3d 943 (6th Cir. 2011) .........................................................................................12, 13

*Pilgrim v. Universal Health Card, LLC*,
Case No. 5:09-cv-879, 2010 U.S. Dist. LEXIS 28298
(N.D. Ohio Mar. 25, 2010) ...................................................................................................20

*Primavera Familienstiftung v. Askin*,
178 F.R.D. 405 (S.D.N.Y. 1998) ..........................................................................................17

*Reed Elsevier, Inc. v. Craig M. Crockett*,
Case No. 3:10-cv-248, 2012 U.S. Dist. LEXIS 23947
(S.D. Ohio, Feb. 24, 2012)....................................................................................................22

*Reyes v. Texas EZPawn, L.P.*,
Civil Action No. V-03-128, 2007 U.S. Dist. LEXIS 1461
(S.D. Tex. Jan. 8, 2007) ........................................................................................................29

# TABLE OF AUTHORITIES
## (CONTD.)

PAGE(S)

CASES

*Snelling v. ATC Healthcare Servs.*,
Case No. 2:11-cv-983, 2012 U.S. Dist. LEXIS 172052
(S.D. Ohio Dec. 4, 2012) ...................................................................................12, 18

*Sosna v. Iowa*,
419 U.S. 393 (1975)........................................................................................................21

*Spainhower v. U.S. Bank Na'l Ass'n*,
Case No. 2:08-cv-137, 2010 U.S. Dist. LEXIS 46316
(C.D. Cal. March 25, 2010) ....................................................................................32

*Spectrum Fin. Cos. v. Marconsult, Inc.*,
608 F.2d 377 (9th Cir. 1979) ...................................................................................19

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) ...................................................................................11

*Sterling v. Velsicol Chem. Corp.*,
855 F.2d 1188 (6th Cir. 1988) .................................................................................31

*Sugai Products v. Kona Kai Farms*,
Civil No. 97-43 SPK, 1997 U.S. Dist. LEXIS 21503
(D. Hawaii Nov. 9, 1997).......................................................................................17

*Tartt v. Wilson County, Tennessee*,
Case No. 3:09-1179, 2012 U.S. Dist. LEXIS 7764
(M.D. Tenn., January 24, 2012)........................................................................30, 35

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935, (9th Cir. 2009) ..................................................................................32

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ....................................................................................... passim

*White v. Western Beef Properties, Inc.*,
Case No. 1:07-cv-2345, 2011 U.S. Dist. LEXIS 141696
(E.D.N.Y. Dec. 9, 2011) ........................................................................................15

*Williams v. Lockheed Martin Corp.*,
Case No. 3:09-cv-1669, 2011 U.S. Dist. LEXIS 58716
(S.D. Cal. June 1, 2011)........................................................................................34

## TABLE OF AUTHORITIES
### (CONTD.)

PAGE(S)

**CASES**

*Wong v. AT and T Mobility Services LLC,*
  Case No. CV 10-8869-GW, 2011 U.S. Dist. LEXIS 125988
  (C.D. Cal., Oct. 20, 2011) .................................................................................15, 23, 32

*Young v. Magnequench Int'l, Inc.,*
  188 F.R.D. 504 (S.D. In. 1999)..........................................................................17


**STATUTES**

29 U.S.C. §207(a) .............................................................................................25

29 U.S.C. §216(b) ....................................................................................... passim

Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA")............................. passim

O.R.C. Section 2305.11 ....................................................................................20, 21

O.R.C. Section 4111.03(A)................................................................................1

Ohio Minimum Wage Fair Standards Act, Ohio Revised Code Section 4111.01, *et seq.*
  ("OMWFSA")..............................................................................................1


**OTHER AUTHORITIES**

29 C.F.R. §541.2 ..............................................................................................24

29 C.F.R. §541.203(b) ......................................................................................32

29. C.F.R. §541.700..........................................................................................24

Rule 23 of the Federal Rules of Civil Procedure .............................................. passim

Article II of the United States Constitution ......................................................21

Article III of the United States Constitution .....................................................21

## I.      <u>INTRODUCTION</u>

Former Consumer Underwriters Gregory Lutz and Dorothy Becker ("Plaintiffs") ask this Court for the exceptional remedy of a class action, but fail to present evidence warranting an exception to the usual rule that litigation be pursued only by individual, named parties.  Plaintiffs' over-simplistic motion falls well short of the legal and evidentiary standards necessary to satisfy the rigorous analysis required for Rule 23 class actions.   While it is easy for Plaintiffs to repeatedly use class action buzz words—such as their oft-repeated allegation that "common proof" will answer questions in "one stroke"—they cannot overcome the dispositive fact that each Home Lending Underwriter's exempt classification must be resolved by **examining the employees' actual job characteristics and duties**, including the duties **each individual employee actually performs**.   Accordingly, Defendants Huntington Bancshares Incorporated and The Huntington National Bank (collectively "Huntington" or "the Bank") respectfully request that the Court deny Plaintiffs' Motion for Class Certification in its entirety.

## II.     <u>BACKGROUND AND SUMMARY OF ARGUMENT</u>

Plaintiffs here challenge their status as "exempt" administrative employees under the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA") and the Ohio Minimum Wage Fair Standards Act, Ohio Revised Code Section 4111.01, *et seq.*, ("OMWFSA") and seek to recover overtime pay for hours worked in excess of forty in a workweek.[1]  On November 28, 2012, Plaintiffs moved pursuant to Section 216(b) of the FLSA to conditionally certify a class of all employees with underwriting as their primary duty (Doc. #3, p. 3).  This Court denied Plaintiffs' request, and instead conditionally certified a smaller class of Home Lending Underwriters— consisting of about 120 Consumer and Mortgage Underwriters (referred to collectively as "Home

---

[1]      Ohio law follows federal law on exemption issues.  See O.R.C. Section 4111.03(A).

Lending Underwriters") (Doc. #24, p. 13). The Home Lending Underwriters received notice advising them of their ability to opt-in and participate in this lawsuit, and only about 20% chose to participate.

Now Plaintiffs move to certify an Ohio class and rope in the Home Lending Underwriters who previously declined Plaintiffs' invitation to participate in this lawsuit pursuant to 29 U.S.C. § 216(b). The burden for class certification under Rule 23 is significantly higher than the burden Plaintiffs faced when moving for conditional certification under the FLSA—and one that Plaintiffs cannot meet in this case. *See, e.g., In re Bank of Am. Wage & Hour Empl. Litig.*, Case No. 10-MD-2138-JWL, 2012 U.S. Dist. LEXIS 140701, at *16 (D. Kan. Sept. 27, 2012) (noting that "certification standard under Rule 23 is clearly much higher than the standard for sending of notice pursuant to §216(b) of the FLSA") (internal quotation marks omitted); *Khadera v. ABM Indus.*, 701 F. Supp.2d 1190, 1197 (W.D. Wash. 2010) (finding that while plaintiffs "met the lenient threshold for conditional certification under the FLSA, they [had] not established the viability of a state law class under Rule 23.").

To succeed on their Motion, Plaintiffs must satisfy each of the following Rule 23(a) and Rule 23(b)(3) elements by a preponderance of the evidence: (1) numerosity; (2) typicality; (3) commonality; (4) adequacy of class representation; (5) that questions of law or fact common to members of the class "predominate" over individual questions; and (6) that a class action is "superior" to other available methods. The Court must conduct a "rigorous analysis" and address the merits of Plaintiffs' claims to determine whether they have satisfied their burden of proof. Here, Plaintiffs do not come close to meeting their burden.

First, this is not a case where there are several hundred Home Lending Underwriters scattered across the country who cannot possibly join the litigation save for the extraordinary

remedy of class certification.  Rather, of the 92 Ohio Home Lending Underwriters who were already invited to join this litigation, all live in Central Ohio and within this Court's jurisdiction but for 6 who live elsewhere in Ohio.  Because joinder is not impracticable, Plaintiffs cannot establish numerosity and their Motion should be denied.

Second, Plaintiffs are not adequate class representatives because the ill-defined class impermissibly includes individuals with time-barred claims.  Further, Lead Plaintiff Lutz did not suffer the same alleged wrongdoing as the Ohio class he seeks to represent and, therefore, is not an adequate class representative.  In fact, Plaintiff Lutz's claims under Ohio law are ripe for dismissal.

Third, Plaintiffs assert two alternative theories of liability in an effort to support their claim that the Bank misclassified them as administratively exempt employees, as follows: (1) Home Lending Underwriters are merely production employees akin to working on an assembly line; and (2) Home Lending Underwriters do not exercise the requisite discretion and independent judgment required for the administrative exemption.   (Plfs. Mot. pp. 1-2). [2] Plaintiffs allege that either theory of liability can be pursued as a class action because purported "common proof" will resolve common factual and legal questions.[3]  (Plfs. Mot. pp. 14, 17-18, 27-28).  The dispositive record, however, is not limited to the evidence Plaintiffs chose to cite for their "common proof" concept.  The record evidence also includes management expectations, other Huntington policies and procedures, and class member testimony about issues germane to the exemption analyses that underscores the need for individualized inquiries.

---

[2]     References to Plaintiffs' Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23 are abbreviated herein as "Plfs. Mot. p. __."

[3]     As set forth in Huntington's pending Motion for Summary Judgment, Plaintiffs cannot establish liability under either theory and their claims fail as a matter of law  (Doc. 62).

Notably, Plaintiffs ignore the premise critical to this lawsuit and offer no alleged "common proof" on the subject: that during the relevant time period each member of the Ohio class worked in excess of 40 hours a week without receiving proper compensation for hours worked over 40.  In short, Plaintiffs here have not identified any company-wide policy or common questions of law or fact that provide the necessary foundation to represent scores of Home Lending Underwriters who view their job of analyzing credit qualification, assessing customer risk and deciding whether Huntington will accept the risk of a requested loan very differently than Plaintiffs. For these reasons, Plaintiffs cannot establish the required commonality, typicality or predominance factors.

Fourth, to the extent that any current or former Home Lending Underwriter employed in the State of Ohio actually wanted to assert a claim for overtime, they have already been given the opportunity to opt-in to this case as a "party plaintiff" pursuant to 29 U.S.C. §216(b) and the Court's May 2, 2013, Order.  Accordingly, certifying a class action under Rule 23 to resolve co-extensive state law claims under Ohio law is not an appropriate or "superior" method to resolve the claims of those Home Lending Underwriters who have already indicated they do not wish to participate in this litigation.  For all of these reasons, neither of Plaintiffs' theories of liability is suitable for class treatment and, as more fully set forth below, Plaintiffs' Motion should be denied.

III.    **FACTUAL SUMMARY**

A.      **Huntington And Its Home Lending Underwriters**

Huntington Bancshares Incorporated is the parent corporation of The Huntington National Bank.  (Cline Decl., ¶2).[4]  The Huntington National Bank provides full-service commercial, small business, and consumer banking services; mortgage banking services; treasury management and foreign exchange services; equipment leasing; wealth and investment management services; trust services; brokerage services; customized insurance brokerage and service programs; and other financial products and services.  (Cline Decl., ¶2).  Huntington primarily operates in six states: Ohio, Michigan, Pennsylvania, Indiana, West Virginia, and Kentucky.

The Bank's home lending underwriting business is divided between the Consumer group and the Mortgage group.  (*Id*., ¶4).  There is a Loan Center Credit Manager who manages the credit function for both the Consumer and Mortgage groups.  (Cline pp. 11-12; Cline Ex. 2).[5] The next level of management consists of Home Lending Credit Section Managers who manage Mortgage Underwriters, and Consumer Credit Section Managers who manage Consumer Underwriters.  (Cline p. 18; Cline Ex. 2).  Huntington's Home Lending Underwriters work out of its Crosswoods building in Columbus, Ohio; but, the Consumer and Mortgage groups work in different areas of the building.  (Whitacre pp. 50-51; Becker pp. 37-39; Lutz p. 39; Miller pp. 44-

---

4      The Declaration of Huntington's former Loan Center Credit Manager Mary Cline was previously filed with this Court on January 17, 2013, as Exhibit 1 to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Conditional Certification.  (Doc. #15-1).

5      Transcripts from the depositions of Huntington's former Credit Center Loan Manager, and current Program Manager, Mary Cline, and Huntington's Compensation Consultant, Jason Reveal, and the deposition exhibits cited herein, were filed with the Court on April 1, 2014.  Deposition testimony is cited herein by deponent last name and page numbers of the transcript.

45). [6]  <u>They are not familiar with each other's job duties</u>.  (Miller p. 46; Whitacre p. 50).  There

are also a few Home Lending Underwriters in Findlay, Ohio, and Grand Rapids, Michigan.

(Cline pp. 20-21).  There are two levels of Home Lending Underwriters: (1) Underwriter—Home

Lending; and (2) Underwriter Senior—Home Lending.  (Cline p. 19; Reveal Exs. 2-3).  Home

Lending Underwriters at Huntington are classified as exempt "administrative" employees.

(Cline pp. 23-24).

There are several differences between and among Consumer Underwriters and Mortgage

Underwriters, beginning with the type of loan products and loan solutions offered by the

Underwriters.  (Cline p. 15).  Consumer Home Lending Underwriters underwrite loans

originating from various sources, including banking offices, the "huntington.com" channel, the

phone bank, and Huntington's Private Financial Group.  (Cline Decl., ¶4).  The primary bulk of

business for Consumer Home Lending Underwriters is the equity business—typically a type of

home equity installment loan, a consumer first mortgage refinance, or a secured personal credit

line.  (Cline Decl., ¶5).  Consumer Home Lending Underwriters also have responsibilities over

non-equity loans, like auto loans, titled vehicles and consumer checking reserves as well as

unsecured loans—like a  customer personal loan.  (*Id*.)  These Underwriters use the ACAPS loan

origination system to assist them with the performance of their job.  (*Id*., ¶6).

In  approximately  2010,  the  Bank  began  the  segmentation  of  the  Consumer  Home

Lending  underwriting  process  into  phases—initial  approval  and  final  approval—with

Underwriters  assigned  to  perform  the  duties  specific  to  a  single  phase.  (Cline Decl., ¶7).

---

6        In  order  to  establish  an  evidentiary  record  for  motion  purposes,  the  parties  selected  four  plaintiffs
("Representative Plaintiffs") to represent the rest of the alleged "similarly situated" class.  Named Plaintiffs Gregory
Lutz and Dorothy Becker (both former Consumer Home Lending Underwriters), and Opt-In Plaintiffs George Miller
(former Consumer Home Lending Underwriter) and Amy Whitacre (current Mortgage Home Lending Underwriter)
are the "Representative Plaintiffs."  Deposition testimony is cited herein by deponent last name and page numbers of
the transcript.  The deposition transcripts, and deposition exhibits cited herein, were filed with the Court on April 1,
2014.

Currently, the Consumer Home Lending Underwriters have compensation and incentive plans that are distinct to them, and their performance is measured against criteria specific to their job within the consumer group.  (*Id.*, ¶8; Cline Exs. 7-9, 11).

In contrast, the Mortgage Home Lending group Underwriters primarily underwrite new and refinanced mortgage loans and are assigned to the "residential" or "third-party" channel, with the difference based upon the origination from a Huntington Mortgage Loan Officer or a Mortgage Broker.  (*Id.*, ¶9).  The Mortgage Home Lending Underwriters work a loan from start to finish—i.e., they perform the initial review, the income analysis and the final review.  (*Id.*, ¶10).  The Mortgage Home Lending group uses the UNIFI loan origination system, rather than ACAPS.  (*Id.*)  There are three Mortgage Home Lending Underwriters who are primarily responsible for covering the Bank's "resource help desk," which is the go-to source for employees who need guidance on the mortgage loan process, underwriting, and related policies and procedures.  (*Id.*, ¶11).  Currently, Mortgage Home Lending Underwriters have compensation and incentive plans that are distinct to them, and their performance is measured against criteria specific to their job within the mortgage group.  (*Id.*, ¶12; Cline. Exs. 7-9, 11).

Both Consumer Home Lending and Mortgage Home Lending Underwriters work with automated underwriting software programs.  STRATA is the automated underwriting software incorporated into ACAPS and used by Consumer Underwriters (Becker pp. 50-51, 60-61), while Huntington's Mortgage Underwriters use a variety of desktop underwriting programs that vary based upon loan product.  (Whitacre pp. 93-95).  As a point of comparison, the consumer group's home lending assets are maintained in Huntington's portfolio.  Accordingly, Consumer Home Lending Underwriters exercise discretion during the underwriting process that is different from the discretion exercised by Mortgage Home Lending Underwriters who are often working with

government agency programs and exercising the types of discretion applicable to those unique programs.  (Cline Decl., ¶13).

B.    **Home Lending Underwriters' Duties And Responsibilities**

1.    **Home Lending Underwriters Analyze Applications, Determine Creditworthiness And Decide Whether Huntington Will Accept The Loan Risk**

The Home Lending Underwriter job primarily exists to protect Huntington, and its customers and investors, from taking on the wrong kind of risk.  Each Home Lending Underwriter is charged with thoroughly analyzing complex customer loan applications, determining creditworthiness, and deciding whether Huntington will accept the requested loan risk.  (Becker p. 125; Miller pp. 141-142).  Plaintiffs admitted that properly assessing risk is important to Huntington, and accepting too much or bad risk is detrimental to Huntington's business.  (Becker p. 140; Whitacre pp. 173-174).  Significantly, Home Lending Underwriters must "look at all the information" (Becker p. 44), "make a decision based off everything that you pull up, that pulls up, with the applications" (Becker p. 49), "make sure the findings are accurate, meets all of the requirements" (Whitacre p. 98), and ultimately decide if the loan is the kind of risk the Bank will accept.  (Miller p. 142).

Substantively, analyzing complex loan applications involves a wide array of skills and knowledge.  As Whitacre confirmed, "[e]very deal is unique."  (Whitacre p. 179).  Becker explained that "it takes years of experience, you can't just sit down and read an application and be an Underwriter."  (Becker p. 145).  Simply put, Home Lending Underwriters are not blindly funneling applications through a checklist procedure and rubber stamping suggestions from the automated underwriting software; rather, the Home Lending Underwriters' job is to <u>analyze</u> the information, and to <u>make</u> the ultimate credit decision.  (*Id.*, p. 120).  Plaintiffs admitted that they work independently, and under minimal supervision.  (Becker pp. 129-139).  Indeed,

Underwriters are disciplined when they fail to work independently.  (Miller pp. 139-140; Miller Ex. 7).

**2.**   **Home Lending Underwriters Provide Training, Serve As Subject Matter Experts And Work On Special Projects**

In addition to analyzing loan applications and deciding whether Huntington will take on the requested risk, another major component of the Home Lending Underwriter job, consistent with their primary duty of helping to control the amount and type of risk assumed by Huntington, is to provide underwriting training to Bank personnel, serve as subject matter experts and work on special project teams.  However, <u>only 3 out of the 4 Representative Plaintiffs played a significant role in training, as a subject matter expert or a special teams contributor</u>: Becker was part of the Sky Integration project, and as such, trained Sky Bank Underwriters who joined Huntington after a corporate acquisition (Becker pp. 124-125; Becker Ex. 10), Miller was a member of the Bank's "shadow" program where Home Lending Underwriters teach Bank Branch Managers about the different steps involved in underwriting, in an effort to make the process more transparent and streamlined (Miller pp. 115-116; Miller Ex. 5), and Lutz went to Huntington's Morse Road location once a week, for about three months, to train its Loss Mitigation personnel on underwriting, the federal government's Home Affordability Modification Program ("HAMP") and income calculations.  (Lutz pp. 106-107; Lutz Ex. 7).

Home Lending Underwriters also serve as subject matter experts.  For example, Becker was the "go-to" person for Bank personnel outside the Consumer Group who had underwriting questions, and "was the go-to person that other branches would come to" for assistance with certain kinds of loans, "like, special mobile home loans, blind trusts, lands in trust, and different kinds of loans that other branches have never handled."  (Becker p. 126; Becker Ex. 10).

9

Because of their subject matter expertise, Home Lending Underwriters are prime candidates for special projects.  Lutz had the *unique* opportunity to serve on three high profile projects during his last few years of employment with Huntington, discussed *infra*.  (Lutz pp. 66-68, 127-128).

### 3.    Underwriting A Loan Application

While training and special projects can constitute a major component of their responsibilities, Home Lending Underwriters spend the majority of their workday analyzing customer loan applications, and deciding whether Huntington will take on the loan risk. Plaintiffs' deposition testimony firmly establishes that Home Lending Underwriters make numerous and different judgment calls during the course of their analysis and must, in the quest to make the right risk decision, exercise discretion with respect to matters of significance. (Becker pp. 44, 48-49, 50-51,70-71, 79, 120; Lutz pp. 92-93; Miller pp. 64-65, 67-68, 71-72, 76, 80, 91-93, 156).

There are numerous Home Lending Underwriter job duties related to underwriting a loan application, including:[7]

- Home Loan Underwriters are responsible for evaluating all aspects of the loan application, and conducting due diligence to confirm that the applications are complete, the information therein is accurate, and the requested loan has all of the necessary components to support the Home Lending Underwriters' risk decision.  (Def. MSJ, pp. 13-15);

- Home Lending Underwriters independently decide whether to put "stipulations" on files that must be satisfied by customers in order to proceed with the requested loan.  (Def. MSJ, pp. 15-16);

- Consumer Underwriters can exercise discretion to make "exceptions," and approve a requested risk, even though the customer may not otherwise

---

[7]    Huntington provided a detailed 11-page assessment of the Home Lending Underwriter job duties related to underwriting a loan application in its Motion for Summary Judgment or, in the alternative, Motion for Decertification filed with the Court on April 1, 2014.  (Doc. 62, and abbreviated herein as "Def. MSJ").  Rather than restate the detailed information herein Huntington has provided the relevant page numbers for the Court's reference.

satisfy all criteria for a particular loan.  Home Lending Underwriters also have the ability to identify compensating factors that might make up for a loan application deficiency.  The ability to identify and make counter-offers of acceptable risk is also within Home Lending Underwriters' discretion.  (Def. MSJ, pp. 16-18);

- As the loan analysis progressives, Home Lending Underwriters are responsible for identifying suspicious loan applications and applications that do not otherwise appear to be in the customer's best interest.  Home Lending Underwriters are also charged with suggesting solutions to best meet a customer's needs.  (Def. MSJ, pp. 18-20);

- Home Lending Underwriters make complex credit decisions and ultimately decide whether to bind Huntington to the requested loan risk. (Def. MSJ, pp. 20-23);

- Home Lending Underwriters are ultimately responsible for defending the risk decisions they make, regardless of whether they approve or deny the requested loan.  Home Lending Underwriters also independently select the reasons why they deny a requested loan, which is reported to the federal government and set forth in customer denial letters.  (Def. MSJ, pp. 23-24).

## IV.  LAW AND ARGUMENT

### A.  Plaintiffs' Class Allegations Cannot Survive The Required Rigorous Analysis Under Rules 23(a) And 23(b)

#### 1.  The Standard Governing Class Certification Under Rule 23

Before certifying a class action, a district court must conduct a "rigorous analysis" into whether the requirements of Rule 23 of the Federal Rules of Civil Procedure have been satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (*en banc*).  Rule 23 is more than a mere pleading standard, and a party seeking class certification must demonstrate sufficient facts to meet its requirements. *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011).  The "similarly situated" requirement for plaintiffs seeking to certify a collective action under the FLSA is far "less stringent" than the requirements to certify a class action under Rule 23.  *Petty v. Russell Cellular, Inc.*, Case No. 2:13-cv-1110, 2014 U.S. Dist. LEXIS 42185 (S.D.

Ohio Mar. 28, 2014) (citing *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009)).  As this Court recognized, a plaintiff may be able to "[meet] the more lenient standards of FLSA conditional certification," but same facts can "fail[] to provide sufficient evidence to satisfy the rigorous analysis applied to Rule 23."  *Snelling v. ATC Healthcare Servs*., Case No. 2:11-cv-983, 2012 U.S. Dist. LEXIS 172052 at *16 (S.D. Ohio Dec. 4, 2012) (granting conditional FLSA certification but denying Rule 23 motion for class certification).

The U.S. Supreme Court has long established that a class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 131 S. Ct. at 2550 (citing *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)).  Departure from this rule requires that class representatives possess the same interest and suffer the same injury as the proposed class members. *Dukes*, 131 S. Ct. at 2550.  To proceed as a class action, there must be questions of law or fact common to the class, and the Supreme Court has noted that this requirement is "easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'''  *Id.* at 2551 (internal citations omitted).  However, "[w]hat matters to class certification . . . is *not* the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (emphasis added).  Any "[d]issimilarities within the proposed class . . . have the potential to impede the generation of common answers," making class certification inappropriate.  *Id.*

To obtain class certification under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs must establish, after a rigorous analysis, each of the four prerequisites under Rule 23(a) and the prerequisites of one of the three types of class actions provided for by Rule 23(b).  *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945-946 (6th Cir. 2011).  Under

Rule 23(a), a party seeking class certification must show by a preponderance of the evidence that (1) the class is so numerous that joinder of all members is impracticable (numerosity), (2) there are questions of law or fact common to the class (commonality), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality), and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). *Pilgrim,* 660 F.3d at 945; *Falcon*, 457 U.S. at 160-61 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable.").

The analysis required under Rule 23(b) is even more demanding, and Plaintiffs' showing is lacking.  Plaintiffs here rely on Rule 23(b)(3), which provides that a class action may be maintained only where  "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."  *Dukes*, 131 S. Ct. at 2549 (citing Fed. R. Civ. P. 23(b)(3)).  This Court exercises "substantial discretion" in evaluating whether Plaintiffs have met their burden of proof in the interest of efficiently managing its docket. *See, Beattie v. Century Tel. Inc*., 511 F.3d 554, 559 (6th Cir. 2007).  If a party fails to introduce sufficient evidence to demonstrate each of the four prerequisites under Rule 23(a) as well as the applicable prerequisite under Rule 23(b), class certification <u>must</u> be denied. *Pilgrim*, 660 F.3d at 946.

### 2. *Dukes* And Its Application In Wage And Hour Litigation

The Supreme Court's landmark decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), guides the Court's consideration of Plaintiffs' request for class certification.  Rule 23's "commonality" requirement was central to the Supreme Court's decision in *Dukes*.  *Dukes* held that the presence of common questions in any given case is insufficient to establish "commonality" as required under Rule 23 because every case will have common questions such

as whether the employer exempted plaintiffs from overtime, and whether the employer's reliance upon that exemption was lawful.  *See*, *e.g.*, *Dukes*, 131 S.Ct. at 2551.  These questions do not constitute "commonality" under Rule 23, however, because:

> Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. . . . This does not mean merely that they have all suffered a violation of the same provision of law.  . . . Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor.  ***That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.***

*Id.* (emphasis added) (internal quotation marks and citations omitted).  In short, the question, according to the Supreme Court, is not whether common questions, "even in droves," can be raised but the capacity of the class proceeding to generate "common *answers* apt to drive the resolution of the litigation."  *Id.* at 2551 (emphasis in the original).  This mandate from the Supreme Court requires district courts to closely scrutinize the class allegations and consider questions that strike at the merits to determine whether a trial on a representative basis can generate common answers that are likely to resolve the case.  *Id.* at 2551-52 (noting that it is "frequently" the case "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.").  Here, the merits of Plaintiffs' Ohio claims are deeply enmeshed with the Rule 23 determination and, as such, this Court should consider those merits in conducting its "rigorous analysis."[8]

---

[8]     Though Plaintiffs suggest that this Court should not assess any aspect of the merits in considering their motion (Plfs. Mot. p. 13), *Dukes* requires a different result.  Here, as in *Dukes*, the "crux of the inquiry" necessarily focuses on a "particular employment decision"—Huntington's decision to classify the Plaintiffs and the putative class members as exempt from Ohio law requiring the payment of overtime.  Because this decision and the need for Plaintiffs to prove that common answers exist sufficient to satisfy the commonality prong are inextricably intertwined, consideration of the merits is appropriate.  *Id.*

Although *Dukes* involved allegations of class-wide discrimination, the Supreme Court's articulation of Rule 23's requirements applies just as forcefully to wage and hour cases. Since *Dukes* was decided, numerous federal courts have recognized the impact of this case when analyzing whether state law wage and hour claims should be certified under Rule 23. *See, e.g., Wang v. Chinese Daily News,* Nos. 08-55483, 08-56740. 2013 U.S. App. LEXIS 4423 at *11-15 (9th Circuit Mar. 4, 2013) (applying *Dukes* and finding that with respect to a proposed class of about 200 reporters working in a single facility asserting wage and hour claims, material differences exist, preventing a finding of commonality under Rule 23(a)); *In re Bank of Am. Wage & Hour Empl. Litig.,* Case No. 10-MD-2138-JWL, 2012 U.S. Dist. LEXIS 140701, at *60 (D. Kan. Sept. 27, 2012) (denying class certification of state law off-the-clock and meal period claims because even if plaintiffs' claims depended on common contentions capable of class wide resolution, any "common contentions that might exist [were] overpowered by individual issues"); *Aburto v. Verizon California, Inc.*, Case No. CV 11-03683-ODW, 2012 U.S. Dist. LEXIS 329, at **13-18 (C.D. Cal., Jan. 3, 2012) (relying on *Dukes* to deny certification because "the question of whether [class members] were improperly classified as exempt [would] depend on answers unique to each potential plaintiff"); *White v. Western Beef Properties, Inc.*, Case No. 1:07-cv-2345, 2011 U.S. Dist. LEXIS 141696, at **6-16 (E.D.N.Y. Dec. 9, 2011) (applying *Dukes*, court denied Rule 23 certification to a putative class of managers and assistant managers asserting claims for misclassification under New York law; held a class wide proceeding would not generate common answers, where evidence did not show that the job duties of putative class members were "largely consistent" or "generalizable" to others in the proposed class); *Wong v. AT&T Mobility Services LLC*, Case No. CV 10-8869-GW, 2011 U.S. Dist. LEXIS 125988, at **6-20 (C.D. Cal., Oct. 20, 2011) (applying *Dukes* and denying class certification because

resolution of exemption and meal break issues would require individualized analysis); *Cruz v. Dollar Tree Stores*, Case No. 3:07-cv-04012-SC, 2011 U.S. Dist. LEXIS 73938, at *27 (N.D. Cal., July 8, 2011) (applying *Dukes*, court decertifying alleged misclassification wage and hour class action). Guided by the principles of *Dukes* and its progeny, Plaintiffs simply have not and cannot show that, among other things, common answers will prevail over the individual issues presented by this fact-specific exemption case.

**B.** **Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The Numerosity Prong Of Rule 23(a)**

Plaintiffs estimate that the proposed Ohio class consists of approximately 120 Home Lending Underwriters "making joinder difficult and inconvenient" and, on this basis alone, they declare numerosity satisfied. (Plfs. Mot. p. 15). Rule 23, however, requires <u>more</u> than meeting some numerical threshold. In fact, although referred to as "numerosity," the real inquiry under Rule 23(a)(1) is whether joinder would be impracticable. Fed. R. Civ. P. 23(a); *see In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("There is no strict numerical test" for determining numerosity because it turns on the impracticability of joinder). The practicability of joinder depends on the size of the class, the ease of identifying its members' names and addresses, whether the class members are dispersed geographically and whether their individual claims are so small as to inhibit them from pursuing their own claims. *Levels v. Akzo Nobel Salt, Inc.*, 178 F.R.D. 171, 176 (N.D. Ohio 1998), citing *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980), *cert. denied*, 449 U.S. 1113. Consideration of these factors here dictates that Plaintiffs have <u>not</u> established the required numerosity.

Aside from their "estimate" of the number of class members, Plaintiffs have offered no evidence whatsoever to support their claim that joinder is impracticable. (Plfs. Mot. pp. 15, 27). The class list Huntington previously provided Plaintiffs for distribution of notice inviting

participation in this lawsuit identifies 92 former and current Ohio Home Lending Underwriters. All of these individuals reside in Central Ohio, and within the Southern District of Ohio's jurisdiction, but for six who reside elsewhere in Ohio.  All of these individuals are readily identifiable by name and address.  Joinder is considered more practicable than class certification when all members of the class reside in the same geographic area and are easily identifiable, like here.  *Levels*, 178 F.R.D. at 176 (court denied certification, finding that "more important than numbers," joinder was feasible where all class members resided in the Cleveland area); *Young v. Magnequench Int'l, Inc.*, 188 F.R.D. 504, 506 (S.D. In. 1999) (class certification denied where plaintiffs presented no evidence that it would be difficult to join class members, such as geographic dispersion or inability to locate parties); *Sugai Products v. Kona Kai Farms*, Civil No. 97-43 SPK, 1997 U.S. Dist. LEXIS 21503 at * 21 (D. Hawaii Nov. 9, 1997) (joinder was not impractical where 600 class members lived in same geographic area).

Plaintiffs have also failed to provide any evidence that non-participating putative class members lack the financial resources to pursue their own relief independently if they chose to do so, or that the claims at issue are "too small to warrant individual litigation."  Here, a review of Plaintiffs' salaries and alleged hours worked over 40 in a week lead to the inescapable conclusion that the individual claims are not "so small" that individuals will be deterred from bringing individual lawsuits.[9]  *See Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 411 (S.D.N.Y. 1998) ("One of the basic reasons for promulgating Rule 23 was to provide small claimants with a method of obtaining redress for claims which would otherwise be too small to

---

[9]     An estimate based upon Named Plaintiff Becker's testimony proves that the claims are not "so small". Becker last earned an annual salary of $57,148.88.  (Becker p. 107).  Becker testified that during her employment she worked between 55-60 hours per week, but never less than 55 hours (Huntington disputes the accuracy of Plaintiff Becker's hours worked estimate).  (Becker pp. 102-104, 112).  Assuming Becker worked 55 hours per week for 2 years (the maximum statutory period for wage claims under Ohio law) Becker is seeking an individual award of at least $21,424.00—certainly not an amount that deters an individual lawsuit.

warrant individual litigation."). As noted above, 21 members of the putative Ohio class have already joined this overtime lawsuit; thus, Plaintiffs have failed to show that it is "impracticable" to join every putative class member who likewise wishes to assert such claims. Under such circumstances, joinder is not impracticable. *Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 603 (D. Colo. 1990); *Levels*, 178 F.R.D. at 175-76; *Snelling v. ATC Healthcare Servs.*, Case No. 2:11-cv-983, 2012 U.S. Dist. LEXIS 172052 at **16-17 (denying Rule 23 certification because plaintiffs alleging off-the-clock wage claims could not establish "numerosity" where the class was estimated at 150 potential members).

The hybrid nature of Plaintiffs' claims also plays a role in the Court's Rule 23(a) analysis. The Court has already determined that it is not "impracticable" to join every member of the proposed state law class to this action as a "party plaintiff," pursuant to 29 U.S.C. §216(b). (Doc. 27). Each member of the proposed class has been invited to join this lawsuit at least <u>once</u> via the court-approved Notice; and, in some instances, <u>twice</u> because they also received correspondence from Plaintiffs' counsel soliciting their involvement before the Complaint was filed. (Lutz pp. 137-138). Plaintiffs do not claim that the Notice they sent to the Ohio class was defective. Rather, through their Motion, Plaintiffs seek to join to this action those who affirmatively chose *not* to consent to be bound by this Court's rulings. In sum, the Court should deny Plaintiffs' Motion because each member of the putative Ohio class has already been provided the opportunity to join this litigation, and 71 out of approximately 92 chose <u>not</u> to sign up. *See Snelling v. ATC Healthcare Servs.*, Case No. 2:11-CV-00983, 2012 U.S. Dist. LEXIS 172052 at fn. 8 (S.D. Ohio Dec. 4. 2012) ("This Court has allowed plaintiffs to proceed, at least under certain circumstances, with both FLSA collective actions and a class action pursuant to Rule 23. Nevertheless, the Court notes that **Plaintiffs' ability to proceed with an FLSA collective action**

diminishes, at least to some degree, the necessity of proceeding with a class action under Rule 23 as to her state-law claims.") (emphasis added); *see also Spectrum Fin. Cos. v. Marconsult, Inc.*, 608 F.2d 377, 382 (9th Cir. 1979) ("district court did not abuse its discretion in ruling that joinder of 92 class members was practicable where the plaintiffs were able to contact all members about joinder"); *Edwards v. City of Long Beach*, 467 F. Supp.2d 986, 992 (C.D. Cal. 2006) (listing likely confusion to plaintiffs over simultaneous opt in and opt out options as reason to deny motion to certify Rule 23 class brought with Section 216(b) claim).[10]

### C. **Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The Adequacy Prong In Rule 23(a)**

#### 1. **Plaintiffs Cannot Adequately Represent The Ill-Defined Class**

Similar to their superficial numerosity analysis, Plaintiffs pay little attention to whether they are adequate class representatives and, instead, essentially declare that they satisfy their evidentiary obligations.  (Plfs. Mot. pp. 21-22).  Courts examine two criteria when assessing adequacy: (1) the representative must have common interests with unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interests. *Am. Med. Sys.*, 75 F.3d at 1083.  Plaintiffs here seek to represent a class of Ohio Home Lending Underwriters employed "anytime between November 28, 2009 to the present . . . [.]"  (Plfs. Mot. p. 11).  This class definition is insufficiently defined, overbroad and problematic.  Consequently,

---

[10]     In *Chase v. Aimco Props., L.P.*, 374 F. Supp.2d 196 (D.D.C. 2005), the court declined to exercise supplemental jurisdiction over state law claims brought in connection with an FLSA §216(b) claim based upon the reality resulting from allowing opt in and opt out claims to proceed together:

> [A] [plaintiff] with notice of her right to opt in to the FLSA claim and to opt out of the state class action might reasonably decide not to respond to the notice--but then she would be a party in the class action and not a party in the collective action. A judgment in the class action might operate to preclude her from pursuing an FLSA claim on her own, a result plainly at odds with Congress's intent to allow workers to preserve FLSA claims by declining to opt in.

*Chase*, 374 F. Supp.2d at 202.  The same possibility exists here. Home Lending Underwriters who chose not to respond to the May 2013 FLSA notice—which invited them to opt *in* to the action—may again not respond to a notice regarding Rule 23 class certification.  The results of this *same* decision to not mail back the form, however, will be dramatically different, i.e., Home Lending Underwriters who do nothing this time around will end up parties to this action.

Plaintiffs cannot establish by a preponderance of the evidence that they can adequately represent the defined class.

"A properly defined class includes only members who would have standing to bring suit in their own right." *Pilgrim v. Universal Health Card, LLC*, Case No. 5:09-cv-879, 2010 U.S. Dist. LEXIS 28298 at *2 (N.D. Ohio Mar. 25, 2010) (*quoting Chaz Concrete Co., LLC v. Codell*, Case No. 3:03-52-KKC, 2006 U.S. Dist. LEXIS 60013 at *6 (E.D. Ky. Aug. 23, 2006)).  To this point, Section 2305.11 of the Ohio Revised Code specifically provides that "no action by an employee for the payment of unpaid minimum wages, unpaid overtime compensation, or liquidated damages by reason of the nonpayment of minimum wages or overtime compensation shall be commenced within two years after the cause of action accrued." *Id.*  "Ohio law provides for a two-year statute of limitations for claims based upon unpaid overtime compensation, but does not provide for an extension in the case of a willful violation by the employer.  Accordingly, a plaintiff's state law claims may be barred even though his federal claims are not." *Claeys v. Gandalf Ltd.*, 303 F. Supp.2d 890, 893 (S.D. Ohio 2004).

Plaintiffs filed their Complaint on November 28, 2012, which tolled the 2-year statute of limitations for Plaintiffs and putative Ohio class members.  (Doc. 1).  Accordingly, neither Plaintiffs nor any putative Ohio class member can maintain an overtime claim pre-dating November 28, 2010.  Nonetheless, Plaintiffs seek to represent individuals employed since November 28, 2009.  Consequently, Plaintiffs' class definition is impermissibly overbroad because it includes Home Lending Underwriters whose claims are time-barred.  While over breadth of the proposed class alone may not be fatal, "when coupled with failure to meet the remaining requirements," class certification must be denied. *Anderson v. United Fin. Sys. Corp.*,

281 F.R.D. 292, 296 (N.D. Ohio) (denying class certification in part because ill-defined class included individuals with time-barred claims).

### 2.    Plaintiff Lutz Lacks Standing To Represent The Class

Plaintiff Lutz has no viable claim under Ohio law and, for this additional reason, is an inadequate class representative.  Article III of the United States Constitution limits federal court jurisdiction to "cases" and "controversies."  This jurisdictional requirement is satisfied when a plaintiff maintains a personal stake in the outcome of the litigation.  *Gerstein v. Pugh*, 420 U.S. 103 (1975).  To establish standing under Article II, the plaintiff must demonstrate (1) an injury in fact; (2) the injury is fairly traceable to the conduct of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Fieger v. Michigan Supreme Court*, 553 F.3d 955, 962 (6th Cir. 2009).  For standing in a class action, the Supreme Court requires that a "litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court."  *Sosna v. Iowa*, 419 U.S. 393, 413 (1975).  Furthermore, to maintain a class action, the named plaintiff must have a live "case or controversy at the time the complaint is filed and at the time the class action is certified." *Id*. at 402.  "As a corollary to the standing principle, individuals with time-barred claims may not pursue relief as part of a class action, when they would lack the right to sue on their own behalf." *Anderson v. United Fin. Sys. Corp*., 281 F.R.D. 292, 295 (N.D. Ohio 2013).

Lead Plaintiff Lutz resigned his employment with Huntington on December 30, 2010 (Lutz p. 29), and filed the Complaint against Huntington almost 2 years later, on November 28, 2012.  (Doc. 1).  Therefore, any claims for unpaid overtime prior to November 28, 2010, are time-barred, which puts only one month of Lutz's employment (December 2010) within the 2-year Ohio statutory period.  *See* O.R.C. §2305.11.  Plaintiff Lutz, however, testified that <u>he worked no more than 40 hours</u> per week during December 2010:

> Q: And turning to your last month of employment with Huntington when you were getting ready to leave to go to Chase, about how many hours were you working per week in that December?
>
> A: I'll be honest with you, I know business slowed down**, so it was probably the typical 40 hours.** (Lutz p. 150.)
>
> Q: Would that have held – or would that have remained the same for the entire month of December 2010?
>
> A: I just know that at the end, we were very slow. **Things had slowed down to the point where there was not extra hours worked**. (Lutz pp. 150-151.)

Accordingly, Plaintiff Lutz's claims under Ohio law must be dismissed as untimely, and he cannot represent the putative Ohio class. He lacks standing not only in his individual claim, but in his ability to bring a class action. Because Lutz has no viable individual claim, he cannot pursue relief on behalf of a class for which he is not a member. *Anderson*, 281 F.R.D. at 295.

Even if Lutz now claims, contrary to his testimony, that he *did* work more than 40 hours per week in December 2010, he is still an inadequate class representative because he worked for Huntington for only five weeks during the statutory period, and was interviewing for a new job and winding down in preparation for his departure during this limited timeframe. (Lutz pp. 31-32.) Plaintiff Lutz's very absence from the workplace for the overwhelming majority of the relevant period of time makes him an unsuitable representative.

> **D.** **Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The Commonality Prong Of Rule 23(A) Because A Classwide Proceeding Will Not Generate Common Answers To Any Purported Common Questions**

> **1.** **Central Questions Concerning Alleged Wage And Hour Liability Cannot Be Determined Based On Representational Proof**

This Court has recognized that "the Supreme Court has made it more difficult to certify any class action by focusing on the commonality requirement set forth in Rule 23(a)(2)." *Reed*

*Elsevier, Inc. v. Craig M. Crockett*, Case No. 3:10-cv-248, 2012 U.S. Dist. LEXIS 23947, *30 n.11 (S.D. Ohio, Feb. 24, 2012) (citing *Dukes*).  Indeed, the *Dukes* decision can be understood as "melding the commonality requirement with the predominance requirement of Rule 23(b)(3)[,]" and the higher standard a plaintiff must meet to show that there are common questions that can be answered based upon representational proof.  *See Wong*, 2011 U.S. Dist. LEXIS 125988, *11. In support of their burden to prove "commonality" here, Plaintiffs point to an obvious question as "common" to the class—that is, whether Home Lending Underwriters qualify as administratively exempt.  (Plfs. Mot. pp. 1-2, 13-14).  The fact that this question is "common" to each member of the proposed class, however, does not establish "commonality" under *Dukes*. *See Corwin v. Lawyers Title Insurance Co.*, 276 F.R.D. 484, 490 (E.D. Mich. 2011) ("[T]he Supreme Court has recently made clear that the ability to articulate common questions does not by itself satisfy Rule 23(a)(2)[,]" citing *Dukes*).

In *Dukes* the Court noted that commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury'".  *Dukes*, 131 S.Ct. at 2551.  The Court, however, countenanced that "this does not mean merely that they have all suffered a violation of the same provision of law," but that "the claims must depend on a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of the truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*.

Though couched in terms of Rule 23(b)(3)'s predominance requirement and not binding here, the Second Circuit's decision in *Myers v. Hertz Corp.* provides guidance as to how *Dukes* applies to a case like this one.  The Second Circuit made clear in *Myers* that, in an overtime exemption classification case, the key issue is whether putative class members were entitled to overtime.  624 F.3d at 548.  The *Myers* Court affirmed a district court's denial of a Rule 23

motion seeking the certification of a class of Hertz station managers who alleged that they were denied overtime wages under New York state law when Hertz classified them as exempt.[11] *Id.* at 543. As the Court explained, no class could be certified because whether an employee is properly classified as exempt is a "complex, disputed issue" that must "be resolved by examining the employees' actual job characteristics and duties", including the duties each individual employee "actually performs." *Id.* at 548-49; *see also id.* at 550 ("the question of entitlement to overtime pay is answered by examining the employee's actual duties.") (citing 29 C.F.R. §§541.2; 541.700).[12]

Plaintiffs claim that "common proof" will answer the issues of whether Home Lending Underwriters are production employees and whether they exercise discretion and independent judgment "in one stroke," and will allow liability to be determined on a class-wide basis. (Plfs. Mot. p. 14). The "common proof" Plaintiffs cite as applicable to their theories of liability consists of the Home Lending Underwriters' job descriptions; Huntington's decision to classify Home Lending Underwriters as administratively exempt; DCL Spotlight newsletters; audit procedures; and Huntington's Consumer Lending Policy, Fair Lending Policy, and other policies, procedures and tools Home Lending Underwriters use in the performance of their job duties. (Plfs. Mot. pp. 17, 27-28).

---

[11]     The Second Circuit, finding no predominance, did not need to consider the remaining requirements of Rule 23, including 23(a). However, its analysis of commonality is fully consistent with *Dukes*.

[12]     Plaintiffs may argue that it is improper to apply *Dukes* to this case because *Dukes* involved thousands of different employment decisions while this case allegedly involved one—the decision to classify all Home Lending Underwriters as exempt. Such an argument is a red herring. In light of *Dukes*, courts have already begun to decertify Rule 23 classes in misclassification contexts identical to this one because plaintiffs in such cases simply cannot meet *Dukes*' "forceful affirmation of [their] obligation to produce common proof of class-wide liability in order to justify class certification" where the required analysis consists of individualized inquiries into how putative class members actually performed their job duties. *See Cruz v. Dollar Tree Stores, Inc.*, Case No. 3:07-cv-04012-SC, 2011 U.S. Dist. LEXIS 73938 (N.D. Cal., July 8, 2011) (decertifying Rule 23 class on California state law misclassification claims because recent decisions, including *Dukes*, clarified that absent "common proof to serve as the 'glue' that would allow a class-wide determination of how class members spent their time on a weekly basis . . . the commonality threshold, let alone the predominance inquiry of Rule 23(b)(3), has not been met.").

Plaintiffs, however, certainly do not intend to establish Huntington's liability under the FLSA and Ohio law solely in reliance upon this alleged "common proof." The key question here under both of Plaintiffs' liability theories is whether Plaintiffs and the putative class members are entitled to overtime under state law. Consistent with the requirements of 29 U.S.C. §207(a) and Ohio law, in order to meet their *prima facie* burden of proof, each Plaintiff and opt-in plaintiff must establish that he or she worked hours in excess of 40 in a workweek, and as an affirmative defense to such liability, Huntington will seek to prove that each Home Lending Underwriter qualified as administratively exempt, based upon their actual job duties and managers' expectations.

Plaintiffs fail to demonstrate a "common policy" that required each Home Lending Underwriter to work hours in excess of 40 in any particular workweek—which they must establish to prove a violation of the FLSA and state law in the first instance. The fact that Becker claims she always worked at least 55 hours a week (Becker. p. 104), or that Whitacre alleges she works an average of 47 hours per week (Whitacre pp. 66-67) does not establish that any other class member worked in excess of forty hours in any particular week, or any week at all. *See Corwin*, 276 F.R.D. at 490 (denying class certification where "the critical inquiry without which liability cannot attach requires individualized determination"). Contrasting Becker's testimony that she <u>always</u> worked at least 55 hours per week, with Lutz's testimony that he <u>rarely</u> worked more than 40 hours per week (Lutz p. 129-131) and Miller's testimony that there were entire months during which he did <u>not</u> work more than 40 hours per week (Miller pp. 161-162), underscores that individualized inquiries are absolutely necessary.

     **2.**     **Whether Plaintiffs Exercised Sufficient Discretion And Independent Judgment To Meet The Administrative Exemption Cannot Be Answered By "Common Proof"**

Plaintiffs claim, in part, that they "do not exercise sufficient discretion and independent judgment" to meet the administrative exemption. (Plfs. Mot. p. 26). To the contrary, the Representative Plaintiffs testified that, with respect to issues germane to this exemption analyses, each absolutely exercised the requisite independent judgment and discretion, but did so in their own distinct ways. (*See* Defs. MSJ, *generally*, Doc. #62). For example:

Consumer Underwriters Becker and Miller Exercised Discretion to Make "Exceptions":

- Consumer Underwriters can exercise discretion to make "exceptions," and approve a requested risk, even though the customer may not otherwise satisfy all criteria for a particular loan. (Becker pp. 57-58). Consumer Underwriters can independently exercise 2 to 3 exceptions on each application without consulting their managers. (*Id*., pp. 56-57, 70-71; Miller pp. 157-158; Cline Ex. 12). Thus, if a customer does not quite meet all criteria for a particular loan, a Consumer Underwriter can still approve the request. Whether Consumer Underwriters make an exception comes down to whether they think it is appropriate. (Becker pp. 58, 125; Becker Ex. 10; Miller pp. 91-92). Thus, as Becker testified, she would exercise her exception discretion "[i]f it was something I felt comfortable with." (Becker pp. 71-72).

- Lutz testified that as a Consumer Underwriter he could <u>not</u> independently make an "exception." Instead, he had to escalate the matter to his supervisor. (Lutz pp. 58-60).

- Whitacre testified that a few years ago Mortgage Underwriters could independently exercise exceptions, but she did <u>not</u> do so and is uncertain whether she can do so any longer. (Whitacre pp. 108-109).

Consumer Underwriter Lutz Worked on Unique Special Project Teams:

- Lutz served on three high profile projects during his last few years of employment with Huntington. (Lutz pp. 66-68, 127-128). In 2009, Lutz was tapped to be part of an 8-member specialized underwriting team formed to review a high risk portfolio that came to Huntington as part of the Sky Bank acquisition. (Lutz pp. 27-28). The specialized team was tasked with analyzing the portfolio, determining whether loans were in compliance with guidelines, and "trying to figure out what we were

needing to do with this whole program of loans that were high risk."
(Lutz pp. 27-28, 124-125).

- After Lutz finished the Sky Bank high-risk portfolio project, he
transitioned to Huntington's HAMP team, where he was "trying to figure
out what the government wanted us to do," under the new program. (Lutz
pp. 78-81). Lutz participated in conference calls with HAMP government
agencies, Freddie Mac and Fannie Mae, to learn their guidelines and
determine how to underwrite them. (Lutz pp. 78-79). Part of this process
was figuring out how to implement HAMP at Huntington, and Lutz
assisted by testing and improving the underwriting waterfall and Excel
spreadsheets Huntington eventually implemented to underwrite the
program. (Lutz pp. 78-79, 87-88, 102-106; Lutz Exs. 3, 7).

- Lutz next transitioned to Primary Lead Underwriter for the Consumer
Underwriting Pilot, which was a program to restructure the consumer
group to underwrite by stage (initial approval and final approval), rather
than underwriting by geographic assignment. (Lutz pp. 117-121). Lutz
was selected as Primary Lead Underwriter for the project because of his
"ability to minimize the risk" for the Bank. (Lutz Ex. 8, p. 2). Lutz's role
in the Consumer Underwriting Pilot "was telling them what was working
successfully and what wasn't." (Lutz p. 121). Lutz's recommendations
were implemented, and resulted in changes that improved the flow of the
underwriting process. (Lutz pp. 121-122; Lutz Ex. 8).

Mortgage Underwriter Whitacre Manually Underwrites Files:

- Not all loan applications go through an automated underwriting program
and, at times, even if they do, Mortgage Underwriters must still manually
underwrite the file. (Whitacre pp. 93-94). For example, applications for
Huntington's "Doctors Only" program are not run through an automated
underwriting program; rather, the Mortgage Underwriter manually
underwrites the file pursuant to the product profile, and approves the risk
after determining the requested loan meets all of the guidelines. (*Id.*, pp.
83-84, 105-107). In addition, FHA's automated underwriting program
will give a "refer" or "refer eligible" suggestion, stating that the "loan is
being referred to a DE Underwriter for complete review." (Whitacre, p.
93). The "refer" requires the Mortgage Underwriter to "make sure [the
loan] really does meet their guidelines because they can't see from the
information they have that it's okay." (*Id.*, pp. 93-94). A "refer" from
FHA's automated underwriting software also means it is "[le[ft] to the
Underwriter's discretion to determine whether [the loan] is insurable or
not." (*Id.*, p. 95).

Each of the above differences among just the four Representative Plaintiffs are *fundamental* to

the exemption analyses, and Huntington's due process rights demand that such evidence be

27

developed.  Plaintiffs' contention that "whether underwriters exercise discretion and independent judgment [] is common to the class as a whole, and, therefore, can be answered in one stroke," clearly misses the mark.  (Plfs. Mot. p. 27).

In addition, the Representative Plaintiffs' testimony provides a very different perspective of their jobs when compared to the mere automatons described in Plaintiffs' Motion.  (Plfs. Mot. pp. 5-7).  The Representative Plaintiffs agree that they were charged with thoroughly analyzing complex customer loan applications, determining creditworthiness, and deciding whether Huntington will accept the requested loan risk.  (Becker p. 125; Miller pp. 141-142). Significantly, Home Lending Underwriters must "look at all the information" (Becker p. 44), "make a decision based off everything that you pull up, that pulls up, with the applications" (Becker p. 49), "make sure the findings are accurate, meets all of the requirements" (Whitacre p. 98), and ultimately decide if the loan is the kind of risk the Bank will accept.  (Miller p. 142). Simply put, Home Lending Underwriters are not blindly funneling applications through a checklist procedure and rubber stamping suggestions from the automated underwriting software; rather, the Home Lending Underwriters' job is to analyze the information, and to make the ultimate credit decision.  (*Id.*, p. 120).

In light of the many material differences between Plaintiffs' allegations and how Huntington's Home Lending Underwriters actually performed their job duties, Plaintiffs' suggestion that commonality exists here merely because Huntington has policies and procedures (largely mandated by federal regulations) which Home Lending Underwriters follow, must be rejected.  (Plfs. Mot. pp. 17, 27-28).  Courts have routinely rejected the argument that the maintenance of policies and procedures *per se* robs an employee of the ability to exercise

independent judgment and discretion.[13]  Evidence of Huntington's policies and procedures is not sufficient to generate "common answers" at trial regarding exemption, as required by *Dukes*, to satisfy Rule 23(a)'s commonality standard.

In sum, because highly individualized issues render "generalized proof" or a "common answer" an impossibility, Plaintiffs cannot satisfy Rule 23's commonality requirement and no Ohio class can be certified here.  *See, e.g.*, *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp.2d 567, 574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits – for either side – that is reached on the basis of purportedly representative evidence."); *Reyes v. Texas EZPawn, L.P.*, Civil Action No. V-03-128, 2007 U.S. Dist. LEXIS 1461 (S.D. Tex. Jan. 8, 2007) (decertifying class where "[p]laintiffs' deposition testimony. . .  reveals significant differences in each ASM's job duties, discretion, and authority, depending on the practices of individual store managers, store demographics, and location").

### E.  Plaintiffs Cannot Satisfy Their Burden Of Proof With Respect To The Typicality Prong Of Rule 23(a)

In *Dukes*, the Supreme Court noted that the "'commonality and typicality requirements of Rule 23(a) tend to merge" insofar as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Id.* at n.5 (citing *Falcon*, 457 U.S. at

---

[13]   *See, e.g., Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982) (a company, "of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made"); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374 (7th Cir. 2005) ("[w]hile the plaintiffs' discretion may be channeled by the regulations that apply to [the nuclear power] industry that does not mean ComEd employees do not exercise independent judgment. Certainly no one would contend that a tax lawyer does not exercise discretion or independent judgment just because the Internal Revenue Code contains a highly regimented set of rules."); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) ("because [plaintiff] was required to follow detailed manuals does not mean she did not exercise discretion and independent judgment.").

157-58 n.13).    Plaintiffs' inability to satisfy their burden of proof with respect to the commonality requirement of Rule 23 also precludes a finding of typicality.

Typicality "is designed to limit the class claims to those fairly encompassed by the named plaintiff's claims.'"  *Tartt v. Wilson County, Tennessee*, Case No. 3:09-01179, 2012 U.S. Dist. LEXIS 7764, *20-21 (M.D. Tenn., January 24, 2012) (quoting *Bacon v. Honda of America, Mfg., Inc.*, 370 F.3d 565, 572 (6th Cir. 2004)).    Although each putative class member would be asserting an overtime claim under Ohio state law, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry."  *Tartt*, 2012 U.S. Dist. LEXIS 7764, *24 (quoting *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006)).

In *Oetinger v. First Residential Mortgage Network, Inc.*, Case No. 3:06-cv-381-H, 2009 U.S. Dist. LEXIS 61877 (W.D. Ky., July 16, 2009), a federal court in this Circuit determined that the "highly individualized factual circumstances and defenses to liability" in a case involving mortgage bankers prevented plaintiffs from establishing typicality—because the plaintiffs' exempt status could not be determined based upon representational proof.  In denying class certification of their state law claims (and decertifying the collective action under the FLSA), the *Oetinger* court noted that the employer's own classification of the mortgage bankers "means little compared to the employee's actual job duties and circumstances."  *Id.*, *8.  Each plaintiff's claim arose out of his or her personal circumstances on the job, rather than "the same event or practice or course of conduct."  *Id.*, *15 (citing *In re Am. Med. Sys.*, 75 F.3d at 1082).

The proof required to establish an actual violation of state law, meaning that Huntington does not prevail on its exemption defense, will be particularized to each Plaintiff—and each member of the putative class.  For instance, the overwhelming majority of Home Lending

Underwriters have chosen *not* to join this litigation, and could very well have different views regarding their primary job responsibilities, and how they performed the day-to-day tasks on the job.  Plaintiffs' claims are not "typical" of the class as a whole because they base their theory of overtime eligibility upon their personal assessment slanted to support their legal theories.  Therefore, Plaintiffs cannot establish typicality and their Motion should be denied for this additional reason.

### F.    Plaintiffs Cannot Satisfy The Requirements Of Rule 23(b)(3)

#### 1.    Class Members' Individual Claims Establishing Both Liability And Damages Predominate Over Class Issues

It follows that if Plaintiffs cannot establish a critical "common question" susceptible to a common answer based upon representational proof, consistent with *Dukes*, they cannot establish that common questions predominate.  The predominance inquiry required under Rule 23(b)(3) is "far more demanding" than the 23(a)(2) commonality prerequisite.  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997).  Plaintiffs must show that the questions of law or fact common to the entire class predominate over any questions affecting only individual members.  Fed. R. Civ. P. 23(b)(3).

Plaintiffs do not dispute that their individual damages claims cannot be determined representationally, conceding that the amount of any potential recovery by any claimant would necessarily be determined based upon his or her own hours worked and compensation—both variables which vary considerably from one Home Lending Underwriter to another.[14]  Although individualized damages claims standing alone will not defeat class certification, *see Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988), if the defendant's potential liability to the entire class, as well as damages, cannot be determined in a single proceeding, than a class

---

[14]    Plaintiffs opine that damages can be determined on an individual basis, separate from liability.  (Plfs. Mot. p. 23, fn. 1).

should not be certified.  In *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013), the Supreme Court held that the question of individual damages must be assessed as an integral part of the requirement of *Dukes* that plaintiffs seeking class certification must "affirmatively demonstrate" with "significant proof" that class members "suffered the same injury." *See Glazer v. Whirlpool Corp.*, 722 F.3d 838, 860 (6th Cir. 2013) ("To the extent that *Comcast Corp.* reaffirms the **settled rule that liability issues relating to injury must be susceptible of proof on a classwide basis to meet the predominance standard**, our opinion thoroughly demonstrates why that requirement is met in this case.") (emphasis added).

"[W]hether the employee actually meets the requirements for the applicable exemption[] based upon what he or she actually does at work is the crux of the inquiry for the predominant overtime claim in this litigation." *Wong*, 2011 U.S. Dist. LEXIS 125988, *19.  The Court must "examine[] in an individualized fashion the work actually performed by the employee to determine how much of that work is exempt[,] as well as "'whether the employee's work was consistent with the employer's expectation and whether those expectations are realistic.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009).  The parties here dispute the material facts that will determine the applicability of the Bank's affirmative defense: Huntington will establish through its corporate documentation and testimony of its managers, Home Lending Underwriters and other employees that Plaintiffs were primarily engaged in those activities expressly contemplated as exempt under the DOL regulations.  *See* 29 C.F.R. §541.203(b).  Plaintiffs will insist they were just production employees on a loan assembly line, or automatons merely issuing prescribed loan decisions.  In consideration of the dramatically different views of individual class members regarding their primary duty, Plaintiffs have offered no reasoned basis for extrapolating their own selective testimony to the class as a whole.  *Cruz*,

2011 U.S. Dist. LEXIS 73938, *25 (decertifying a misclassification case, concluding that "the failure of Plaintiffs . . . to offer a basis for extrapolation of representative testimony to the class as a whole is fatal to continued certification."); *Spainhower v. U.S. Bank Na'l Ass'n*, Case No. 2:08-cv-137, 2010 U.S. Dist. LEXIS 46316 at *11-13 (C.D. Cal. March 25, 2010) (in the absence of "common proof" that would determine how each employee "actually spent his or her time or what percentage of each employee's work was spent in exempt versus non-exempt activities[,]" common questions did not predominate and a class could not be certified).

### 2. Huntington's Exempt Classification Decision Does Not Establish Predominance

While Plaintiffs claim that Huntington's classification of its Home Lending Underwriters as exempt from overtime eligibility is somehow dispositive of whether common questions predominate over individual issues in this litigation, the "existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common issues.'" *Myers*, 624 F.3d at 549. Plaintiffs attempt to make much of the classification decision, repeatedly citing it as crucial to their request for Rule 23 certification. (Plfs. Mot. pp. 9-10, 17-20, 25, 28-29, 31). As the Second Circuit explained, whether employees were classified as exempt "pursuant to a common policy" is not substantial enough "in the overall mix of issues . . . when compared to the ultimate (contested) question the district court would have to decide in any potential class action: whether plaintiffs were legally entitled to the overtime they were not paid." *Id*. at 550-51; accord *Kopera v. Home Depot U.S.A.*, Case No. 1:09-cv-8337, 2011 U.S. Dist. LEXIS 3382, at *10 (S.D.N.Y. Jan. 11, 2011) (denying class certification in misclassification case, reasoning, "[t]hus, the question—whether ASM Trainees were properly classified under the executive exemption based on their actual duties—is likely to be overwhelmed by a case-by-case inquiry."); *see also Marlo*

*v. UPS, Inc.*, 639 F.3d 942, 948 (9th Cir. 2011) (affirming decertification of class under California state law, reasoning that "a blanket exemption policy does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties. Specifically, the existence of a policy classifying [the employees in question] as exempt from overtime-pay requirements does not necessarily establish that [they] were misclassified, because the policy may have accurately classified some employees and misclassified others"); *Williams v. Lockheed Martin Corp.*, Case No. 09-cv-1669; 2011 U.S. Dist. LEXIS 58716, at **41-42 (S.D. Cal. June 1, 2011) ("Individual inquiries are necessary to determine whether class members are properly categorized as exempt and the need for individual inquiry is not reduced by the presence of centralized control or standard policies governing how employees spend their time.").

### G. A Statewide Class Action Is Not A Superior Method Of Resolving The Claims Of The Class

Finally, Plaintiffs must also demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This requirement addresses "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004). The Rule sets forth a number of factors for consideration in this respect, namely:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id*.

With respect to the first factor, the Home Lending Underwriters in the State of Ohio who declined Plaintiffs' invitation to join them in litigating their co-extensive overtime claims under the FLSA have clearly elected to "control[] the prosecution" of any potential wage and hour claim against their current or former employer, and have decided *not* to be represented for this purpose in this particular case.  That choice should be respected.  Plaintiffs' request to certify a state law class action seeks to accomplish under Rule 23 what they could <u>not</u> achieve using the opt-in mechanism prescribed in Section 216(b) of the FLSA.  Since each putative class member already received one notice regarding participation in this case and declined Plaintiffs' invitation, it makes no sense to make the same request again under a different procedural rule.  In a similar way, the fact that this case is already proceeding with each class member who has consented to join the case, after receiving judicially-approved notice, demonstrates that the rights of the class have been fully protected.

The desirability of concentrating these wage and hour claims in one forum, and the manageability of the class is impacted by the central dispute between the parties regarding the Home Lending Underwriters' primary duty.  The record before the Court establishes that each Home Lending Underwriter views his or her role and responsibilities very differently, and the parties plainly dispute not only the actual facts, but the characterization of those facts for the purpose of assessing the Bank's affirmative exemption defense. "Given the necessary number of individual inquiries, a class action cannot be a superior form of adjudication."  *Tartt*, 2012 U.S. Dist. LEXIS 7764, *24 (internal citation omitted).

Furthermore, a class-wide determination that Home Lending Underwriters are not properly characterized as administratively exempt would have only limited usefulness in adjudicating the actual claims of absent class members, who would still be forced to establish

their *prima facie* overtime case.  Each class member must prove a statutory violation—that they worked hours in excess of the statutory threshold, as well as how many hours they worked on a week to week basis, throughout the relevant limitations period.  *See*, *e.g.*, *Oakley v. Verizon Communications, Inc.*, Case No. 1:09-cv-09175, 2012 U.S. Dist. LEXIS 12975, *47 (S.D.N.Y., February 1, 2012) (denying class certification of statutory claim where "the collateral estoppel effects of a judgment in an individual case would go a long way toward conferring the only advantage afforded by classwide treatment—a binding judgment against [the employer] that a particular policy" violates the law).  Plaintiffs concede that "damages" in this matter cannot be determined collectively, but no Home Lending Underwriter is entitled to "damages" measured as an overtime premium unless he or she first establishes a violation of the FLSA, meaning that they worked more than 40 hours in a week.[15]  Plaintiffs offer no proposal as to how these questions can be answered, especially for absent class members who have already affirmatively declined an invitation to join this litigation.

## V.    **CONCLUSION**

For all of these reasons, Huntington requests that the Court exercise its discretion and decline Plaintiffs' request to expand the claims at issue even further to encompass the state law claims of other Home Lending Underwriters who declined Plaintiffs' first invitation to join this litigation.  Plaintiffs' allegations about their duties and responsibilities as Home Lending Underwriters is inconsistent with the Bank's expectations, the Bank's documentation, and their own frank assessment provided during depositions.  They cannot insist that their particular perspective, consistent only with their theory of liability, is representative of the class.  In the

---

[15]    Plaintiffs' Motion surmises without much analysis that, in this case, damages can be tried separate and apart from liability.  (Plfs. Mot. p. 23, fn 1.)

absence of a "common answer" to this central question in the case, no class can be certified consistent with due process.

Respectfully submitted,

**LITTLER MENDELSON, P.C.**

*s/ Tracy Stott Pyles*
Tracy Stott Pyles, OH Bar. No. 0074241
Kaila M. Krausz, OH Bar. No. 0085517
21 East State Street, 16th Floor
Columbus, OH  43215
Telephone:      614.463.4201
Facsimile:      614.221.3301
E-mail:      tpyles@littler.com
            kkrausz@littler.com

Andrew J. Voss, MN Bar No. 0241556*
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:      612.630.1000
Facsimile:      612.630.9626
E-mail:      avoss@littler.com

*Attorneys for Defendants*

* Admitted *Pro Hac Vice*

37

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing has been filed via the electronic filing system on

April 25, 2014.  Notice of filing will be performed by the Court's electronic filing system and

Parties may access the document through the electronic filing system.

*s/ Tracy Stott Pyles*
Tracy Stott Pyles

Firmwide:126656607.1 067629.1005
4/25/14