**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY LUTZ and DOROTHY BECKER, on behalf of themselves and all others similarly situated,** | : | |
| | : | |
| | : | |
| | : | Case No. 2:12-cv-1091 |
| Plaintiffs, | : | |
| | : | Judge Gregory L. Frost |
| v. | : | |
| | : | Magistrate Judge Norah McCann King |
| **HUNTINGTON BANCSHARES INC. and HUNTINGTON NATIONAL BANK,** | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' RESPONSE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, MOTION TO DECERTIFY THE COLLECTIVE ACTION CLASS**

Dated:  May 16, 2014

Tracy Stott Pyles, OH Bar. No. 0074241
Kaila M. Krausz, OH Bar. No. 0085517
LITTLER MENDELSON, P.C.
21 East State Street, 16th Floor
Columbus, OH  43215
Telephone:      614.463.4201
Facsimile:      614.221.3301
E-mail:          tpyles@littler.com
                    kkrausz@littler.com

Andrew J. Voss, MN Bar No. 0241556*
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:      612.630.1000
Facsimile:      612.630.9626
E-mail:          avoss@littler.com

*Attorneys for Defendants*

*Admitted Pro Hac Vice

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ vi

DEFENDANTS' RESPONSE MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
    MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE
    ALTERNATIVE, MOTION TO DECERTIFY THE COLLECTIVE ACTION
    CLASS ............................................................................................................... 1

I.     INTRODUCTION .......................................................................................... 1

II.    ARGUMENT ................................................................................................. 3

       A.    Huntington's Evidentiary Burden Is No Greater Than Any Other Party In
           A Civil Case Who Must Prove A Claim Or Defense ............................................. 3

Huntington must prevail with respect to its affirmative defense to liability under the Fair Labor Standards Act ("FLSA" or "the Act") if it simply shows by a "preponderance of the evidence" that Home Lending Underwriters are properly classified as administratively exempt from the Act's overtime rule. *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 575-76 (6th Cir. 2007). *See also Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 506-508 (7th Cir. 2007) (Posner, J.) (examining the contorted history of the concept that affirmative defenses to liability under the FLSA must be proved by anything more than a preponderance of relevant evidence). For the purpose of summary judgment the burden of proof is even less relevant. Rather, the relevant question is whether Huntington's Home Lending Underwriters are appropriately classified as exempt administrative employees based upon the application of the law to the undisputed material facts. *Murray v. Ohio Casualty Corp.*, Case No. 2:04-cr-539, 2005 U.S. Dist. LEXIS 41374, **5-6 (S.D. Ohio, Sep. 27, 2005) (applying the summary judgment standard to employer's affirmative defense to liability under the FLSA).

       B.    Plaintiffs' Argument That They Are Production Employees Must Be
           Rejected ................................................................................................................. 4

           1.    The Second Circuit's Non-Binding Decision In Davis v. JPMorgan
               Chase Bank & Co. Is Flawed And Should Not Be Applied ...................... 4

Plaintiffs' core argument urges this Court to adopt the Second Circuit Court of Appeals' non-binding decision in *Davis v. JPMorgan Chase Bank & Co.*, 587 F.3d 529 (2nd Cir. 2009), and to declare that Huntington's Home Lending Underwriters are "production" workers. (Ptfs. Mot. pp. 16-37). The *Davis* decision relies on an outdated interpretation of the administrative production dichotomy, outdated regulations withdrawn in 2004, and obsolete cases decided before the DOL revised its exemption regulations in 2004. No court outside the Second Circuit has relied upon *Davis* to find underwriters nonexempt "production" employees; in fact, the Second Circuit is the only federal circuit court to find loan underwriters nonexempt employees.

# TABLE OF CONTENTS
### (CONTINUED)

As Huntington stated in its Motion for Summary Judgment, this Court is not bound by the administrative production dichotomy nor the Davis decision.

      2.      Davis Outright Ignored The Developing Case Law Questioning And Minimizing The Administrative Production Dichotomy ................. 10

The *Davis* decision completely ignored the growing body of law analyzing the DOL's 2004 regulations and limiting application of, or refusing to apply, the administrative production dichotomy. Despite this body of federal law criticizing application of the administrative production dichotomy outside the manufacturing context, and without giving deference to the DOL's revised 2004 regulations, the Second Circuit reversed the District Court's decision in *Davis* and held that Chase's underwriters were nonexempt "production" workers. *Davis*, 587 F.3d at 535. The *Davis* court did not even attempt to explain its basis for ignoring the contemporary judicial approach to the administrative production dichotomy. In sum, the *Davis* decision is a flawed anomaly that is not entitled to deference or application by this Court.

      3.      Case law From The Sixth Circuit Compels A Finding That Home Lending Underwriters Are Not Production Employees, But Rather Exempt Administrative Employees ......................................................... 12

The Sixth Circuit Court of Appeals recognizes that "[n]ot all work is classified as either production or administrative, as this dichotomy does not fit all cases." *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 644-6456 (6th Cir. 2013). "Only when work falls squarely on the production side of the line, has the administrative production dichotomy been determinative." *Foster v. Nationwide Mut. Ins. Co.*, 695 F. Supp.2d 748, 758 (S.D. Ohio 2010) (finding that insurance Special Investigators were not production employees). Home Lending Underwriters do not work on a manufacturing production line and do not create, market nor sell loan products. There is no question that Home Lending Underwriters do not fall "squarely on the production side of the line." In sum, the work performed by Huntington's Home Lending Underwriters is "directly related" to its business operations, jurisprudence.

      4.      Home Lending Underwriters' Incentive Compensation Does Not Render Them Production Employees ...................................................... 17

Home Lending Underwriters have an incentive component to their compensation that, in part, measures "production." However, Home Lending Underwriters' "productivity" is not the same as producing widgets on a production line. To be clear, the Home Lending Underwriters' "productivity" is not measured based upon the number of loan applications they approve. Rather, "productivity" is measured based upon how often Home Lending Underwriters "touch" a loan application, whether an initial review, a follow-up review to see if conditions have been satisfied, a review that results in a "hold" placed on the application, a review that results in an application being sent back to the loan processor for further documentation, a decline or an

## TABLE OF CONTENTS
### (CONTINUED)

PAGE

approval.  It is not rare for a Home Lending Underwriter to work on the same loan application 4 to 6 times before making a final credit decision.  It is permissible within the Sixth Circuit to pay "additional compensation" to an exempt employee without rendering the employee nonexempt. *See Acs v. Detroit Edison Co.*, 444 F.3d 763, 768 (6th Cir. 2006).  Thus, the mere existence of an incentive component to Home Lending Underwriters' compensation does not harm their exempt status.

C.    Plaintiffs' Admissions Belie Their Claim That Their Job Does Not Include The Exercise Of Independent Judgment And Discretion ................................... 18

1.    Plaintiffs' Argument That They Simply Use Skill To Apply Huntington's Credit Policy Has No Basis In the Undisputed Facts Or The Law ........................................................................................... 21

To support their primary argument that they lack discretion and independent judgment, Plaintiffs contend that they simply use skill to apply Huntington's credit guide.  The undisputed facts and the applicable law render this argument an utter fallacy.  The existence of policies, procedures, and guidelines are absolutely permissible for the administrative exemption.  "While the regulations require the employee to exercise independent judgment, the term does not require this judgment to be made in isolation."  *Piscione v. Ernst & Young*, 171 F.3d 527, 535 (7th Cir. 1999)).  To determine whether an employee allegedly constrained by guidelines and procedure actually exercises discretion and independent judgment, the Sixth Circuit considers whether the guidelines and procedures contemplate independent judgment calls or allow for deviations. *Renfro v. Indiana Michigan Power Co.*, 479 F.3d 573 (6th Cir. 2007).  Home Lending Underwriters exercise the requisite discretion and independent judgment to satisfy the administrative exemption requirements.

2.    Plaintiffs' Argument That Home Lending Underwriters' Primary Duty Does Not Include Matters of Significance Has No Basis In The Undisputed Facts Or The Law ......................................................... 25

Plaintiffs assert, without legitimacy, that the Home Lending Underwriters' ability to bind Huntington to millions of dollars of financial risk each year is of little consequence.  In the alternative, Plaintiffs assert without factual support that Home Lending Underwriters do not actually bind Huntington financially but fail to offer an alternative theory about who, then, binds Huntington to millions of dollars of risk.  Notably, the Representative Plaintiffs' undisputed testimony confirms that they do, in fact, make the ultimate decisions binding Huntington, and do exercise discretion and independent judgment as to matters of significance.

3.    Plaintiffs' Training And Special Project Responsibilities Are Further Evidence In Support Of The Administrative Exemption ................................................................................................. 26

## TABLE OF CONTENTS
### (CONTINUED)

Plaintiffs training and special project responsibilities, including the discretion associated with the design and implementation of training protocols and special projects, is another major component of the Home Lending Underwriter job, consistent with their primary duty of helping to control the amount and type of risk assumed by Huntington.  The undisputed fact that Huntington and its customers receive the benefit of the Home Lending Underwriters' subject-matter expertise demonstrates that Plaintiffs perform exempt administrative work.  *See, e.g., Piscione v. Ernst & Young*, 171 F.3d 527, 535-36 (7th Cir. 1999).

D.   Plaintiffs' Legal Position Regarding The Application Of The Fluctuating Workweek Method Of Calculating Potential Damages Should Be Rejected ...... 27

Plaintiffs chose to singularly focus their FWW analysis on whether the payment of incentive compensation destroys the FWW method of compensation.  In so doing, Plaintiffs wholly ignore the real issue here – how should employees misclassified as exempt from the FLSA's overtime requirements be compensated for past working time.  Decades ago, the United States Supreme Court held that when an employee is, by agreement, paid a fixed weekly salary for hours that fluctuate from week to week, the proper way to calculate the employee's regular rate of pay is to divide the weekly wage by the number of hours actually worked in the particular week.  *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942).

The DOL regulations codified this concept in *Missel* by instructing that overtime may be calculated according to the half-time "fluctuating workweek" method when "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period."  29 C.F.R. § 778.114(a).  In their deposition testimony, Plaintiffs agreed that they were always been paid their weekly salary, regardless of the number of hours they worked, and that they understood their salary was intended to compensate them for all hours worked, no matter how many.

1.   Plaintiffs Ignore The Relevant Fluctuating Workweek Standard For Assessing Misclassifed Employee Wage Claims And Instead Analzye Incentive Compensation Issues ................................................. 27

2.   As a Matter of Law, Plaintiffs' Claim for Straight Time Wages for Hours Worked in Excess of Forty in a Workweek Should Be Dismissed ................................................................................................ 29

E.   Huntington Acted In Good Faith And Did Not Willfully Violate The FLSA ...................................................................................................... 31

# TABLE OF CONTENTS
## (CONTINUED)

PAGE

Plaintiffs' requests for liquidated damages and an extended statute of limitations on these claims should be dismissed.  In an effort to defeat Huntington's request that such claims be dismissed, Plaintiffs minimize the efforts Huntington made to comply with the law and primarily rely upon *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004), which is inapposite to this case.  Here, Huntington established the efforts it went through to make reasoned, correct and compliant classification decisions with respect to its Home Lending Underwriter positions.  These actions, and Huntington's classification decision, satisfy the requirements to show good faith and a lack of willfulness under the FLSA.

F.    Defendants' Motion To Decertify The Collective Action Should Be
Granted.................................................................................................................. 33

Huntington requests that this Court grant it summary judgment and dismiss Plaintiffs' Complaint entirely; however, should the Court find that issues of fact preclude summary judgment, those same issues of fact preclude proceeding with this matter as a collective action.  *See Monroe v. FTS USA, LLC*, 763 F. Supp.2d 979, 986 (W.D. Tenn. 2011) (to avoid decertification, plaintiffs "must meet a stricter standard of proving that the putative plaintiffs are similarly situated" and the review is "more demanding and factually-intensive").

III.   CONCLUSION......................................................................................................... 34

CERTIFICATE OF SERVICE ....................................................................................... 35

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Acs v. Detroit Edison Co.*,
    444 F.3d 763 (6th Cir. 2006) ................................................................................18

*Ale v. Tennessee Valley Authority*,
    269 F.3d 680 (6th Cir. 2002) ................................................................................24

*Bailey v. County of Georgetown*,
    94 F.3d 152 (4th Cir. 1996) .................................................................................30

*Biechele v. Cedar Point, Inc.*,
    747 F.2d 209 (6th Cir. 1984) ...............................................................................19

*Blackmon v. Brookshire Grocery Co.*,
    835 F.2d 1135 (5th Cir. 1988) .............................................................................30

*Bollinger v. Residential Capital, LLC*,
    863 F. Supp.2d 1041 (W.D. Wash. 2012) ....................................................8, 9, 10

*Bothell v. Phase Metrics, Inc.*.
    299 F.3d 1120 (9th Cir. 2009) ...............................................................................5

*Cameron v. Abercrombie & Fitch Co.*,
    Case No. 2:10-cv-631, 2012 U.S. Dist. LEXIS 131557
    (S.D. Ohio, Sep. 14, 2012) ...................................................................................16

*Casas v. Conseco*,
    Case No. 00-1512 (JRT/SRN), 2002 U.S. Dist. LEXIS 5775
    (D. Minn., Mar. 31, 2002) ......................................................................................7

*Caveness v. Vogely & Todd, Inc.*,
    Case No. 3:10-cv-0650, 2011 U.S. Dist. LEXIS 98144
    (M.D. Tenn., Aug. 30, 2011) .....................................................................5, 14, 15

*Cheatham v. Allstate Ins. Co.*,
    465 F.3d 578 (5th Cir. 2006) ...............................................................................25

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984).........................................................................................28, 27

*Clements v. Serco, Inc.*,
    530 F.3d 1224 (10th Cir. 2008) ...........................................................................30

vi

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE(S)

*Coffey v. Chattanooga-Hamilton County Hosp. Auth.*,
 Case No. 98-6230, 1999 U.S. App. LEXIS 25187
 (6th Cir., Oct. 6, 1999) ..................................................................................... 19

*Dalheim v. KDFW-TV*,
 918 F.2d 1220 (5th Cir. 1990) .............................................................................. 7

*Davis v. JPMorgan Chase Bank & Co.*,
 587 F.3d 529 (2nd Cir. 2009) ...................................................................... passim

*Desmond v. PNGI Charles Town Gaming, LLC*,
 630 F.3d 351 (4th Cir. 2011) ............................................................................. 30

*Edwards v. Audubon Ins. Group, Inc.*,
 Case No. 3:02-cv-1618-WS, 2004 U.S. Dist. LEXIS 27562
 (S.D. Miss., Aug. 31, 2004) ............................................................................... 11

*Featsent v. City of Youngstown*,
 70 F.3d 900 (6th Cir. 1995) ............................................................................... 32

*Fife v. Harmon*,
 171 F.3d 1173 (8th Cir. 1999) ........................................................................... 18

*Foster v. Nationwide Mut. Ins. Co.*,
 695 F. Supp.2d 748 (S.D. Ohio 2010) ............................................................... 12

*Foster v. Nationwide Mut. Ins. Co.*,
 710 F.3d 640 (6th Cir. 2013) ............................................................................. 12

*Gagne v. Northwestern Nat. Ins. Co.*,
 881 F.2d 309 (6th Cir. 1989) ............................................................................. 19

*Gonter v. Hunt Valve Co.*,
 510 F.3d 610 (6th Cir. 2007) ............................................................................... 9

*Harper v. GEICO*,
 Case No. 5:12-cv-95, 2013 U.S. Dist. LEXIS 15793
 (E.D.N.Y., Nov. 4, 2013) ............................................................................ 25, 26

*Hayes v. Scruggs, Inc.*,
 990 F.Supp. 545 (E.D. Tenn. 1997) ................................................................... 18

*Heffelginer v. Electronic Data Systems Corp.*,
 580 F. Supp.2d 933 (C.D. Cal. 2008) ................................................................ 12

**TABLE OF AUTHORITIES**
**(CONTINUED)**

PAGE(S)

*Holt v. Olmsted Township Bd. of Trustees,*
    43 F. Supp.2d 812 (N.D. Ohio 1998) ...............................................................................19

*Jacobs v. Nat'l Drug Intelligence Ctr.,*
    548 F.3d 375 (5th Cir. 2008) .........................................................................................10

*Kennedy v. Commonwealth Edison Co.,*
    410 F.3d 365 (7th Cir. 2005) .....................................................................................18, 22

*Kohl v. The Woodlands Fire Dept.,*
    440 F. Supp.2d 626 (S.D. Tex. 2006) ........................................................................11, 12

*Lacourse v. GRS III, LLC,*
    Case No. 05-73613, 2006 U.S. Dist. LEXIS 89935
    (E.D. Mich., Dec. 13, 2006) ........................................................................................9, 14

*Maddox v. Continental Casualty Co.,*
    Case No. CV-11-2451-JFW, 2011 U.S. Dist. LEXIS 151085
    (C.D. Cal. Dec. 22, 2011) ..............................................................................................26

*Martin v. Cooper Electric Supply Co.,*
    940 F.2d 896 (3d Cir. 1991) ...................................................................................6, 17, 33

*Martin v. Indiana Michigan Power Co.,*
    381 F.3d 574 (6th Cir. 2004) ..................................................................................16, 33, 31

*Marting v. Crawford & Co.,*
    Case No. 00-cv-7132, 2006 U.S. Dist. LEXIS 10509
    (N.D. Ill., Mar. 14, 2006) ...............................................................................................25

*McAllister v. Transamerica Occidental Life Ins. Co.,*
    325 F.3d 997 (8th Cir. 2003) ..........................................................................................25

*McLaughlin v. Nationwide Mutual Ins. Co.,*
    Case No. 02-6205-TC, 2004 U.S. Dist. LEXIS 21841
    (D. Ore., Aug. 18, 2004) .................................................................................................12

*Miller v. Farmers Ins. Exchange (In re farmers Ins. Exch.),*
    481 F.3d 1119 (9th Cir. 2007) ........................................................................................10

*Monroe v. FTS USA, LLC,*
    763 F. Supp.2d 979 (W.D. Tenn. 2011).........................................................................33

*Mortgage Bankers Ass'n v. Harris,*
    No. 12-5246 (D.C. Cir., Jul. 2, 2013) ..............................................................................8

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE(S)

*Murray v. Ohio Casualty Corp.*,
  Case No. 2:04-cr-539, 2005 U.S. Dist. LEXIS 41374
  (S.D. Ohio, Sep. 27, 2005) ..............................................................3, 25

*Overnight Motor Transp. Co. v. Missel*,
  316 U.S. 572 (1942) ..............................................................29

*Penny v. United Parcel Service*,
  128 F.3d 408 (6th Cir. 1997) ..............................................................19

*Piscione v. Ernst & Young*,
  171 F.3d 527 (7th Cir. 1999) ..............................................................21, 27

*Pyramid Securities Limited v. IB Resolution, Inc.*,
  924 F.2d 1114 (D.C. Cir. 1991) ..............................................................18

*Reich v. Chicago Title Inc. Co.*,
  853 F.Supp. 1325 (D. Kan. 1994) ..............................................................6, 7

*Reich v. State of New York*,
  3 F.3d 581 (2nd Cir. 1993) ..............................................................7

*Renfro v. Indiana Mich. Power Co. (Renfro I)*,
  370 F.3d 512 (6th Cir. 2004) ..............................................................9, 13, 14, 17

*Renfro v. Indiana Michigan Power Co.*,
  497 F.3d 573 (6th Cir. 2007) ..............................................................3, 9, 13, 21

*Robinson-Smith v. Government Employees Insurance Company*,
  323 F. Supp.2d 12 (D.D.C. 2004) ..............................................................11

*Roe-Midgett v. CC Services, Inc.*,
  512 F.3d 865 (7th Cir. 2008) ..............................................................5, 10, 11

*Schaefer v. Indiana Michigan and Power Co.*,
  358 F.3d 394 (6th Cir. 2004) ..............................................................13, 17

*Schneider v. City of Springfield*,
  Case No. C-3-96-62, 2000 U.S. Dist. LEXIS 6217
  (S.D. Ohio, Mar. 30, 2000) ..............................................................28, 30, 31

*Sessoms v. Ghertner & Co.*,
  Case No. 3:05-cv-0257, 2006 U.S. Dist. LEXIS 29863
  (M.D. Tenn., Apr. 25, 2006) ..............................................................4

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE(S)

*Sisson v. RadioShack Corp.*,
    Case No. 1:12-cv-958, 2013 U.S. Dist. LEXIS 40135
    (N.D. Ohio, Mar. 11, 2013) ...............................................................................27, 28

*Smith v. Johnson & Johnson*,
    593 F.3d 280 (3d Cir. 2010) ........................................................................................6

*Urnikis-Negro v. Am. Family Property Sirus.*,
    616 F.3d 665 (7th Cir. 2010) ....................................................................................30

*Valerio v. Putnam Assocs., Inc.*,
    173 F.3d 35 (1st Cir. 1999) ..................................................................................30, 31

*Wills v. RadioShack Corp.*,
    Case No. 13 Civ. 2733, 2013 U.S. Dist. LEXIS 159727
    (S.D.N.Y., Nov. 7, 2013) ..........................................................................................28

*Yi v. Sterling Collision Centers, Inc.*,
    480 F.3d 505 (7th Cir. 2007) (Posner, J.) ..................................................................3


STATUTES

Administrative Procedure Act,
    5 U.S.C. § 500, *et seq.*................................................................................................8

Fair Labor Standards Act,
    29 U.S.C. § 201, *et seq.*..................................................................................... passim

DOL Opinion Letter,
    FLSA 2006-31, 2006 DOLWH LEXIS 42 (Sep. 8, 2006)......................................7, 8

DOL Opinion Letter, Wage & Hour Div.,
    FLSA 2009-3 (Jan. 14, 2009) ...................................................................................30

Administrator's Interpretation
    FLSA 2010-1 (Mar. 24, 2010) ...................................................................7, 8, 31, 32


OTHER AUTHORITIES

29 C.F.R. § 202(a).............................................................................................................26

29 C.F.R. § 541.201(a)........................................................................................................6

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE(S)

29 C.F.R. § 541.201(b) ......................................................................16

29 C.F.R. § 541.202(e) ......................................................................21

29 C.F.R. § 541.205(a) .................................................................6, 7, 16

29 C.F.R. § 541.602(a) ......................................................................29

29 C.F.R. § 541.704 ..........................................................................21

29 C.F.R. § 778.114 ......................................................................27, 28

29 C.F.R. § 778.114(a) ..................................................................27, 29

69 Fed. Reg. 22122 .........................................................................5, 7

69 Fed. Reg. 22141 ............................................................................5

69 Fed. Reg. 22260 ............................................................................7

73 Fed. Reg. 43654 ..........................................................................27

76 Fed. Reg. 18832 ..........................................................................27

*New Oxford Dictionary*,
  http://www.oxforddictionaries.com/us/definition/american_english/
  ancillary?q=ancillary..............................................................14

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY LUTZ and DOROTHY BECKER, on behalf of themselves and all others similarly situated,** | : : : : | |
| Plaintiffs, | : : | Case No. 2:12-cv-1091 |
| v. | : : | Judge Gregory L. Frost |
| **HUNTINGTON BANCSHARES INCORPORATED and THE HUNTINGTON NATIONAL BANK,** | : : : : | Magistrate Judge Norah McCann King |
| Defendants. | : | |

**DEFENDANTS' RESPONSE MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION
TO DECERTIFY THE COLLECTIVE ACTION CLASS**

## I.    INTRODUCTION

As anticipated, Plaintiffs portray themselves as mere automatons whose every move, thought, and inclination are controlled by Huntington's lending policies.  Plaintiffs' description of the facts, however, lies in stark contrast with the admissions they made at their depositions of the realities of their Home Lending Underwriter jobs.   They admit that Home Lending Underwriters do substantially more than "apply the pre-established policies and guidelines to each loan application reviewed[,]" (quoting Ptfs. Mot. p. 26).[1]  Applying Huntington's credit policies to loan applications is a superficial description of one part of their job duties.  Indeed, Plaintiffs largely ignore their actual testimony in favor of contrived arguments and inapplicable case law that has no relevancy to the facts at hand.

---

[1]      References to Plaintiffs' Motion for Summary Judgment are abbreviated herein as "Ptfs. Mot. p. __".

Plaintiffs rely heavily upon the regulatory nature of the financial industry, and the various policies, procedures, manuals and other tools available to assist Home Lending Underwriters in the performance of their job duties.  While Plaintiffs' Motion attempts to characterize Home Lending Underwriters as merely using skill to apply the guidelines described in these manuals, the Representative Plaintiffs themselves belie such a conclusion in their own testimony.  As Named Plaintiff Dorothy Becker confirmed, these materials are, in fact, "guidelines"—Home Lending Underwriters are still required to use their discretion and independent judgment when making their ultimate risk decisions.  (Becker Dep. pp. 120, 144).  Therein lies but one obstacle to Plaintiff's request for summary judgment.  The Court need look no further than the Representative Plaintiffs' own testimony to decide that it does not comport with the glossed-over superficial analysis in Plaintiffs' Motion.

Plaintiffs' Motion also urges this Court to adopt the Second Circuit Court of Appeal's stand-alone decision in *Davis v. JPMorgan Chase Bank & Co.*, 587 F.3d 529 (2nd Cir. 2009), and find Home Lending Underwriters "production" workers.  Notably, *Davis* has not been adopted by any other federal circuit court, nor applied to Underwriters by any court outside the Second Circuit.

Ultimately, Plaintiffs have submitted nothing to the Court that lays any foundation for their claims that they are production workers or, in the alternative, that Huntington prohibits them from exercising discretion and independent judgment as to matters of significance.  They rely on argument alone, and arguments are not facts. Plaintiffs' failure to provide any admissible evidence raising triable issues of material fact entitles Huntington to judgment on Plaintiffs' claims.

## II.   ARGUMENT

### A.   Huntington's Evidentiary Burden Is No Greater Than Any Other Party In A Civil Case Who Must Prove A Claim Or Defense

Huntington must prevail with respect to its affirmative defense to liability under the Fair Labor Standards Act ("FLSA" or "the Act") if it simply shows by a "preponderance of the evidence" that Home Lending Underwriters are properly classified as administratively exempt from the Act's overtime rule.  *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 575-76 (6th Cir. 2007).  *See also Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 506-508 (7th Cir. 2007) (Posner, J.) (examining the contorted history of the concept that affirmative defenses to liability under the FLSA must be proved by anything more than a preponderance of relevant evidence). For the purpose of summary judgment the burden of proof is even less relevant.  Rather, the relevant question is whether Huntington's Home Lending Underwriters are appropriately classified as exempt administrative employees based upon the application of the law to the undisputed material facts.  *Murray v. Ohio Casualty Corp.*, Case No. 2:04-cr-539, 2005 U.S. Dist. LEXIS 41374, **5-6 (S.D. Ohio, Sep. 27, 2005) (applying the summary judgment standard to employer's affirmative defense to liability under the FLSA).

The two questions that must be determined by the Court on these cross-motions for summary judgment are:

(1)    whether Huntington's Home Lending Underwriters' primary duty relates to Huntington's general business operations; and,

(2)    whether the Home Lending Underwriters exercise independent judgment and discretion, based upon the undisputed material factual record established by the testimony of the Representative Plaintiffs.

No matter how these two elements of the administrative exemption are construed, the administrative exemption applies squarely here.

**B.**  **Plaintiffs' Argument That They Are Production Employees Must Be Rejected**

**1.**  **The Second Circuit's Non-Binding Decision In *Davis v. JPMorgan Chase Bank & Co.* Is Flawed And Should Not Be Applied**

As anticipated, Plaintiffs' core argument urges this Court to adopt the Second Circuit Court of Appeals' non-binding decision in *Davis v. JPMorgan Chase Bank & Co.*, 587 F.3d 529 (2nd Cir. 2009), and to declare that Huntington's Home Lending Underwriters are "production" workers.  (Ptfs. Mot. pp. 16-37).  Plaintiffs claim that, according to *Davis*, underwriters employed by banks "can never be considered exempt administrative employees" because they are always production workers.  (Ptfs. Mot. p. 20).  This blanket statement drives home the absurdity of Plaintiffs' position.  The concept of "administrative" is amorphous and, unquestionably, fact specific.  *Sessoms v. Ghertner & Co.*, Case No. 3:05-cv-0257, 2006 U.S. Dist. LEXIS 29863, at *26 (M.D. Tenn., Apr. 25, 2006).  Accordingly, such an absolute position that avoids even a cursory review of a claimant's job duties in determining the applicability of an exemption under the FLSA underscores why *Davis* should not be followed here.

The *Davis* decision relies on an ***outdated interpretation*** of the administrative production dichotomy, ***outdated regulations*** withdrawn in 2004, and ***obsolete cases*** decided before the DOL revised its exemption regulations in 2004.  No court outside the Second Circuit has relied upon *Davis* to find underwriters nonexempt "production" employees; in fact, the Second Circuit is the only federal circuit court to find loan underwriters nonexempt employees.  As  Huntington stated in its Motion for Summary Judgment, this Court is not bound by the administrative production dichotomy nor the *Davis* decision.  (Defs. Mot. p. 8, fn. 10, p. 33).[2]

---

[2]  References to Huntington's Motion for Summary Judgment or, in the alternative, Motion to Decertify are abbreviated herein as "Defs. Mot. p. __."

More specifically, in *Davis* the Second Circuit cited the outdated 2003 DOL regulation describing the distinction between administrative and production work as being dispositive for interpreting and applying the administrative exemption.  *Davis*, 587 F.3d at 531.  The Second Circuit set up an either/or proposition, unsupported by the revised 2004 regulations, that employment must be classified as either falling in the administrative category, or as production/sales work.  Then the Second Circuit re-characterized several of the underwriters' job duties described by the District Court, reversed the District Court's determination that the underwriters were administratively exempt, and held that Chase's underwriters fell into the nonexempt "production" employee category.  *Id.* at 534-535.

Courts have consistently held that the administrative/production dichotomy in *Davis* is of limited use in analyzing relationships in the modern workplace, "particularly given that the 2004 regulations suggest a more traditional meaning of 'production.'"  *Caveness v. Vogely & Todd, Inc.*, Case No. 3:10-cv-0650, 2011 U.S. Dist. LEXIS 98144 (M.D. Tenn., Aug. 30, 2011) (concluding that the antiquated production/administrative dichotomy is of limited use) (citing *Roe-Midgett,* 512 F.3d 865, 872 (7th Cir. 2008)).  As the DOL expressly stated in the preamble to the revised 2004 regulations:

> "[t]he Department's view that the 'production versus staff' dichotomy has always been illustrative—but not dispositive—of exempt status is supported by federal case law."

69 Fed. Reg. 22122, 22141.  The DOL proceeded to quote from *Bothell v. Phase Metrics, Inc.*:

> "the administrative production dichotomy  . . . is but one analytical tool, to be used only to the extent that it clarifies the analysis. Only when work falls 'squarely on the production side of the line,' had the administrative production dichotomy been determinative."

69 Fed. Reg. 22122, 22141 (quoting *Bothell v. Phase Metrics, Inc.*. 299 F.3d 1120, 1127 (9th Cir. 2009)).  Indeed, the DOL regulations, as revised in 2004, suggest a more traditional meaning of

"production" and state that "directly related" means employees who "assist[] with the running or servicing of the business, as distinguished, for example, from ***working on a manufacturing production line or selling a product in a retail or service establishment***." 29 C.F.R. § 541.201(a) (emphasis added).

In *Davis*, the Second Circuit ignored the DOL's point that "production" should be viewed in the traditional sense, and relied upon outdated judicial opinions issued ***before*** the DOL revised its exemption regulations in 2004. Plaintiffs here rely upon the same obsolete cases. For instance, Plaintiffs cite *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896 (3d Cir. 1991), decided 13 years *before* the DOL's revised 2004 regulations, and involving the classification of telephone sales representatives at a company whose primary business was "to produce wholesale calls." (Ptfs. Mot. p. 52). Notably, the Third Circuit revisited its *Martin* decision in 2010, and agreed that ***the DOL's 2004 regulations render Martin inapplicable***. *See Smith v. Johnson & Johnson*, 593 F.3d 280, 286 (3d Cir. 2010) (when deciding whether administrative exemption applied to pharmaceutical sales representatives, court found *Martin* inapplicable because of the DOL's intervening 2004 regulations). Like the Third Circuit in *Johnson & Johnson*, this Court should decline Plaintiffs' invitation to rely upon both outdated regulations and judicial decisions that rely upon them. (Ptfs. Mot. p. 52).

Plaintiffs also rely on *Reich v. Chicago Title Inc. Co.*, 853 F.Supp. 1325, 1330 (D. Kan. 1994), decided 10 years *before* the DOL's revised regulations, which found escrow closers nonexempt "production" employees after agreeing with the Fifth Circuit's interpretation of § 541.205(a), which drew a distinction between employees whose "primary duty was administering the business affairs of the enterprise from those whose primary duty was producing the commodity or commodities, whether goods or services, that the enterprise exists to

produce and market," quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990). (Ptfs. Mot. p. 24). Notably, the regulation relied upon to support the "production" finding in *Dalheim* and *Reich* (Section 541.205(a)) was ***withdrawn*** in 2004.[3]

Plaintiffs repeatedly cite to *Casas v. Conseco*, Case No. 00-1512 (JRT/SRN), 2002 U.S. Dist. LEXIS 5775 (D. Minn., Mar. 31, 2002), decided two years *before* the DOL revised its regulations and one of the few financial services cases cited by Plaintiffs. (Ptfs. Mot. pp. 22-24). In *Casas*, a federal court in Minnesota applied the administrative production dichotomy to loan originators and concluded they were production employees because they had a *primary duty of sales*. (Ptfs. Mot. pp. 22-24). Notably, Plaintiffs do not claim that they are sales employees like in *Casas*; rather, they allege that Huntington's Home Lending Underwriters are akin to manufacturing employees working on a production line—a twisted view of "production" unsupported by the DOL's 2004 regulations. (Ptfs. Mot. pp. 17-21). Plaintiffs also cite without analysis *Reich v. State of New York*, 3 F.3d 581 (2nd Cir. 1993), decided 11 years *before* the DOL's revised regulations, and applying the administrative versus production analysis to conclude that criminal investigators fell "squarely on the production side" because their primary function was "to conduct—or 'produce'—its criminal investigations." (Ptfs. Mot. p. 22).

In addition to obsolete and irrelevant judicial decisions, Plaintiffs inexplicably "rely" upon the DOL's ***vacated*** Administrator's Interpretation 2010-1. (Ptfs. Mot. pp. 22, 24, 57). For context, in 2006 the DOL issued an opinion letter stating that mortgage loan officers typically fell within the FLSA's administrative exemption. *See* DOL Opinion Letter, FLSA 2006-31, 2006 DOLWH LEXIS 42 (Sep. 8, 2006). In 2010, four months *after* the Second Circuit's *Davis* decision, the Agency reversed its earlier stance and issued an Administrator's Interpretation that

---

[3]       29 C.F.R. § 541.205(a) was removed at 69 FR 22122, 22260, effective Aug. 23, 2004, and is no longer good law.

"explicitly withdrew" the Agency's 2006 opinion letter and instead stated that loan officers were nonexempt under the FLSA. *See* Administrator's Interpretation No. 2010-1 (Mar. 24, 2010).

The Mortgage Bankers Association challenged the DOL's abrupt decision to change its interpretation as a violation of the Administrative Procedure Act and, on July 2, 2013, the D.C. Circuit agreed, and **vacated** Administrator's Interpretation FLSA 2010-1. *Mortgage Bankers Ass'n v. Harris*, No. 12-5246 (D.C. Cir. July 2, 2013) (attached hereto as Exhibit 1). Plaintiffs cite to the Administrator's Interpretation for its views about "work in functional areas" and the exempt status of loan officers under the FLSA. (Ptfs. Mot. pp. 22, 24, 57). However, the 2006 Opinion Letter is once again the DOL's definitive interpretation, and it finds that mortgage loan officers are administratively exempt employees. Accordingly, Plaintiffs' citations to the now **vacated** Administrator's Interpretation 2010-1 as a reason to find Home Lending Underwriters nonexempt production employees under *Davis* makes no sense.

Finally, Plaintiffs repeatedly cite to *Bollinger v. Residential Capital, LLC*, 863 F. Supp.2d 1041 (W.D. Wash. 2012), in an attempt to support their assertion that "the Second Circuit's holding in *Davis* is correct." (Ptfs. Mot. pp. 21-25). However, *Bollinger* **outright rejects** the Second Circuit's holding in *Davis*, stating:

> **It is not clear that Davis says as much as Plaintiffs claim it does.** Although *Davis* phrased its holding in terms of the administrative production dichotomy, it explicitly compared its reasoning to the Ninth circuit approach of treating the dichotomy as a mere tool in a larger inquiry. But **to the extent Davis found the dichotomy dispositive, its analysis was flawed. Davis relied on the pre-2004 example of 'production,' which had no qualifications. The current example equates production with physical manufacturing, and its usefulness is limited accordingly**.

*Bollinger*, 863 F. Supp. 2d at 1047 (citations omitted) (emphasis added). The court in *Bollinger* further commented that the administrative production dichotomy's "focus on traditional

manufacturing lines makes it 'not terribly useful' when applied to service workers," and that "*since 2004, the clear trend is to move away from contrived analogies between services and production*." *Id.* (citations omitted) (emphasis added).

Plaintiffs likely cite to *Bollinger* because even though it rejected the *Davis* holding, the court incorrectly determined that the Underwriters at issue were nonexempt employees. *Bollinger*, 863 F. Supp. 2d at 1048-1050.  Specifically, *Bollinger* determined, contrary to Sixth Circuit case law, that the Underwriters did not perform work that assisted with the running or servicing of business operations because their work was only necessary due to the employer's line of business, and not because the employer was in business, generally.  *Id*. at 1048.  Put another way, under *Bollinger*, an employee is administratively exempt if their work is the type that any employer needs performed by virtue of being in business (like accounting, human resources and regulatory compliance), but not if their work is particular to the employer's industry.  *Id*.

*Bollinger* is completely inapposite to the judicial law in the Sixth Circuit.  *See Renfro v. Indiana Mich. Power Co. (Renfro I)*, 370 F.3d 512, 517 (6th Cir. 2004) (holding that "[w]hen employees engage in *work that is ancillary to an employer's principal production activity*, those employees are *administrative.*") (citations omitted) (emphasis added); *see also Lacourse v. GRS III, LLC*, Case No. 05-73613, 2006 U.S. Dist. LEXIS 89935 (E.D. Mich., Dec. 13, 2006) (applying *Renfro* and finding that a training consultant who taught production employees how to repair vehicle production assembly line was administratively exempt employee engaged in work ancillary to the employer's principal activity of producing motor vehicles).  District courts are bound by law to follow the precedents established by the Circuit Courts of Appeal.  *See, e.g.*, *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 620 (6th Cir. 2007) ("The district court's decision . . .

9

thus contradicts Sixth Circuit precedent."); *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 376 (5th Cir. 2008) (recognizing that district courts are to issue holdings "[c]onsistent with our binding precedent.").  Moreover, the *Bollinger* decision is 2 years old, and no court has relied upon *Bollinger* for its exemption analysis and finding.  Accordingly, *Bollinger* does nothing to advance Plaintiffs' case here.

**2.**    ***Davis* Outright Ignored The Developing Case Law Questioning And Minimizing The Administrative Production Dichotomy**

The *Davis* decision completely ignored the growing body of law analyzing the DOL's 2004 regulations and limiting application of, or refusing to apply, the administrative production dichotomy.  For instance, in *Miller v. Farmers Ins. Exchange (In re farmers Ins. Exch.)*, 481 F.3d 1119 (9th Cir. 2007), the Ninth Circuit determined that insurance claims handlers did not fall on the production side of the administrative production dichotomy:

> ***To place them there would elevate form—corporate form, to be precise—over substance***.  What matters is that, because they represent FIE to the public through their handling of claims and directly impact FIE's customer base, the adjusters' work 'affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

*Miller*, 481 F.3d at 1132 (emphasis added).  Indeed, this Court should reach the same conclusion because Home Lending Underwriters make decisions that directly impact Huntington's customers; as such, their work affects business operations to a substantial degree. (Defs. Mot. pp. 9, 18-20).

In *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008), the Seventh Circuit emphasized the industrial-age genesis of the term "production," found that the DOL's 2004 regulations suggested a more traditional definition of production, like working on a manufacturing production line, and concluded that the administrative production dichotomy

10

was not particularly useful when applied by analogy to the "modern service industry context." *Id.* at 872 (the *Roe-Midgett* court did not ultimately apply the new regulations because they went in effect after plaintiffs filed suit, but still determined that Material Damage Appraisers fell within the FLSA's administrative exemption).

In *Robinson-Smith v. Government Employees Insurance Company*, 323 F. Supp.2d 12 (D.D.C. 2004), the federal court for the District of Columbia criticized the application of the administrative production dichotomy outside the manufacturing or industrial context. The *Robinson-Smith* court stated that the DOL's 2004 regulations make it clear that the DOL "has moved away from the administrative production dichotomy . . . an outmoded line of reasoning" and found that ***"[a]ttemping to force the current situation into a production analogy makes no sense."*** *Id.*at 23, n. 6 (emphasis added).

In *Edwards v. Audubon Ins. Group, Inc.*, Case No. 3:02-cv-1618-WS, 2004 U.S. Dist. LEXIS 27562 (S.D. Miss., Aug. 31, 2004), an instructive case with similar facts, a federal court in Mississippi rejected plaintiff's claim that an insurance underwriter was a production employee, stating:

> ***The administrative-production dichotomy is not a rule of law***. Rather, this dichotomy has always been only 'illustrative—but not dispositive of exempt status;' is but 'one analytical tool' that should be used "toward answering the ultimate question [of exempt status]; and is ***only determinative if the work 'falls squarely on the production side of the line***.

*Id.* at *17 (emphasis added) (citations omitted). Furthermore, in *Kohl v. The Woodlands Fire Dept.*, 440 F. Supp.2d 626 (S.D. Tex. 2006), a Texas federal court emphasized the limitations of the administrative production dichotomy, and noted the:

> [A]nalytic difficulty of applying the production/administrative distinction has led some courts to question whether the dichotomy is analytically helpful in the context of modern service industries and to emphasize that the analogy applied in a particular case only

11

to the extent that it elucidates the phrase 'work directly related to the management policies or general business operations.'

*Id.* at 636; *see also McLaughlin v. Nationwide Mutual Ins. Co.*, Case No. 02-6205-TC, 2004 U.S. Dist. LEXIS 21841, at **13-14 (D. Ore., Aug. 18, 2004) (Oregon federal court refused to apply the administrative production dichotomy, calling it "an outdated line of reasoning."); *Heffelginer v. Electronic Data Systems Corp.*, 580 F. Supp.2d 933, 956 (C.D. Cal. 2008) (court explained that the administrative production dichotomy "is often of **limited use outside the manufacturing context in which it was devised**.") (emphasis added).

Despite the above-detailed body of federal law criticizing application of the administrative production dichotomy outside the manufacturing context, and without giving deference to the DOL's revised 2004 regulations, the Second Circuit reversed the District Court's decision in *Davis* and held that Chase's underwriters were nonexempt "production" workers. *Davis*, 587 F.3d at 535. The *Davis* court did not even attempt to explain its basis for ignoring the contemporary judicial approach to the administrative production dichotomy. In sum, the *Davis* decision is a flawed anomaly that is not entitled to deference or application by this Court.

### 3.    Case law From The Sixth Circuit Compels A Finding That Home Lending Underwriters Are Not Production Employees, But Rather Exempt Administrative Employees

The Sixth Circuit Court of Appeals recognizes that "[n]ot all work is classified as either production or administrative, as this dichotomy does not fit all cases." *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 644-6456 (6th Cir. 2013). "Only when work falls **squarely on the production side of the line**, has the administrative production dichotomy been determinative." *Foster v. Nationwide Mut. Ins. Co.*, 695 F. Supp.2d 748, 758 (S.D. Ohio 2010) (finding that insurance Special Investigators were not production employees) (emphasis added). Home

Lending Underwriters do not work on a manufacturing production line and do not create, market nor sell loan products.  (Defs. Mot. pp. 30-33).  There is no question that Home Lending Underwriters ***do not fall*** "squarely on the production side of the line."  To hold otherwise conflicts with the DOL's revised regulations instructing that "production" means the traditional definition of the word.  Moreover, while Plaintiffs appear to find it significant that every loan must be analyzed and decisioned by a Home Lending Underwriter (Ptfs. Mot. p. 7), Home Lending Underwriters do not approve every loan.  (Defs. Mot. pp. 20-22).  Rather, Home Lending Underwriters' primary responsibility to analyze home lending customer creditworthiness and to decide whether the Bank will take on the requested loan risk, includes putting loans on hold pending the customer's ability to satisfy various criteria, suggesting alternative loan structures and denying a customer's loan request. (Defs. Mot. pp. 15-22).  Thus, even by analogy, Home Lending Underwriters are not metaphorically processing loans on a production line.

While the Sixth Circuit recognizes that the administrative production dichotomy is typically not dispositive, it can be useful "to the extent that it elucidates the phrase 'work directly related to the management policies or general business operations.'"  *Schaefer v. Indiana Michigan and Power Co.*, 358 F.3d 394, 402-403 (6th Cir. 2004).  In *Renfro v. Indiana Mich. Power Co. (Renfro I)*, 370 F.3d 512, 517 (6th Cir. 2004), the Sixth Circuit explained that:

> Under the administrative production dichotomy analysis, the job of ***production employees is to generate (i.e. 'produce') the very product or service*** that the employer's business offers to the public.  When employees engage in ***work that is ancillary to an employer's principal production activity***, those employees are ***administrative.***

*Renfro*, 370 F.3d at 517 (citations omitted) (emphasis added).  As applied in *Renfro*, AEP's principal production activity was generating electricity, the product it offered the public was

13

electricity, and the Planner job at issue had a primary duty of creating plans for maintaining equipment and systems in the nuclear plant that generated the electricity. *Id.* The court found the planners were administratively exempt employees because their work *was ancillary* to AEP's principal production activity of generating electricity. *Id.* at 518.

The term "ancillary" is defined as "[p]roviding necessary support to the primary activities or operation of an organization, institution, industry, or system." *See New Oxford Dictionary*, http://www.oxforddictionaries.com/us/definition/american_english/ancillary?q=ancillary. The "ancillary" concept was applied in *Lacourse v. GRS III, LLC*, Case No. 05-73613, 2006 U.S. Dist. LEXIS 89935 (E.D. Mich., Dec. 13, 2006), where the court determined that a training consultant for General Motors was not engaged in producing motor vehicles when he taught production employees how to repair the production assembly line. *Id.* at **53-55. Instead, the training consultant was engaged in work *ancillary to* GM's principal activity of producing motor vehicles and, as such, was an administratively exempt employee. *Id.* at *56.

In a particularly illustrative case, *Caveness v. Vogely & Todd, Inc.*, Case No. 3:10-cv-0650, 2011 U.S. Dist. LEXIS 98144 (M.D. Tenn., Aug. 30, 2011), the plaintiff worked as a repair costs estimator for an auto repair body shop. The court denied plaintiff's dispositive motion because the facts suggested she assisted "with the running or servicing" of the business and, therefore, was not a production employee. *Id.* at **8-9. The employer was in the business of repairing damaged vehicles, plaintiff was responsible for making repair estimates and, although estimates are necessary to the repair process, the employer was not in the business of selling repair estimates (i.e., while part of the process, the employee did not actually produce the product offered to the public). *Id*. at *10. The court determined that the facts suggested the employee assisted "with the running or servicing of the business," as required for the

administrative exemption, because she "performed general business services **necessary to facilitate** V&T's restoration and repair business . . . [.]" *Id.* (emphasis added).

Similarly, Huntington is in the business of, among other things, providing home loans to customers and Home Lending Underwriters are responsible for analyzing home lending customer creditworthiness and deciding whether the Bank will take on the requested loan risk. (Defs. Mot. p. 2). Home Lending Underwriters do not "create" or "produce" the loans or the credit that Huntington's customers are seeking to finance the purchase of a home. Although Huntington's Home Lending Underwriters are a necessary part of the process by which a customer is approved for a home loan, Huntington is not in the business of selling their credit and risk decisions. Accordingly, Home Lending Underwriters perform general business services **necessary to facilitate** Huntington's home lending business. This primary duty (and responsibility to Huntington's shareholders in order to protect the Bank's assets) cannot reasonably be characterized as "production work." *Caveness*, 2011 U.S. Dist. LEXIS 98144 at *10.

On this point, Plaintiffs twist the testimony of Compensation Consultant, Jason Reveal, and claim his statement that Home Lending Underwriters are "part of the process" is somehow an admission that Home Lending Underwriters are production employees. (Ptfs. Mot. pp. 7, 25). Plaintiffs are wrong. It is entirely permissible for Home Lending Underwriters to be **part of the process**, which is exactly what Mr. Reveal stated:

> Q: Okay. So functionally underwriters are involved with producing loans for Huntington; isn't that right?
>
> A. They are part of the process, yes.

(Reveal Dep. p. 20). Indeed, exempt administrative work includes servicing, supporting, and facilitating the employer's primary business activities, the precise nature of the work performed

by Huntington's Home Lending Underwriters.  In other words, administrative employees are usually "part of the process" if they are facilitating the business.  *See Renfro (I), Caveness, and Lacourse, supra.*

Huntington's Home Lending Underwriters are charged with thoroughly analyzing complex customer loan applications, determining creditworthiness, and deciding whether Huntington will accept the requested loan risk.  (Defs. Mot. pp. 9-10).  It is undisputed that while Home Lending Underwriters are part of the process, they are not responsible for producing a loan.  In this way, Home Lending Underwriters perform a function similar to quality control, which this Court has specifically found does not qualify as "production work."  *See Cameron v. Abercrombie & Fitch Co.*, Case No. 2:10-cv-631, 2012 U.S. Dist. LEXIS 131557, at **13-14 (S.D. Ohio, Sep. 14, 2012) (finding that a Technical Designer whose primary duties were quality control was not a "production" employee because she did not work on a manufacturing production line or sell products in a retail establishment, and because quality control is explicitly listed as an example of the type of work administratively exempt under 29 C.F.R. § 541.201(b)); *see also* 29 C.F.R. § 541.201(b) ("Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . .  quality control . . . and similar activities.").

In an attempt to support their case, Plaintiffs repeatedly cite a decision from the Sixth Circuit finding that a Computer/IT Security Technician did not perform work "directly related to management policies or general business operations of the employer."  *See Martin v. Ind. Mich. Power Co.*, 381 F.3d 574 (6th Cir. 2004).  Plaintiffs devote nearly an entire page in their brief to the court's decision that the IT employee's work was not of "substantial importance"—a requirement in the previous administrative exemption test, 29 C.F.R. § 541.205(a), that was

16

*withdrawn in 2004*. (Ptfs. Mot. p. 19). Accordingly, the "substantial importance" factor is not before this Court because it is no longer part of the DOL's regulations, and the holding in *Martin* is inapplicable here.

Plaintiffs also claim that *Schaefer* supports the Second Circuit's *Davis* decision, but in *Schaefer* the Sixth Circuit rejected the administrative production dichotomy and determined the exemption issue must be resolved using other analytical tools. 358 F.3d at 403. In addition, the *Schaefer* court ultimately did not decide whether the employee engaged in nuclear waste disposal had a primary duty "directly related to" management policies or general business operations because issues of fact precluded a decision. *Id.* Furthermore, *Schaefer* was issued before the Sixth Circuit's *Renfro I* decision which clarified that "work that is ancillary to an employer's principal production activity" is administrative. *Renfro*, 370 F.3d 512, 517.

In sum, and in accordance with the law in this Circuit, the work performed by Huntington's Home Lending Underwriters is "directly related" to its business operations, including work that "services" the home lending business and, as such, is properly characterized as "administrative" rather than "production" work.

### 4. Home Lending Underwriters' Incentive Compensation Does Not Render Them Production Employees

Plaintiffs claim that because Home Lending Underwriters have an incentive component to their compensation that, in part, measures "production," they must be "production" employees. (Ptfs. Mot. pp. 28-29). To be clear, the Home Lending Underwriters' "productivity" is not measured based upon the number of loan applications they approve. Rather, "productivity" is measured based upon how often Home Lending Underwriters "touch" a loan application, whether an initial review, a follow-up review to see if conditions have been satisfied, a review that results in a "hold" placed on the application, a review that results in an application

being sent back to the loan processor for further documentation, a decline or an approval. (Becker Dep. pp. 103-104; Miller Dep. pp. 123-124; Cline Dep. 104-105, 115-116).  It is not rare for a Home Lending Underwriter to work on the same loan application 4 to 6 times before making a final credit decision.  (Whitacre Dep. pp. 116-117).  As such, the Home Lending Underwriters' "productivity" to which Plaintiffs cite is not the same as producing widgets on a production line.

Notably, it is permissible within the Sixth Circuit to pay "additional compensation" to an exempt employee without rendering the employee nonexempt.  *See Acs v. Detroit Edison Co.*, 444 F.3d 763, 768 (6th Cir. 2006); *see also Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 370 (7th Cir. 2005) (rejecting argument that because workers were paid "more than their listed salaries, the resulting upward fluctuations must mean that they were hourly workers" and thus nonexempt); *Fife v. Harmon*, 171 F.3d 1173, 1175 (8th Cir. 1999) (reversing district court's ruling that the payment of additional compensation was "inherently inconsistent" with being a salaried, exempt worker).  Thus, the mere existence of an incentive component to Home Lending Underwriters' compensation does not harm their exempt status.

### C.    Plaintiffs' Admissions Belie Their Claim That Their Job Does Not Include The Exercise Of Independent Judgment And Discretion

Plaintiffs' brief tries to run away from the admissions they made at their depositions about the significant discretion and independent judgment they exercised.  Indeed, Plaintiffs largely gloss over testimony about their actual job duties, and instead focus on Huntington's documents and case law that is not tied to the actual facts here.  (Ptfs. Mot. pp. 9-13, 38-45).  Their admissions, however, are controlling.  *See Hayes v. Scruggs, Inc.*, 990 F.Supp. 545, 550 (E.D. Tenn. 1997) ("[P]laintiff's admissions . . . are material factors and will be given controlling weight by this court at the summary judgment stage."); *see also Pyramid Securities Limited v. IB*

*Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) (parties' prior sworn statements must be given "controlling weight" at summary judgment).

The undisputed evidence, including Plaintiffs' sworn testimony, establishes that Huntington's Home Lending Underwriters exercise the required judgment and independent discretion for the administration exemption. <u>First</u>, as the Representative Plaintiffs acknowledged, their job is not to just blindly funnel an application through a checklist procedure and rubber stamp the outcome; rather, Home Lending Underwriters analyze the information, and make the ultimate credit decision. (Defs. Mot. pp. 13-15). <u>Second</u>, Home Lending Underwriters must question and compare information on the credit bureau with the application to confirm veracity, identify "conditions" to place on a file, and decide whether to place "stipulations" on files that customers must satisfy in order to proceed with the requested loan. (Defs. Mot. pp. 13-16).

<u>Third,</u> Plaintiffs admitted at their depositions that Consumer Underwriters have discretion to make exceptions and approve a requested risk, even though the customer did not otherwise satisfy all criteria for a loan. (Defs. Mot. pp. 16-18). Incredibly, Plaintiffs now claim *without factual support* that they somehow did not have discretion to decide whether to make an exception.[4] (Ptfs. Mot. pp. 43-44). Plaintiffs wholly ignore their testimony on this subject, which explained that ***whether to make an exception comes down to whether they think it is appropriate***. (Becker Dep. pp. 58, 125; Becker Dep. Ex. 10; Miller Dep. pp. 91-92).

---

[4]      It is well settled within the Sixth Circuit law that a party cannot contradict his or her sworn deposition testimony in an effort to create a genuine issue of material fact unless the party provides a persuasive justification for the contradiction. *See Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997); *Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 315 (6th Cir. 1989) *(overruled on other grounds); Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984). "If a witness, who has knowledge of a fact, is questioned during her deposition about that fact, she is required to bring it out at the deposition" and cannot contradict her testimony through subsequent sworn testimony. *Holt v. Olmsted Township Bd. of Trustees,* 43 F. Supp.2d 812, 817 (N.D. Ohio 1998) (internal citations omitted). Plaintiffs have offered nothing to support their new claim that they lacked discretion to decide whether to make an exception. Therefore, Plaintiffs' contrived "dispute" of material fact cannot preclude summary judgment here. *See Coffey v. Chattanooga-Hamilton County Hosp. Auth.*, Case No. 98-6230, 1999 U.S. App. LEXIS 25187 (6th Cir., Oct. 6, 1999) (affirming summary judgment where the only disputes of material fact were found within Plaintiff's own testimony).

Furthermore, Plaintiffs' tortured argument that discipline for failing to exercise exception authority is actually discipline for exercising some kind of discretion, is nonsensical. (Ptfs. Mot. p. 44, fn. 8). More specifically, as a Home Lending Underwriter, Plaintiff Miller was expected to use his discretion and independent judgment to make exception decisions when appropriate. (Miller Dep. pp. 136-137; Miller Dep. Ex. 8). Plaintiff Miller failed to do so, and was disciplined. (*Id.*). Plaintiffs' argument that by failing to perform expected job duties Plaintiff Miller was actually exercising discretion and independent judgment, for which he was disciplined, makes no sense. Taken to its logical conclusion, Plaintiffs' argument means that nearly every workplace violation is the exercise of discretion and independent judgment.

Fourth, Home Lending Underwriters have the ability to identify compensating factors that might otherwise make up for deficiencies in the loan application, and to identify appropriate counter-offers. (Defs. Mot. pp. 16-18). Fifth, Home Lending Underwriters are responsible for acting in the customer's best interest, including flagging suspicious applications for investigation, determining whether the collateral fits the requested loan, and finding solutions to potential problems. (Defs. Mot. pp. 18-20). Sixth, Home Lending Underwriters admittedly make complex credit decisions, and ultimately bind Huntington to the requested loan risk. (Defs. Mot. pp. 20-23). Seventh, Home Lending Underwriters are ultimately responsible for defending their risk decisions, regardless of whether they approve or deny a loan. (Defs. Mot. pp. 23-24).

A review of Plaintiffs' 59-page Cross-Motion for Summary Judgment reveals that Plaintiffs rarely mention any of these actual job duties. (Ptfs. Mot. *generally*). Instead, Plaintiffs repeat a few superficial arguments and ignore the undisputed evidence that Home Lending Underwriters exercise the requisite discretion and independent judgment for the administrative exemption. (Defs. Mot. pp. 9-24).

      1.    **Plaintiffs' Argument That They Simply Use Skill To Apply Huntington's Credit Policy Has No Basis In the Undisputed Facts Or The Law**

To support their primary argument that they lack discretion and independent judgment, Plaintiffs contend that they simply use skill to apply Huntington's credit guide. (Ptfs. Mot. pp. 38-45). The undisputed facts and the applicable law render this argument an utter fallacy. The DOL's regulations on this issue provide, in pertinent part, that:

> The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources.

29 C.F.R. § 541.202(e). The existence of policies, procedures, and guidelines are absolutely permissible for the administrative exemption. "While the regulations require the employee to exercise independent judgment, *the term does not require this judgment to be made in isolation*." *Piscione v. Ernst & Young*, 171 F.3d 527, 535 (7th Cir. 1999) (emphasis added). On this point, the DOL regulations explain:

> The use of manuals, guidelines, or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part. Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status.

29 C.F.R. § 541.704. To determine whether an employee allegedly constrained by guidelines and procedure actually exercises discretion and independent judgment, the Sixth Circuit considers whether the guidelines and procedures contemplate independent judgment calls or allow for deviations. *Renfro v. Indiana Michigan Power Co.*, 479 F.3d 573 (6th Cir. 2007).

Plaintiffs do not rely upon their undisputed testimony to support their argument that they simply use skill to apply Huntington's policies, because they cannot.  Rather, Plaintiffs make a series of red herring arguments—none of which have merit.  For example, Plaintiffs claim that because Huntington's Credit Policy Manual advises that "[l]ending personnel are expected to exercise their judgment regarding credit decisions objectively," Home Lending Underwriters only apply skills and are not empowered to exercise discretion or independent judgment.  (Ptfs. Mot. pp. 38-45).  Not surprisingly, Plaintiffs fail to mention that Huntington's Credit Policy Manual also advises ***more than 50 times*** that Home Lending Underwriters have the ability to make exceptions to approve a loan where the customer might not otherwise qualify.  (Exhibit A to the Affirmation of Sarah M. Born, filed with the Court on April 22, 2014).  Plaintiffs also fail to mention that Huntington's Credit Policy Manual includes a specific "Exceptions/Override Authority" policy, and further provides that Home Lending Underwriters may make "override" decisions apart and in addition to exceptions.  (*Id*.).

Requiring Home Lending Underwriters to make their credit analysis and risk decisions based upon objective factors, such as credit scores and loan-to-value ratios, rather than because they like the customer's name, promotes responsible lending and does not mean they are otherwise prohibited from exercising discretion and independent judgment. The home lending financial business is heavily regulated, including Fair Lending regulations that are in place for every financial institution. (Cline Dep. p. 187).  Working in an exceedingly regulated workplace does not mean there is no room to exercise independent judgment.  Taken to its logical limit, such a blanket rule would prevent any employee at Huntington from falling under the administrative exemption. *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365 (7th Cir.

2005) (rejecting argument that nuclear industry employees did not exercise independent judgment where nuclear regulatory guidelines and procedures were strictly controlled).

Relatedly, Plaintiffs claim that Huntington's Fair Lending Policy, which prohibits discriminatory lending decisions and requires the equal treatment of applicants without regard to race, gender, marital status, age or any other protected category, somehow inhibits Home Lending Underwriters in their exercise of discretion. (Ptfs. Mot. pp. 11-12). This type of argument hardly merits a response. It is true, Plaintiffs were prohibited from evaluating credit risk based upon the race of Huntington's customers. Taken to the extreme, according to Plaintiffs every employee who must abide by an equal opportunity policy is at risk of losing their administrative exempt status. Requirements to follow statutory and regulatory law, which most employees must do at some level, does not mean that such employees can only be nonexempt workers.

Plaintiffs also cite Huntington's goal of providing its customers the "correct" or "right" answer as contrary to the Home Lending Underwriters' exercise of discretion and independent judgment. (Ptfs. Mot. pp. 41-45). By and large, all employers expect their employees to make the "correct" judgment call in the performance of their job duties—Huntington is no different. Plaintiffs even claim that because Home Lending Underwriters must defend their credit analysis and risk acceptance decisions, this means they lack the requisite discretion and independent judgment. (Ptfs. Mot. pp. 42-43). To the contrary, due to the critical nature of their decisions, Home Lending Underwriters on occasion must explain the basis for the *choices* they made. This actually underscores that they *do make decisions* and thereby exercise discretion and independent judgment with respect to matters of significance. (Defs. Mot. pp. 22-23). Plaintiffs also allege that there can only ever be one possible decision on a loan—and that same decision is

made regardless of the Home Lending Underwriter.  (Ptfs. Mot. pp. 42-43).  Plaintiffs need look

no further than their own testimony to understand the fallacies in that statement.  (Becker Dep.

pp. 56-58, 71-72).[5]

In addition to their obscure factual arguments not premised upon testimony about their

actual job duties, Plaintiffs cite *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 686 (6th Cir.

2002), in an attempt to support their claim that they merely use skill to apply Huntington's

procedures.  (Ptfs. Mot. pp. 38-40).  In *Ale,* the Sixth Circuit examined numerous jobs, and found

that the Training Officer was not administratively exempt because he inherited the training tests

he administered, and could only make changes required by the Nuclear Regulatory Commission.

*Ale*, 269 F.3d at 686.  The Sixth Circuit determined that Lieutenants who provided security and

supervised officers were not administratively exempt because they had specific guidelines for

evaluating the officers' conduct, and there were guidelines and instructions for almost every

possible occasion.  *Id*. at 686-687.  In *Ale* it appears that none of the at-issue positions had the

ability to make independent decisions about matters of significance.   However, here, the

Representative Plaintiffs repeatedly testified about their ability to exercise discretion and

independent judgment with respect to matters of significance throughout the performance of their

primary duty – the assessment of credit risk, regardless of the existence of Huntington's Credit

Manual, Fair Lending Policy, and other policies, procedures and programs.  (Defs. Mot. pp. 9-

24).  Accordingly, *Ale* is inapposite to the instant matter.

Indeed, courts recognize that employees who do not have ultimate authority to do as they

please and are bound to comply with internal procedures, can still exercise the level of discretion

---

[5]      Plaintiffs repeatedly cite to testimony from Mary Cline to support the assertion that there can only ever be
one possible decision on an application; thus, regardless of the Home Lending Underwriter assigned to a file, the
same decision must be generated.  (Ptfs. Mot. pp. 42-44).  Ms. Cline never made any such statement, and the pages
to which Plaintiffs cite from Ms. Cline's deposition does not contain such testimony.

and independent judgment required for the administrative exemption. *See Murray v. Ohio Casualty Corp.*, Case No. 2:04-cr-539, 2005 U.S. Dist. LEXIS 41374 (S.D. Ohio, Sep. 27, 2005) (finding insurance claims specialist administratively exempt even though she was required to use a computer software estimating program and internal investigation guidelines). Courts also accept the need for uniform procedures to ensure consistency with customer interactions and find that ***uniformity does not destroy*** the administrative exemption. *See Harper v. GEICO*, Case No. 5:12-cv-95, 2013 U.S. Dist. LEXIS 15793 (E.D.N.Y., Nov. 4, 2013) (finding telephone service representatives administratively exempt employees even though there were company-wide manuals, procedures, claims software and supervisors guiding the employees); *see also Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (requirement that adjusters consult with manuals or guidelines does not preclude exercise of discretion and independent judgment); *Marting v. Crawford & Co.*, Case No. 00-cv-7132, 2006 U.S. Dist. LEXIS 10509, at *26 (N.D. Ill., Mar. 14, 2006) ("Although there were guidelines, some of which contained specific rules, adjusters nonetheless still had to make numerous choices. . . . [T]he investigative process involved numerous choices that were often dictated by the unique facts at hand."); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) (claims adjuster exercised discretion and independent judgment even though she was required to follow state law and procedures in the claims manual).

> **2.** **Plaintiffs' Argument That Home Lending Underwriters'
> Primary Duty Does Not Include Matters of Significance Has
> No Basis In The Undisputed Facts Or The Law**

Plaintiffs assert, without legitimacy, that the Home Lending Underwriters' ability to bind Huntington to millions of dollars of financial risk each year is of little consequence. (Ptfs. Mot. pp. 45-46). In the alternative, Plaintiffs assert *without factual support* that Home Lending Underwriters do not actually bind Huntington financially but fail to offer an alternative theory

about who, then, binds Huntington to millions of dollars of risk.  (*Id*.).  Notably, the Representative Plaintiffs' undisputed testimony confirms that they do, in fact, make the ultimate decisions binding Huntington.  (Defs. Mot. pp. 20-23).

There can be no reasonable dispute that Home Lending Underwriters make decisions regarding "matters of significance."  In this context, [t]he term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 202(a).  Home Lending Underwriters possess lending authority ranging from <u>$250,000 up to one million dollars</u>. (Becker Dep. pp. 48, 72; Miller Dep. p. 56; Lutz Dep. p. 54; Whitacre Dep. p. 143).  The analysis and risk decisions rendered by Home Lending Underwriters do not only effect Huntington, but also its customers.  These are both serious, consequential matters.  Plainly, Home Lending Underwriters' decisions affect "matters of significance."  *See Harper*, 2013 U.S. Dist. LEXIS 157938 at *40-41 (recognizing that impacting customers "is a significant matter to the company's overall business reputation and, consequently, its financial health and potential for growth."); *Maddox v. Continental Casualty Co.,* Case No. CV-11-2451-JFW (PLAx), 2011 U.S. Dist. LEXIS 151085 at *17 (C.D. Cal. Dec. 22, 2011) (insurance underwriter who evaluated risks, determined their acceptability, and made pricing decisions and recommendations exercised discretion and independent judgment with respect to matters of significance).

**3.**    **Plaintiffs' Training And Special Project Responsibilities Are Further Evidence In Support Of The Administrative Exemption**

Plaintiffs pay little attention to their training and special project responsibilities.  (Ptfs. Mot. pp. 32-33).  They do so because these facts are inconsistent with their theory that they merely use skill to apply policies and procedures.  This theory, however, is belied by the undisputed factual record.  (Defs. Mot. pp. 10-13).

These activities, including the discretion associated with the design and implementation of training protocols and special projects is another major component of the Home Lending Underwriter job, consistent with their primary duty of helping to control the amount and type of risk assumed by Huntington.  The undisputed fact that Huntington and its customers receive the benefit of the Home Lending Underwriters' subject-matter expertise demonstrates that Plaintiffs perform exempt administrative work.  *See, e.g., Piscione v. Ernst & Young*, 171 F.3d 527, 535-36 (7th Cir. 1999).

> **D.**   **Plaintiffs' Legal Position Regarding The Application Of The Fluctuating Workweek Method Of Calculating Potential Damages Should Be Rejected**

> **1.**   **Plaintiffs Ignore The Relevant Fluctuating Workweek Standard For Assessing Misclassifed Employee Wage Claims And Instead Analzye Incentive Compensation Issues**

Plaintiffs claim that the fluctuating workweek ("FWW") method of calculating potential overtime damages, pursuant to 29 C.F.R. § 778.114(a), is inapplicable here.  (Ptfs. Mot. pp. 49-51).  Plaintiffs primarily rely upon *Sisson v. RadioShack Corp.*, Case No. 1:12-cv-958, 2013 U.S. Dist. LEXIS 40135 (N.D. Ohio, Mar. 11, 2013), as support for their argument.  (Ptfs. Mot. pp. 49-50).  By way of background, the Department of Labor (DOL) historically recognized that the payment of incentive compensation did not undermine the "fixed salary" component of a valid FWW plan under 29 C.F.R. § 778.114.  In 2008, the DOL even issued a notice of proposed rulemaking to amend § 778.114 to clarify and confirm its position that bonus or premium payments do not invalidate the FWW method.  73 Fed. Reg. 43654.

In 2011, however, the DOL abruptly rescinded the proposed amendment and changed its position, announcing (in a preamble to a Final Rule) that the payment of bonus and premium payments is "incompatible" with the FWW method.  76 Fed. Reg. 18832.  In *Sisson*, the court granted *Chevron* deference to the DOL's 2011 announcement even though it did not result in any

change to the relevant text of § 778.114.[6]  The court concluded that while bonus payments to FWW employees were lawful prior to 2011, the language in the preamble to the 2011 Final Rule changed the law and rendered subsequent bonuses incompatible with the FWW method.  Later, acknowledging its "struggles with this issue and with the deference to be afforded the DOL's Final Rule," the court certified its order for interlocutory appeal to the Sixth Circuit.

In November 2013, the Southern District of New York issued a thoughtful and well-reasoned decision rejecting the holding in *Sisson*.  In *Wills v. RadioShack Corp.*, Case No. 13 Civ. 2733, 2013 U.S. Dist. LEXIS 159727 (S.D.N.Y., Nov. 7, 2013), the court concluded that the 2011 Final Rule left in place a distinction between hours-based bonuses (which it held were incompatible with the "fixed salary" requirement) and performance-based bonuses (which are not).

On March 5, 2014, the Sixth Circuit granted RadioShack's petition for permission to appeal.  The Court of Appeals noted that the question of whether the payment of performance-based bonuses is inconsistent with the FWW method "is a difficult, novel issue of first impression" and that the "only other case directly on point [*Wills*] reached a conclusion contrary to that of the district court" in *Sisson*.  Except for the recent decision in *Sisson*, a first impression issue on appeal, courts in the Sixth Circuit apply the FWW method of calculating backpay to overtime litigation.  *See Schneider v. City of Springfield*, Case No. C-3-96-62, 2000 U.S. Dist. LEXIS 6217, **25-26 (S.D. Ohio, Mar. 30, 2000). Plaintiffs ignore this established authority altogether, but it provides this Court with the proper legal rule to apply here, and on the basis of that rule, Plaintiffs' claim for straight-time wages for hours worked in excess of forty in a workweek should be flatly rejected.

---

[6]     *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is the leading case in which the United States Supreme Court set forth the legal test for determining whether to grant deference to a government agency's interpretation of a statute which it administers.

2.    **As a Matter of Law, Plaintiffs' Claim for Straight Time Wages for Hours Worked in Excess of Forty in a Workweek Should Be Dismissed.**

Plaintiffs chose to singularly focus their FWW analysis on whether the payment of incentive compensation destroys the FWW method of compensation, *supra*. (Ptfs. Mot. pp. 49-51).  In so doing, Plaintiffs wholly ignore the real issue here – how should employees misclassified as exempt from the FLSA's overtime requirements be compensated for past working time. (Defs. Mot., pp. 44-46).  Decades ago, the United States Supreme Court held that when an employee is, by agreement, paid a fixed weekly salary for hours that fluctuate from week to week, the proper way to calculate the employee's regular rate of pay is to divide the weekly wage by the number of hours actually worked in the particular week.  *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942).  The DOL regulations codified this concept in *Missel* by instructing that overtime may be calculated according to the half-time "fluctuating workweek" method when "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period."  29 C.F.R. § 778.114(a).

At the foundation of salaried status, consistent with the DOL regulations governing the administration of an exempt employee's compensation, is that the employee receives "a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602(a).  In other words, the exempt employee receives his salary, regardless of the number of hours he works, whether many or few.  It follows only logically that when a salaried employee challenges his exempt status and it is undisputed that he was been paid on a salaried basis, the Circuit Courts have uniformly held that the employee is only entitled to

recover his half-time overtime premium, calculated based upon the salary paid for each individual week divided by the total number of hours worked, week by week. *See, e.g.*, *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351 (4th Cir. 2011); *Urnikis-Negro v. Am. Family Property Sirus.*, 616 F.3d 665 (7th Cir. 2010); *Clements v. Serco, Inc.*, 530 F.3d 1224, 1230-1231 (10th Cir. 2008); *Valerio v. Putnam Assocs., Inc.,* 173 F.3d 35 (1st Cir. 1999); *Blackmon v. Brookshire Grocery Co.,* 835 F.2d 1135 (5th Cir. 1988).[7] Courts in this judicial district calculate damages in FLSA cases similarly. *See Schneider v. City of Springfield*, Case No. C-3-96-62, 2000 U.S. Dist. LEXIS 6217, **25-26, 37-38 (S.D. Ohio, Mar. 30, 2000). Plaintiffs benefitted from the advantages of salaried status during the period they were classified as exempt—they cannot recharacterize their salary as the sum of their hourly wages for any set number of hours when that recharacterization is not grounded in actual fact.

The DOL likewise advises that employees are only entitled to the half-time premium payment when their employer determines that they have been misclassified as exempt from the FLSA's overtime requirement, if the employees "received and accepted the salary knowing that it covered whatever hours they worked." *See* DOL Wage & Hour Div. Op. Ltr., FLSA2009-3, at 2 (January 14, 2009) (citing *Clements*).

In their deposition testimony, Plaintiffs agreed that they were always been paid their weekly salary, regardless of the number of hours they worked, and that they understood their salary was intended to compensate them for all hours worked, no matter how many. (Becker Dep. pp. 34-36, 104, 112, 110-111; Miller Dep. pp. 29-30, 165-166; Lutz Dep. pp. 25-26, 129, 131; Whitacre Dep. pp. 42-43. 65-67). There was never any "understanding" that if they worked

---

[7]     This "mutual agreement" does not extend to how overtime will be calculated. *Clements*, 530 F.3d at 1230; *Bailey v. County of Georgetown*, 94 F.3d 152, 156-57 (4th Cir. 1996) (rejecting the proposition that "employees must understand the manner in which their overtime pay is calculated" as contrary to the regulation).

more than any set number of hours, they would receive additional pay. They were "salaried"; it did not matter how many hours they worked, because they were not paid on an hourly basis.

Based upon this testimony and the undisputed record, there was a "mutual understanding" between the parties that their weekly salary was intended to compensate them for all hours worked, whether many or few. *See, e.g.*, *Valerio*, 173 F.3d at 39 (where plaintiff routinely worked more than 40 hours per week without overtime pay, she understood that her salary was to compensate her for fluctuating hours); *Schneider*, 2000 U.S. Dist. LEXIS 6217 at *27 (plaintiff agreed that compensation he received "covered all of the hours that he worked"; therefore, fluctuating workweek method of calculating overtime applied to determine damages). Plaintiffs have not disputed that they have always been paid on a salary basis, regardless of the number of hours they worked. Plaintiffs here have no claim to an entitlement to additional straight time wages.

### E.    Huntington Acted In Good Faith And Did Not Willfully Violate The FLSA

Assuming, *arguendo,* that the Court finds that Huntington violated the FLSA by not classifying Home Lending Underwriters as administratively exempt, Plaintiffs' requests for liquidated damages and an extended statute of limitations on these claims should be dismissed. (Defs. Mot. pp. 46-49). In an effort to defeat Huntington's request that such claims be dismissed, Plaintiffs minimize the efforts Huntington made to comply with the law and primarily rely upon *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004), which is inapposite to this case. (Ptfs. Mot. pp. 51-57).

Plaintiffs first allege that Huntington cannot establish that it acted in good faith nor a lack of willfulness because it "knew" it was violating the FLSA after the Second Circuit issued *Davis* on November 20, 2009, and after the DOL's March 24, 2010, Administrator's Interpretation 2010-1. (Ptfs. Mot. pp. 53-54, 57). As an initial matter, *Davis* is not controlling law in the Sixth

Circuit and Huntington does not employ Home Lending Underwriters in the Second Circuit; thus, Huntington was not required to reclassify its Home Lending Underwriters in response to a non-binding stand-alone decision that did not follow the developing case law nor the correct version of the DOL regulations. Moreover, the DOL's Administrator's Interpretation 2010-1 related to the exempt classification of mortgage loan officers, not underwriters, and its legitimacy was immediately challenged by the Mortgage Bankers Association, a challenge that was ultimately successful (see Section II.B.1., *supra*).

Plaintiffs misstate that Huntington "failed to identify a single thing they relied on" to demonstrate the legitimacy of their exemption decision. (Ptfs. Mot. p. 57). To the contrary, Huntington detailed the process it went through on ***two separate occasions in less than three years***, including multiple interviews and meetings with executive leadership and management, reviewing the Home Lending Underwriters' job duties, the completion of Job Questionnaires, and analysis by a trained compensation consultant with knowledge of the FLSA's administrative exemption and its application to the Home Lending Underwriter positions. (Defs. Mot. pp. 46-49).[8]

Plaintiffs further claim *without support* that Mr. Reveal's explanation that Home Lending Underwriters are part of the home loan process means Huntington knew Home Lending Underwriters were misclassified. (Ptfs. Mot. p. 57). Plaintiffs' assertion makes no sense. It is well-established in the Sixth Circuit that exempt administrative work includes servicing, supporting, and facilitating the employer's primary business activities, i.e., being part of the

---

[8]     Huntington does not seek to rely on any specific attorney-client privileged advice provided during its classification reviews, but is entitled to state that counsel was present at the meetings and/or interviews, and that there were no objections by any participants to the classification decisions made after each review. *See Featsent v. City of Youngstown*, 70 F.3d 900, 906-907 (6th Cir. 1995).

process—the precise nature of the work performed by Huntington's Home Lending Underwriters. *See Caveness, Cameron, Renfro (I) and Lacourse, supra*.

Plaintiffs' reliance on *Martin v. Indiana Michigan Power Co.*, is misplaced. In *Martin*, the employer did not set forth any evidence that it actually undertook a review of the at-issue job. Rather, the employer initially allowed the computer professional employee to select his own job classification, and made later classification decisions without any effort to drill down to the actual job duties and responsibilities. *Martin*, 381 F.3d 574, 584-586. Here, Huntington has established the efforts it went through to make a reasoned, correct and compliant classification decision with respect to its Home Lending Underwriter positions. The facts here are nothing like those in *Martin*.

      **F.**      **Defendants' Motion To Decertify The Collective Action Should Be Granted**

Contrary to Plaintiffs' argument, Huntington is entitled to move for both summary judgment on Plaintiffs' claims and, in the alternative, for decertification of the conditionally certified class. (Ptfs. Mot. pp. 58-59). While intertwined, these alternative motions do not conflict. Huntington requests that this Court grant it summary judgment and dismiss Plaintiffs' Complaint entirely; however, should the Court find that issues of fact preclude summary judgment, those same issues of fact preclude proceeding with this matter as a collective action. *See Monroe v. FTS USA, LLC*, 763 F. Supp.2d 979, 986 (W.D. Tenn. 2011) (to avoid decertification, plaintiffs "must meet a stricter standard of proving that the putative plaintiffs are similarly situated" and the review is "more demanding and factually-intensive").

Indeed, as set forth herein and in Huntington's initial Motion, there are wide variances in testimony between the Representative Plaintiffs on critical issues, which supports decertifying the conditionally certified class. Because the differences outweigh the similarities, the collective

33

class must be decertified if Huntington's Motion for Summary Judgment is not granted.  (Defs. Mot. pp. 50-52).

III.    **CONCLUSION**

For the reasons set forth herein, and in Huntington's Motion for Summary Judgment or, in the alternative, Motion to Decertify Collective Class, summary judgment should be granted in favor of Huntington and all claims should be dismissed with prejudice.  In the event this case is not dismissed in its entirety, the class should be decertified because adjudicating Plaintiffs' claims requires individualized proceedings that are inherently incompatible with collective treatment.

Respectfully submitted,

**LITTLER MENDELSON, P.C.**


*s/ Tracy Stott Pyles*
Tracy Stott Pyles, OH Bar. No. 0074241
Kaila M. Krausz, OH Bar. No. 0085517
21 East State Street, 16th Floor
Columbus, OH  43215
Telephone:     614.463.4201
Facsimile:      614.221.3301
E-mail:          tpyles@littler.com
                   kkrausz@littler.com

Andrew J. Voss, MN Bar No. 0241556*
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:     612.630.1000
Facsimile:      612.630.9626
E-mail:          avoss@littler.com

*Attorneys for Defendants*

                   * Admitted *Pro Hac Vice*

34

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing *Defendants' Response Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment, And In Support Of Defendants' Motion For Summary Judgment Or, In The Alternative, Motion To Decertify The Collective Action Class* has been filed via the electronic filing system on May 16, 2014. Notice of filing will be performed by the Court's electronic filing system and Parties may access the document through the electronic filing system.

*s/ Tracy Stott Pyles*
Tracy Stott Pyles

Firmwide:127037712.1 067629.1005
5/16/14

35