# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

GREGORY LUTZ, et al.,

        Plaintiffs,

v.

HUNTINGTON BANCSHARES INC., et al.,

        Defendants.

        **Case No. 2:12-cv-01091**
        **JUDGE GREGORY L. FROST**
        **Magistrate Judge Norah McCann King**

## OPINION & ORDER

This matter is before the Court for consideration of the following motions and corresponding briefs:  Defendants' motion for summary judgment, or, in the alternative, Defendants' motion to decertify the collective action class (ECF No. 62); Plaintiffs' cross-motion for summary judgment and response in opposition to Defendants' motion (ECF No. 65); Defendants' response in opposition to Plaintiffs' cross-motion for summary judgment and reply in support of their motion for summary judgment (ECF No. 70); and Plaintiffs' reply in support of their cross-motion for summary judgment (ECF No. 71).  Also before the Court are the following motion and corresponding briefs: Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23 (ECF No. 63); Defendants' response in opposition (ECF No. 66); and Plaintiffs' reply (ECF No. 69).

The briefing before the Court presents the following three issues: (1) whether Defendants correctly classified their Home Lending Underwriters under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"), and, if Defendants misclassified their Home Lending Underwriters, (2) whether the Court should decertify the FLSA collective action class that it conditionally certified on April 19, 2013, and (3) whether the Court should certify an Ohio class

under Rule 23 with respect to Plaintiffs' state-law claim. For the reasons that follow, the Court concludes that Defendants correctly classified their Home Lending Underwriters as administratively exempt employees, such that Defendants are entitled to summary judgment. The Court does not reach the issues of whether it should decertify the FLSA collective action class or whether it should certify an Ohio state-law class under Rule 23.

I.      BACKGROUND

        A.  The Parties' Claims

        Plaintiffs Gregory Lutz and Dorothy Becker are former employees of Defendants. Plaintiffs, who are pursuing their Complaint on behalf of themselves and other similarly-situated employees, allege that Defendants violated the FLSA and Ohio state law by failing to pay them overtime wages to which they are entitled. Plaintiffs also allege that Defendants violated Article II § 34a of Ohio's Constitution by failing to keep accurate wage and hour records.

        On April 19, 2013, the Court conditionally certified a collective action under the FLSA that includes Defendants' current and former Home Lending Underwriters. (ECF No. 24.) Approximately twenty-eight individuals opted to join the FLSA collection action class.[1] Two of those opt-in plaintiffs, George Miller and Amy Whitacre (collectively with Lutz and Becker, "Plaintiffs"), were selected to represent the FLSA collective action class.

        On April 1, 2014, Plaintiffs Lutz and Becker filed a motion to certify an Ohio class action with respect to their state-law claim. That motion currently is pending before the Court.

        The crux of this dispute is set forth in the parties' competing motions for summary judgment. In their motion, Defendants assert that they were justified in withholding overtime wages because Plaintiffs are "administratively exempt" employees, who are not subject to the

---

[1] Defendants assert that only twenty-two individuals opted to join the collective-action class. This discrepancy, however, is irrelevant to the Court's analysis.

FLSA's overtime provisions.[2]  Plaintiffs contend that neither they nor the members of the FLSA collective action class qualify for the administrative exemption.

### B.  Background Facts

The following facts are undisputed.  Defendant Huntington Bancshares, Inc. is the parent company of Defendant Huntington National Bank ("the Bank").  The Bank provides an array of banking services, including commercial, small business, and consumer banking services, mortgage banking services, treasury management and foreign exchange services, equipment leasing, wealth and investment management services, trust services, brokerage services, customized insurance brokerage and service programs, and other financial products and services.

At issue in this case is the Bank's home lending business, which is divided between the Consumer group and the Mortgage group.  Home Lending Underwriters in the Consumer group are referred to as "Consumer HLUs," and Home Lending Underwriters in the Mortgage group are referred to as "Mortgage HLUs."  Plaintiffs Lutz, Becker, and Miller are former Consumer HLUs.  Plaintiff Whitacre is a current Mortgage HLU.

Defendants note several differences between Consumer HLUs and Mortgage HLUs; however, they classify all HLUs as administratively exempt employees under the FLSA.  The Court therefore examines the job responsibilities that all HLUs share to determine whether the administrative exemption applies to the position as a whole.

### 1.  Development and sale of loan products

HLUs do not develop the Bank's loan products.  The Bank's Product Development Group—an independent group within the Bank—designs its loan products and creates product portfolios for each of those products.  That group then sets certain risk guidelines, such as a

---

[2] Defendants also note that Plaintiffs' state-law claims are subject to the same exemption analysis as their FLSA claim.  *See* Ohio Rev. Code § 4111.03(A).

maximum loan-to-value or debt-to-income ratio, that the Bank is willing to accept.  Another group, the Secondary Marketing Group, then sets the interest rates for the various loan products.

HLUs do not sell the Bank's loan products and do not directly interact with the Bank's customers.  A loan originator (a separate position from an HLU) begins the sale process by discussing various loan products with a customer.  The loan originator then selects a loan product that meets the customer's needs, and begins the application process.  A loan processor (another separate position within the Bank) works with the customer to gather the required documents and complete the loan application.

For most loans, the customer's information is then uploaded into the Bank's underwriting software program, which generates an electronic file and suggested actions for each loan application.  The file is then placed in an electronic queue for review by an HLU.

### 2. The HLUs' primary responsibilities

An HLU's job is twofold: he or she must assess the loan application to ensure that the information contained therein is accurate and then decide whether the loan is of the type that the Bank will accept.  To confirm the accuracy of a loan application, an HLU must review the documents provided by the customer and compare those documents to a credit bureau report.  An HLU may decide that additional materials, such as a property appraisal, are necessary for a full review of the application.  If the HLU determines that additional materials are necessary, the loan processor works with the customer to gather those additional documents.

The HLU must then determine whether the Bank will accept the loan.  To do so, the HLU must review the calculations and recommendations generated by the Bank's underwriting software, then analyze the file and decide whether to go along with or override the software's recommendations.  If the loan is one that is not run through the underwriting software, the HLU

must manually underwrite the file.  If the loan is one that generates a "refer" or "refer eligible" notation (such as an FHA government loan), the loan application will be referred without suggestions to the HLU, who must use his or her "discretion to determine whether [the loan is] insurable or not."  (Whitacre Depo, ECF No. 60, at 96.)

To make the ultimate loan determination, the HLU must apply the Bank's guidelines and lending criteria, as well as any applicable regulations, to the loan application to determine whether it falls within the level of risk the Bank is willing to accept.  The guidelines relevant to the HLU's job function include: the Bank's Credit Policy Manual and Fair and Responsible Lending Policy, Product Profiles and rate sheets for each loan product, manuals and guides specific to each loan product (if applicable), and other applicable regulations.  Those policies exist, at least in part, because "[e]qual treatment of all applicants without regard to race, gender, marital status, age or any other Prohibited Basis is an essential requirement of all Credit Transactions."  (ECF No. 65-16, at 2.)  As such, HLUs "are expected to exercise their judgment regarding credit decisions objectively."  (ECF No. 65-2, at 13.)

Although an HLU's decision whether to approve a loan application necessarily will be influenced by the guidelines and manuals referenced above, an HLU may sometimes go outside those guidelines/manuals and take action based on his or her experience and/or judgment.  For example, in analyzing a loan application, an HLU may determine that the Bank can accept a loan only if additional stipulations are placed on that application.  The HLU can, for instance, require that a customer pay off certain credit cards before the Bank will accept the loan.  Plaintiffs acknowledge that these stipulations are not automatically generated by loan software and do not come from any manual or guidelines.  Rather, they are additional safeguards designed to protect

the Bank's and the customer's long-term interests.  Once attached, the stipulations placed on a loan application by the HLU cannot be ignored.

An HLU also can make exceptions or adjustments to the Bank's lending criteria in certain circumstances.  For example, if a loan application does not meet the Bank's criteria, but the customer has a history with the Bank, reserves, reasons for derogatory credit, assets with the Bank, pay history or time at his or her residence and job, the HLU can make an exception or adjust the required criteria in order to accept the loan.  HLUs are permitted to make two or three exceptions/adjustments to a loan application without consulting their managers.[3]

An HLU also can identify "counteroffers" that would change the initial loan application but place that application within terms that would be acceptable to the Bank.  If an HLU proposes a counteroffer, the loan processor or loan originator works with the customer to determine whether the counteroffer is acceptable.

Finally, HLUs are permitted to deviate from the Bank's lending criteria if a loan seems suspicious or against the customer's best interests.  For example, if the loan application is one that typically would meet the Bank's lending criteria, but the customer is an elderly individual attempting to trade a two-year note for a thirty-year note, the HLU would inquire further to ensure that the customer understands what he or she is requesting.  The HLU therefore might end up disapproving a loan application that otherwise would have been approved under the Bank's lending criteria.

Once the HLU has considered the software recommendations and applied the guidelines, applicable regulations, and any exceptions or other considerations to the loan application, he or

---

[3] Plaintiff Whitacre testified that she did not believe Mortgage HLUs can independently make exceptions on a loan application, (Whitacre Depo, ECF No. 60, at 109–110); however, they can identify compensating factors (such as high reserves and high credit scores, for example) to make up for loan application deficiencies in certain types of loans.

she will either clear the loan for approval or deny the application.  At that point, the HLU's role in the loan process ends.  Approved loans move into the processing phase, while disapproved loan applications "go[] back to the branch as a turndown."  (Becker Depo, ECF No. 56, at 45.)  HLUs have authority to approve loans up to one million dollars.

### 3.  The Bank's hiring, supervision, and evaluation of HLUs

The Bank employs several HLUs in its Columbus, Ohio office.  HLUs are grouped into two positions: "Senior Underwriters," which requires a high school diploma and 3–5 years of underwriting experience, and "Underwriters," which requires a high school diploma and 1–3 years of underwriting experience.  (ECF No. 65-9, at 2–19.)  HLUs generally work out of the Bank's offices, although they occasionally work out of their homes.

To supervise its HLUs, the Bank conducts periodic audits of loan applications.  During that process, a Pre-Funding Audit Team reviews selected loans prior to and after the HLU approves or disapproves the loan application.  The Audit Team compares its work to the HLU's work and determines whether there are "errors or inconsistencies found."  (Cline Depo, ECF No. 58, at 110.)  At that point, the HLU can review the Audit Team's conclusion and explain why he or she does not agree.[4]

Some mortgage loans also are subject to independent audits by investors.  In those cases, if a HLU receives an audit letter from an investor, the HLU will have the opportunity to defend his or her decision and explain why he or she does not feel there was an error.

HLUs are evaluated based, at least in part, on the number of times they access different loan applications on a given day.  An HLU is expected to look at between three to five loan files per day, whether it be new loan applications or old applications that he or she must revisit.  *See*

---

[4] Ms. Cline's statements regarding the Audit Team relate only to Mortgage HLUs; however, it appears later in her deposition that a similar system applies to Consumer HLUs.  *See id.* at 112–15.

*id*. at 97–98.  The more files an HLU accesses per day, the higher the rating assigned to that HLU for purposes of evaluating his or her incentive-based compensation.  Faster "turn times" between an HLU's initial review of a loan and his or her final decision on that loan also result in a higher rating for that HLU.  (*Id*. at 109.)  Additional factors relevant to an HLU's compensation include the quality of his or her work (based on feedback from the various audit procedures discussed above), and internal reviews from other Bank employees.  (*Id*. at 112.)

HLUs are not evaluated based on whether the approved loan applicants ultimately default on their loans.  The Bank does not keep track of such information at the underwriter level.

### 4.  Hours worked and compensation

Plaintiffs testified that their hours fluctuated on a weekly basis.  Some weeks, they worked more than forty hours a week, and some weeks they worked less.  Plaintiffs understood that, regardless of the number of hours they worked in any given week, their salary would remain the same and they would not receive overtime compensation.  Plaintiffs received salaries that ranged from $52,376.50 to $71,000.00 per year.

### 5.  The Banks' decision to classify HLUs as exempt

To make decisions regarding wage and hour compliance, the Bank employs a specialized and trained Compensation Consultant, who works together with the Bank's management, human resources department, and in-house legal counsel (collectively, "Compensation Group").  Following the Second Circuit Court of Appeals' 2009 decision in *Davis v. J.P. Morgan Chase & Co*., 587 F.3d 529 (2d Cir. 2009), discussed in more detail below, the Compensation Group discussed the HLUs' exempt classification.  After reviewing the HLUs' duties and responsibilities and comparing those duties to the position discussed in *Davis*, the Compensation Group determined that HLUs should remain exempt from the FLSA's overtime requirements.

The Compensation Group met again in 2012 to conduct a wage and hour compliance review.  At that time, the Compensation Group again reviewed the job duties and responsibilities for the HLU position, and again concluded that the position should retain its exempt classification.

## II.    ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251-52).

In this case, the parties dispute the proper application of the FLSA's overtime provisions. The FLSA requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week, 29 U.S.C. § 207(a)(1), but exempts employers from this requirement with respect to individuals "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); *see also Martin v. Ind. Mich. Power Co*., 381 F.3d 574, 578 (6th Cir. 2004). Defendants contend that Plaintiffs fall within the "administrative" exemption such that they are not entitled to overtime under the FLSA.

"The exemptions to the FLSA's overtime provisions are 'to be narrowly construed against the employers seeking to assert [them].' " *Martin*, 381 F.3d at 578 (quoting *Douglas v. Argo–Tech Corp.,* 113 F.3d 67, 70 (6th Cir. 1997)). "[T]he employer bears not only the burden of proof, but also the burden on each element of the claimed exemption." *Id*. Defendants must prove each element of the claimed exemption by a preponderance of the evidence. *Renfro v. Ind. Mich. Power Co*., 497 F.3d 573, 575 (6th Cir. 2007).

"Because the burden of proof is shifted, [the plaintiff] is entitled to summary judgment unless [the defendant] can come forward with evidence at least creating a genuine issue of material fact as to whether [the plaintiff] meets each and every element of the exemption." *Martin*, 381 F.3d at 578. "If [the defendant] fails to proffer such evidence, not only must its motion for summary judgment be denied, but summary judgment for [the plaintiff] must be granted." *Id*.

"The question of how an employee spends his time is a question of fact, while the question of whether his activities fall within an exemption is a question of law." *Jastremski v. Safeco Ins. Cos*., 243 F. Supp. 2d 743, 747 (N.D. Ohio 2003). Here, although the parties characterize Plaintiffs' job responsibilities differently, the facts regarding the scope of Plaintiffs'

job responsibilities are undisputed.  As such, the question of whether Plaintiffs are properly classified as exempt administrative employees is a question of law for the Court.  *See id.*; *see also Murray v. Ohio Cas. Corp*., No. 2:04-CV-539, 2005 WL 2373857, at *3 (S.D. Ohio Sept. 27, 2005).

### B.  The FLSA's Administrative Exemption

As stated above, the FLSA exempts from its overtime provisions those employees employed in a "bona fide administrative capacity."  29 U.S.C. § 213(a)(1).  The term "employed in a bona fide administrative capacity" refers to any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

### a.  Salary Requirement

The parties do not dispute that Plaintiffs meet the salary requirement of $455 per week set forth in § 541.200(a)(1).  Indeed, Plaintiffs received salaries that ranged from $52,376.50 to $71,000 per year, which far exceeds the $455 per week salary requirement.  Section 541.200(a)(1) therefore is not at issue in this case.

   b.   *"Office or Non-Manual Work Directly Related to the Management or General Business Operations of the Employer"*

      1.   Regulations

Section 541.200(a)(2) sets forth a two-part inquiry.  First, Defendants must prove that Plaintiffs performed "office or non-manual work," which is not in dispute in this case.  Plaintiffs concede that they perform most of their work at their desks and that their duties generally are office-based so as to satisfy the "office or non-manual work" requirement.

Second, Defendants must prove that Plaintiffs' primary duties consist of the performance of work "directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  The term "primary duty" means "the principal, main, major, or most important duty that the employee performs."  *Id*. § 541.700(a).

Here, although the parties characterize Plaintiffs' primary duties differently, their characterizations do not differ in substance.  The Court concludes that Plaintiffs' primary duties consist of (1) reviewing loan application files to evaluate the creditworthiness of customers applying for home loans, and (2) determining whether the borrower qualifies for the loan that he or she has applied for—in other words, whether the Bank will approve or disapprove the loan.  *See* Pls.' Mot., ECF No. 65, at 25; Defs.' Mot., ECF No. 62, at 27.[5]

At issue in this case is whether those duties are directly related to the Bank's management or general business operations.  "The phrase 'directly related to the management or general business operations' refers to the *type of work* performed by the employee."  29 C.F.R. § 541.201(a) (emphasis added).  "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for

---

[5] Defendants note that Plaintiffs performed additional job duties during their tenure at the Bank, including working on special project teams and advising the Bank's management in the case of a corporate acquisition.  Because Defendants do not argue that these job duties are part of Plaintiffs' "primary duties," however, the Court will not consider them in its analysis.

example, from working on a manufacturing production line or selling a product in a retail or

service establishment." *Id*. The Code of Federal Regulations provides the following additional

guidance:

> Work directly related to management or general business operations includes, but
> is not limited to, **work in functional areas such as tax; finance; accounting;**
> **budgeting; auditing; insurance; quality control; purchasing; procurement;**
> **advertising; marketing; research; safety and health; personnel management;**
> **human resources; employee benefits; labor relations; public relations;**
> **government relations; computer network, internet and database**
> **administration; legal and regulatory compliance; and similar activities.**

*Id*. § 541.201(b) (emphasis added).

### 2. Sixth Circuit Case Law

The distinction between "running or servicing of the business" and "working on a

manufacturing production line or selling a product in a retail or service establishment," *id*. §

541.201(a), has given rise to what many courts refer to as the "administrative/production

dichotomy." *See, e.g., Foster v. Nationwide Mut. Ins. Co*., 710 F.3d 640, 644 (6th Cir. 2013).

Under the dichotomy, "production employees (whose job it is to generate the product or service

the business offers to the public) will not qualify for the exemption." *Id*. Stated differently, if a

court determines that an employee generates, or "produces" the product/service that the

employer offers to the public, then that employee is a "production" employee who cannot qualify

for the administrative exemption. *See id*.; *see also Renfro v. Ind. Mich. Power Co*., 370 F.3d

512, 517–18 (6th Cir. 2004). If, on the other hand, the employee does not "produce" the

employer's product or service, the court must undertake an additional analysis to determine

whether the employee performs an "administrative" function within the meaning of 29 C.F.R. §

541.201. *See, e.g., Martin v. Ind. Mich. Power Co*., 381 F.3d 574, 583 (6th Cir. 2004).

The administrative/production dichotomy is not useful in every case.  *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004).  Rather, "the analogy . . . is only useful to the extent that it is a helpful analogy in the case at hand."  *Id*. at 402–03.  For example, in a case involving an environmental specialist who shipped radioactive waste for an electric production company, the Sixth Circuit Court of Appeals found the administrative/production dichotomy not useful and declined to utilize it.  *See id*.

Notwithstanding the above, Sixth Circuit case law suggests that the proper course of action is to begin with the administrative/production dichotomy and determine whether it can be useful by analogy.  *See, e.g, Foster*, 710 F.3d at 645.  The first question, therefore, is what constitutes "production" work under the administrative/production dichotomy.

Courts in this circuit have interpreted the term "production" narrowly.  For example, in *Foster*, the Sixth Circuit analyzed the job responsibilities of an insurance company's "special investigators" who analyzed suspicious claims and made recommendations as to whether the company should pay or deny those claims.  710 F.3d at 642.  Because the special investigators "do not write or sell insurance policies," they could not be characterized as production employees.  *Id*. at 645.[6]  Similarly, in *Renfro*, the Sixth Circuit rejected the plaintiff's contention that an electric company's "planners," who took job orders and created work packages that the plant's craft workers would use to perform the work in the field, were performing production work.  370 F.3d at 514–18.  *See also Cameron v. Abercrombie & Fitch Co.*, No. 2:10-cv-631, 2012 WL 4057240, at *4–5 (S.D. Ohio Sept. 14, 2012) (holding that the plaintiff, who performed quality control for a clothing company, was not a production employee because, *inter alia*, "she

---

[6] Plaintiffs suggest that the Sixth Circuit's reference to "write" refers to underwriters.  Viewed in context of the court's opinion, however, the Sixth Circuit's use of the term "write" appears to refer to those employees who actually create the insurance policies.  *See* 710 F.3d at 645 ("Nationwide is in the business of creating and marketing insurance policies to the public . . . [s]ince the [plaintiffs] do not write or sell insurance policies, the district court did not err in concluding that [they] cannot be fairly characterized as production employees." (internal citations omitted)).

was not involved in the manufacturing or selling of [the employer's] product in the manner contemplated by the regulations," and rejecting the plaintiff's argument that her "duties were directly related to the production of clothes"); *Caveness v. Vogely & Todd*, No. 3:10-0650, 2011 WL 3841649, at *4 (M.D. Tenn. Aug. 30, 2011) (holding that an employee of an automobile repair shop who made repair estimates, set repair schedules, and assigned repair work was not a production employee); *LaCourse v. GRS III*, No. 05-73613, 2006 WL 3694623, at *19 (E.D. Mich. Dec. 13, 2006) (finding that a training consultant who "develop[ed] manufacturing and repair methods and systems on new products" for General Motors was not a production employee because he "was not engaged in producing motor vehicles; rather, he taught the production employees how to conduct certain repairs so the assembly line could proceed"). These cases show that the definition of "production" in the administrative/production dichotomy is limited to those employees who actually create or sell the product/service the employer offers; it does not encompass any employee whose job responsibilities are related to the production process.[7]

      If a court determines that the plaintiff is not a production employee, it must then move to the second step of the analysis and determine whether he or she performs administrative work. Work that is "ancillary to an employer's principal production activity" is administrative. *Renfro*, 370 F.3d at 517 (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 904 (3d Cir. 1991)). As such, "planners" for an electricity company performed work that "serviced" the business within the meaning of the administrative exemption, because:

---

[7] Even the cases Plaintiff cites, in which the Sixth Circuit found that the administrative exemption did not apply, do not expand the definition of production. *See Martin*, 381 F.3d at 582 (finding that a technology employee who maintained an electric company's computer system was not exempt without characterizing the employee's job duties as "production" under the dichotomy); *Schaefer*, 358 F.3d at 402–03 (declining to utilize the administrative/production dichotomy).

> AEP's principal production activity is generating electricity, and the product it offers the public is electricity; the planners' primary duty—creating plans for maintaining equipment and systems in the nuclear plant—is ancillary to AEP's principal production activity of generating electricity.

*Id*. at 518. *See also Foster*, 710 F.3d at 645 (concluding that special investigators who investigated suspicious insurance claims "performed work for an insurance company that is ancillary to an insurance company's primary production activity"); *but see Schaefer*, 358 F.3d at 402 (rejecting the argument that an environmental specialist who shipped radioactive materials for an electric company was performing administrative work since it was "collateral to the production of electricity").

If the guidance set forth above does not resolve the issue, courts must analogize between the job duties at issue and the examples in § 541.201(b) of the Code of Federal Regulations to determine whether the duties are administrative. The Court therefore must ask whether Plaintiffs' job duties are similar to "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b); *see also Foster*, 710 F.3d at 645 (concluding that "an insurance company's investigation of suspicious claims is similar to some of these functional areas").

Plaintiffs rely heavily on two Sixth Circuit cases, *Schaefer v. Indiana Michigan Power Company* and *Martin v. Indiana Michigan Power Company*, in which the court analogized a

plaintiffs' job duties to the now-nonexistent 29 C.F.R. § 541.205(b).[8]  In *Schaefer*, after finding

the administrative/production dichotomy of little value, the court concluded that the plaintiff's

job duties (shipping radioactive waste for an electric company) were not analogous to "advising

the management, planning, negotiating, representing the company, purchasing, promoting sales,

and business research and control."  358 F.3d at 403 (citing 29 C.F.R. § 541.205(b)).  The *Martin*

court reached the same conclusion regarding a technology professional who maintained a

company's computer systems.  381 F.3d at 582 (citing and distinguishing § 541.205(b)).

The current version of the applicable regulations, effective August 23, 2004, changes the

analysis from whether a plaintiff's job duties consist of "advising the management, planning,

negotiating, representing the company, purchasing, promoting sales, and business research and

control" to whether the work is in a "functional area" that is "directly related to assisting with the

running or servicing of the business."[9]  29 C.F.R. § 541.201.  Given this change, as well as the

fact that the position of "internet and database administration"—a seemingly analogous position

to the *Martin* plaintiff's—was added in 2004 as a "functional" job duty that could qualify for the

administrative exemption, *Martin* and *Schaefer* are not particularly instructive on the issue of

whether Plaintiffs' job duties are "directly related to management or general business operations"

pursuant to § 541.200(a)(2).

---

[8] Prior to the 2004 revisions to the Regulations, § 541.205(b) read as follows:  "The administrative operations of the business include the work performed by so-called white-collar employees engaged in "servicing" a business as, for, example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control. . . ."  29 C.F.R. § 541.205(b).  That section was deleted in 2004.

[9] The Department of Labor's comments suggest that the factors set forth in the former § 541.205(b) are more relevant to the third prong of the administrative exemption analysis (i.e., whether the employee exercises "discretion and independent judgment") rather than the second prong ("directly related to management or general business operations").  *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22122-01 (Apr. 23, 2004) (stating that the factors in the current version of 29 C.F.R. § 541.202—which define the "discretion and independent judgment" requirement—were taken from regulations such as the former §541.205(b)).

With that framework in mind, the Court turns to the case law the parties cite from other jurisdictions in which courts have applied the Regulations to employees performing job duties similar to Plaintiffs' duties in this case.

### 3.  Case Law From Other Jurisdictions

Although the parties cite several cases from other jurisdictions in support of their positions, only two of those cases—*Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009) and *Bollinger v. Residential Capital, LLC*, 863 F. Supp. 2d 1041 (W.D. Wash. 2012)—warrant in-depth analyses.  In both *Davis* and *Bollinger*, the courts analyzed the job duties of underwriters who performed similar tasks as Plaintiffs.  *See Davis*, 587 F.3d at 530–31; *Bollinger*, 863 F. Supp. 2d at 1043–44.  Both the *Davis* and *Bollinger* courts concluded that the underwriters did not perform work directly related to management policies or general business operations, such that they did not qualify for the administrative exemption.  *Davis*, 587 F.3d at 537; *Bollinger*, 863 F. Supp. 2d at 1048–49.

Because neither *Davis* nor *Bollinger* is binding on this Court, their holdings only impact this analysis if their analyses comport with Sixth Circuit precedent and the applicable Regulations, and the job duties analyzed therein are analogous to Plaintiffs' job duties in this case.  Ultimately, because the Court finds that the *Davis* and *Bollinger* holdings rest on a flawed premise that is inconsistent with Sixth Circuit case law, it finds *Davis* and *Bollinger* to be of minimal persuasive value.

 Central to the *Davis* and *Bollinger* decisions is the proposition that there exists an important distinction "between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of *any* business."  *Davis*, 587 F.3d at 535 (emphasis added); *accord Bollinger*, 863

F. Supp. 2d at 1048 (characterizing § 541.201(b) as "distinguish[ing] between work that any employer needs performed—such as accounting, human resources, and regulatory compliance—and work that is particular to an employer's industry").  In other words, "[a]n employee whose job is to evaluate credit who works in the credit industry is more likely to perform a production job," whereas employees "who evaluate and extend credit on behalf of a company that is not in the credit industry . . . are generally considered administrative."  *Davis*, 587 F.3d at 536–37.  The *Davis* court concluded that, because underwriters are "directly engaged in creating the 'goods'—loans and other financial services—produced and sold by Chase" and do not perform a function that is required to run "any business," they were not administrative employees.  *Id*. at 535; *accord Bollinger*, 863 F. Supp. 2d at 1048 (concluding that underwriters were not administrative employees because "[t]he work [the plaintiffs] did—collecting customers' financial data and measuring that data against [the employer's] lending guidelines—was necessary because Defendants provided mortgages, not because Defendants were in business generally").

This purported rule of law, although attractive in its simplicity, does not square with Sixth Circuit case law and the Regulations.  It may be the case that jobs required to run "any business," such as human resources and accounting, are more likely to be "directly related to management or general business operations" under 29 C.F.R. § 541.201(b).  In that sense, it is true that "context matters."  *Davis*, 587 F.3d at 536; *accord Schaefer*, 358 F.3d at 402 (examining the context of the plaintiff's job duties in relation to the employer's business).  But it is not the case that job duties that are "particular to the employer's industry" necessarily are excluded from the administrative exemption.  If that were the rule, then the Sixth Circuit's holdings in *Renfro* (administrative exemption applied to an electric company's employees who, *inter alia*, prepared work packages from specific job orders that the company's craft workers

could use to perform work in the field) and *Foster* (exemption applied to insurance company's employees who investigated suspicious insurance claims) would make no sense.

Such a rule also would not square with the administrative exemption examples in 29 C.F.R. § 541.203.  That section states that insurance claims adjusters who perform work such as interviewing insureds, inspecting property damage, preparing damage estimates, and determining liability and total value of a claim—which clearly are duties specific to the insurance industry—generally meet the duties requirements for the administrative exemption.  29 C.F.R. § 541.203(a).  Similarly, employees in the financial services industry who "collect[] and analyz[e] information regarding the customer's income, assets, investments or debts; determin[e] which financial products best meet the customer's needs and financial circumstances; advis[e] the customer regarding the advantages and disadvantages of different financial products; and market[], servic[e] or promot[e] the employer's financial products"—which clearly are job duties particular to the finance industry—generally qualify the administrative exemption.[10]

Because the *Bollinger* court appeared to rely almost exclusively on this distinction between "work that any employer needs performed . . . and work that is particular to an employer's industry" in concluding that underwriters are not administrative employees, 863 F. Supp. 2d at 1048, the Court declines to follow its holding.  The Court similarly declines to adopt the corresponding portion of the *Davis* court's holding.  The *Davis* court, however, also went a step further and concluded that the underwriter position could not be administrative because it

---

[10] The *Bollinger* court attempted to harmonize its holding with the financial services example in 29 C.F.R. § 541.203(b) by re-characterizing the job duties listed therein as providing "analysis of [a business'] particular needs and advice on the best products or services to meet those needs."  *Id.* at 1049.  The court concluded: "[a]lthough the advice received will reflect individual circumstances, the need for the advice is independent of those goals" and therefore not particular to the finance industry.  863 F. Supp. 2d at 1049.  But the same could be said about any job duty characterized in its most abstract terms.  Shipping radioactive waste for an electric company could, for example, be characterized as disposing of waste generated by production of the business' products, which is a service every business needs.  Applying the *Bollinger* analysis, that job would qualify as administrative, but the Sixth Circuit held the opposite.  *See Schaefer*, 358 F.3d at 403.  The *Bollinger* court's analysis therefore is not persuasive on this point.

qualified as production work under the administrative/production dichotomy.  587 F.3d at 535. Because the Court also finds this conclusion to be contrary to Sixth Circuit precedent, it finds *Davis* to be of minimal persuasive value.

In *Davis*, the court concluded that, because the underwriters' job duties "concern[ed] the production of loans—the fundamental service provided by the bank," they were production employees.  587 F.3d at 534.  But, as stated above, the Sixth Circuit has defined the term "production" narrowly to include only those employees who actually create or sell the product/service the employer offers—not all employees whose job responsibilities are related to the production process.  *See, e.g., Foster*, 710 F.3d at 645; *Renfro*, 370 F.3d at 517–18.  The *Davis* court's expansive definition of production therefore conflicts with the Sixth Circuit precedent discussed above.[11]

Importantly, in concluding that the underwriters in question were production employees, the *Davis* court characterized their primary duty as "sell[ing] loan products."  587 F.3d at 534. This characterization highlights the fact that many employees performing loan-related duties— including those in many of the cases Plaintiffs cite—play an active role in the process of "selling" loans to customers.  *See, e.g., Casas v. Conseco Fin. Corp.*, No. 00-1512, 2002 WL 507059, at *1, 9 (D. Minn. Mar. 31, 2002) (concluding that loan originators who, *inter alia*, made telephone contact with potential customers and matched the customers' needs with the company's loan products were production employees); *see also* Opinion Letter, 2010 WL 1822423 (Dep't of Labor Mar. 24, 2010) (setting forth the Department of Labor Deputy

---

[11] The *Davis* court also appeared to employ an either-or analysis with respect to the production/ administrative dichotomy, *see* 587 F.3d at 531–32, which clearly conflicts with Sixth Circuit precedent. *See Martin*, 381 F.3d at 583.  Moreover, the *Davis* court concluded that the underwriters were production employees at least in part because their job duties were "functional rather than conceptual," 587 F.3d at 535, but 29 C.F.R. § 541.201(b) states that work in "functional areas" is "directly related to management or general business operations" so as to qualify for the administrative exemption.

Administrator's opinion that mortgage loan officers, who typically receive internal leads and contact potential customers regarding loan products, generally perform production work because their primary duty is making sales).  When an employee is contacting customers, selling those customers on particular loan products, and collecting information from those customers, it makes sense to characterize him or her as a "production" employee because he or she is directly involved in selling the employer's product to consumers.

Here, however, Plaintiffs have no contact with the Bank's customers.  The process is split into two parts, with the loan originators and loan processors contacting and discussing options with potential customers, selling those customers on the appropriate loan package, and collecting all necessary information for the loan application.  Only then does the loan application proceed to an HLU for review and approval.  The HLUs' job responsibilities in this case therefore are not related to sales/production in the same way as the job responsibilities discussed in *Casas*.

Given that difference, and for the reasons set forth above, the Court does not find the *Davis*, *Bollinger*, or *Casas* decisions to be particularly instructive to the present analysis.  The Court therefore proceeds to examine Plaintiffs' job duties pursuant to the Sixth Circuit framework discussed above.

4.  Analysis

Necessarily beginning this analysis with the administrative/production dichotomy, the Court first concludes that Plaintiffs are not "production" employees under the narrow definition employed by courts in this Circuit.  Plaintiffs do not contend that they create or sell loan products.  Instead, they argue that they are production employees simply because they are involved in the process of "producing" loans.  But just as the planners in *Renfro* who took job orders and created work packages that the employer's craft workers would use to perform the

work in the field—clearly a responsibility that is involved in the production process—were not production employees, neither are the underwriters here.  *See Renfro*, 370 F.3d at 514, 517–18.

Moreover, in some sense, Plaintiffs' responsibilities can be characterized as the opposite of production, in that Plaintiffs can disapprove loan applications for customers who have already been "sold" on a particular loan product.  Plaintiffs' job responsibilities in that respect are analogous to a security officer in a retail store that sells age-restricted items.  Although the security officer must verify the customer's age in order for the sale to proceed, he or she is not engaged in "production" in the same way as the manufacturing employees who actually make the item and/or the retail employees who sell it to customers.  The Court therefore concludes that Plaintiffs are not production employees.

The more difficult question is whether Plaintiffs are administrative employees.  Plaintiffs' primary duties, as stated above, consist of reviewing loan application files to evaluate the creditworthiness of customers applying for home loans and determining whether the Bank will approve or disapprove the loan.  Various aspects of these duties are analogous to various aspects of the "functional" job duties set forth in 29 C.F.R. § 541.201(b).  For example, the fact that Plaintiffs can disapprove a potential loan agreement makes their duties analogous to a quality control employee who prevents a defective product from being sold or a legal/regulatory compliance professional who counsels against selling a certain product or using a certain marketing technique.  *See* 29 C.F.R. § 541.201(b).  In each example, the employees "service" the business (and therefore qualify for the administrative exemption under § 541.201(a)) by looking beyond short-term sales to protecting the company's long-term interests.

Similarly, the fact that Plaintiffs work with loan applications that already exist (rather than soliciting and working with the customer to create the loan application) makes their role

loosely analogous to that of an insurance claims adjuster who makes decisions on accounts that have already been sold to consumers.  *See* 29 C.F.R. § 541.203(a) (listing insurance claims adjuster as an example of a position that qualifies for the administrative exemption).  In that sense, both Plaintiffs and insurance claims adjusters provide a service that does not generate business for their employers, but that is necessary for their employers to do business.  In other words, those employees do not perform "production" roles, but instead perform roles that are "ancillary" to the employer's principal production activity.  *Cf. Renfro*, 370 F.3d at 517–18.

Regarding financial services employees in particular, the Regulations distinguish between "an employee whose primary duty is selling financial products" (who does not qualify for the administrative exemption), and one who collects and analyzes information regarding the customer's income, asserts, investments or debts, determines which financial products best meet the customer's needs and circumstances, and advises the customer regarding the advantages and disadvantages of different financial products (who does qualify for the administrative exemption).  29 C.F.R. § 541.203(a).  Plaintiffs in this case are not directly analogous to either of these hypothetical employees.  But because Plaintiffs have no contact with customers, their role is less analogous to the sales associate in the former example and more analogous to the nuanced role played by the employee in the latter example.  Similar to that latter employee, Plaintiffs analyze information regarding a customer's financial status, accept or reject loan packages based on the customer's circumstances, and occasionally suggest alternative products that may be a better fit for both the Bank and the customer.  The financial services example therefore provides further support for the Court's conclusion that Plaintiffs perform administrative job duties.

Plaintiffs' remaining arguments in support of their position are not persuasive.  For example, Plaintiffs note several times that they work in cubicles, that they are low-level

employees, and that the HLU position requires only 1–3 years of experience.  But Plaintiffs

provide no authority to suggest that those facts are even relevant to the present analysis.  To the

contrary, the focus of this analysis is on the type of work performed, not the level of

responsibility or skill needed to perform the HLU position.  Even the court in *Davis*—on which

Plaintiffs so heavily rely—agrees with that conclusion.  *See Davis*, 587 F.3d at 533 (finding it

"irrelevant" that the plaintiff's salary was "relatively low" or that he "worked in a cubicle").

Plaintiffs also argue that they are evaluated based on production, which makes them

production employees.  But, as Defendants point out, Plaintiffs are monitored based on how

many loan files they "touch" in a particular day; not how many loans they approve.  Stated

differently, Plaintiffs are evaluated on their *productivity*, not how many loans they *produce*.

Moreover, even if an evaluation scheme such as Defendants' were relevant to the question of

whether an employee performs a production role, it certainly is not dispositive: many of the

occupations listed in 29 C.F.R. § 541.201(b) could be evaluated in a similar way (such as an

auditor who is evaluated based on the number of files he or she audits per day), but those

occupations still qualify as "directly related to management or general business operations"

under § 541.200(a)(2).

Plaintiffs also argue that HLUs are under strict supervision and are not free to disregard

the Bank's lending regulations.  That argument, however, is relevant to the third prong of the

exemption analysis—i.e., whether Plaintiffs exercise discretion and independent judgment—and

not the second.  Plaintiff's argument that HLUs do not set the Bank's risk appetite is similarly

unavailing.  Although it may be the case that the employees who set the Bank's risk appetite are

clearly administrative, it does not follow that the lower-level employees who implement those

risk policies are not.  And finally, Plaintiffs' argument that HLUs play no role in determining the

future strategy or direction of the Bank's business misses the mark, as many of the occupations listed in 29 C.F.R. § 541.201(b) play no role in establishing the future direction of the business (such as tax, insurance, and personnel management, for example) but still meet the duties requirement of § 541.200(a)(2).

In short, having considered the Regulations, relevant case law, and the parties' arguments, the Court concludes that Plaintiffs' primary duties consist of the performance of office or non-manual work directly related to the management or general business operations of the Bank pursuant to 29 C.F.R. § 541.200(a)(2).  Plaintiffs therefore qualify for the administrative exemption under the second prong of § 541.200(a)'s three-pronged test.  The Court now proceeds to analyze whether Plaintiffs qualify under the third and final prong.

     c.   *"Exercise of Discretion and Independent Judgment With Respect to Matters of Significance"*

Pursuant to 29 C.F.R. § 541.200(a)(3), employees cannot qualify for the administrative exemption unless their primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance."

1.  <u>Discretion and Independent Judgment</u>

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  A court must consider several factors when determining whether an employee exercises discretion and independent judgment, including:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular

26

> segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

Other factors are not determinative of whether an employee exercises discretion and independent judgment pursuant to § 541.200(a)(3). "The fact that many employees perform identical work or work of the same relative importance," for example, does not mean that those employees are not exercising discretion or independent judgment. *Id*. § 541.202(d). Similarly, the fact that an employee's decisions or recommendations are "reviewed at a higher level" does not remove the employee from the scope of the administrative exemption. *Id*. § 541.202(c).

Because Plaintiffs are required to apply the Bank's lending criteria in making loan decisions, the Regulations' comments regarding the use of guidelines and manuals are particularly relevant to this dispute. Pursuant to § 541.202(e), "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id*. § 541.202(e); *see also Ale v. Tenn. Valley Auth*., 269 F.3d 680, 687–688 (6th Cir. 2001) (affirming the lower court's finding that employees did not exercise discretion or independent judgment when they followed strict procedures and protocols that controlled nearly everything they did).

An employer's use of manuals and guidelines does not, however, preclude exemption. *Id*. § 541.704. "To determine whether an employee, constrained by guidelines and procedures, actually exercises any discretion or independent judgment . . . [a court must] consider whether

27

those guidelines and procedures contemplate independent judgment calls or allow for deviations." *Renfro v. Ind. Mich. Power Co*., 497 F.3d 573, 577 (6th Cir. 2007) (hereinafter "*Renfro II*") (citing *Schaefer*, 358 F.3d at 404). Employees in heavily-regulated industries therefore can qualify for the administrative exemption if they exercise discretion and independent judgment within the confines of those regulations. *See, e.g., Schaefer*, 358 F.3d at 404 (examining whether the employee, although "constrained by regulations, actually exercises discretion and independent judgment"); *Henry v. Quicken Loans, Inc*., 698 F.3d 897, 901 (6th Cir. 2012) ("That [the employer] used various methods to channel the [employee's] discretion 'does not eliminate the existence of that discretion.' " (citing *Renfro II*, 497 F.3d at 577)).

Notwithstanding that fact, "employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the *correct response* to an inquiry or set of circumstances" do not exercise discretion and independent judgment within the meaning of § 541.200(a)(3). 29 C.F.R. § 541.704 (emphasis added). This provision can, however, be somewhat misleading. On some level, all employees are trying to make "correct" decisions, in the sense that they do not want to make incorrect decisions. Insurance claims adjusters, for example, undoubtedly want to make the "correct" decision with regard to whether the company should pay a specific claim, but still exercise discretion and independent judgment within the meaning of § 541.200(a)(3). *See id*. § 541.203(a) (listing insurance claims adjuster as a position that qualifies for the administrative exemption). The same can be said of financial advisors, who undoubtedly want to recommend the "correct" products and services to fit a customer's needs, but still qualify for the administrative exemption. *See id*. § 541.203(b).

As these examples show, only when the "correct response" is objective and capable of verification does the language in § 541.704 make any sense.  If there can be more than one "correct response," or if it is impossible to determine the "correct response" at the time the employee must make a decision, then the language in § 541.704 provides little guidance.  *See id.*; *see also Foster v. Nationwide Mut. Ins. Co*., No. 2:08-CV-020, 2012 WL 407442, at *26 (S.D. Ohio Jan. 5, 2012), *aff'd*, 710 F.3d 640 (6th Cir. 2013) (holding that special investigators for an insurance company exercised discretion and independent judgment because their jobs entailed searching for truth, which "is not an entirely objective concept"); *Renfro II*, 497 F.3d at 577 (finding that technical writers at an electric company exercised discretion and independent judgment because, *inter alia*, "two different writers may solve the same problem two different ways, even though both solutions are equally effective").

## 2.  Matters of Significance

"The term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).  Courts in this circuit have interpreted the term consistently with its common-sense meaning.  *See, e.g., Foster*, 2012 WL 407442, at *26 (holding that an insurance company's decision to pay or deny insurance claims involved a matter of significance because "[p]aying insurance claims is central to Nationwide's business, and payment of fraudulent claims would threaten to make the company less competitive in its industry").  Consistently, courts in other jurisdictions have found that employees with authority to financially bind their employers make "significant" decisions within the meaning of § 541.200(a)(3).  *See, e.g., Robinson-Smith v. Gov't Emps. Ins. Co*., 590 F.3d 886, 895 (D.C. Cir. 2010) (holding that an insurance claims adjuster made choices "with respect to matters of significance" because he could bind his employer up to $15,000).

29

3. <u>Analysis</u>

Applying the above-cited authority, the Court concludes that Plaintiffs' primary duties include the exercise of discretion and independent judgment with respect to matters of significance. Defendants have met their burden in demonstrating that Plaintiffs qualify for the administrative exemption under the third and final prong of § 541.200(a).

Before analyzing the factors set forth in 29 C.F.R. § 541.202(b), the Court highlights one important fact that undercuts Plaintiffs' arguments on this issue. It is undisputed that the Bank's HLUs use underwriting software programs that run numbers from the customer's loan application, produce calculations, and recommend whether the Bank should approve the loan. If, as Plaintiffs suggest, an HLU's job is to plug numbers and facts into an established formula to come up with the correct loan decision, his or her job would begin and end with those software programs. But an HLU's job does not end there. Instead, he or she must then review the software recommendation and determine whether to accept or override it, meaning that he or she must decide whether additional materials are necessary before the Bank can make a loan decision, whether to place stipulations on the application, whether to make an exception based on factors such as the customer's history with the Bank, whether a different loan product should be offered to the customer, and whether other factors (such as the customer's age and circumstances) raise concerns that would cause the Bank to question a loan it otherwise would have approved. The fact that the Bank even needs human underwriters—in addition to its software programs—suggests that the decisions at issue are more than just mechanical calculations. In other words, it suggests that HLUs necessarily exercise discretion and judgment of which a software program is not capable.

Moving to the factors set forth in 29 C.F.R. § 541.202(b), Plaintiffs' primary duties include the exercise of discretion and independent judgment in two important respects.  First, Plaintiffs have "authority to commit the employer in matters that have significant financial impact."  29 C.F.R. § 541.202(b).  It is undisputed that Plaintiffs have the authority to approve or deny a loan application.  Plaintiffs are authorized to approve loan applications valued between $250,000 and $1,000,000.  Plaintiffs therefore have the authority to bind the Bank to significant financial commitments.

Second and most importantly, although Plaintiffs' authority is heavily tempered by the Bank's lending criteria, Plaintiffs have the "authority to waive or deviate from [that criteria] without prior approval."  *Id*.  Plaintiffs can, in certain circumstances, deviate from the Bank's lending criteria by declining to approve a loan that meets that criteria and/or making exceptions in order to approve a loan that does not.

Plaintiffs can, for example, decline to approve a loan that meets the Bank's lending criteria unless and until the customer meets certain stipulations.  Such stipulations are not automatically generated by loan software or required by any manual or guidelines.  Rather, they are placed on a file after an HLU compares and evaluates possible courses of conduct (i.e., the risk of approving the loan without the stipulation, the chance that the customer will not meet the stipulation and the Bank will lose the loan, the benefits of approving the loan once the stipulation is satisfied) and decides that the stipulation represents the best course of action.  As such, even if the Bank's guidelines contemplate stipulations in certain circumstances, the process of attaching stipulations to a loan application meets the Regulations' definition of exercising discretion and independent judgment.  *See* 29 C.F.R. § 541.202(a) ("In general, the exercise of discretion and

independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.")

Plaintiffs also can decline to approve a loan that meets the Bank's lending criteria if the loan seems suspicious, as in the case of an elderly individual attempting to trade in a two-year note for a thirty-year note.  In such a case, the HLU might inquire further and end up not approving a loan that met the Bank's lending criteria.  That action also requires a comparison of different options to decide on an appropriate course of conduct, which, again, qualifies as exercising discretion and independent judgment.  *See id.*

Finally, Plaintiffs can approve a loan that does not meet the Bank's lending criteria by making an exception or adjustment to that criteria.  This too involves comparing different courses of conduct (i.e., whether it is in the Bank's interest to approve a loan when the customer has a history with the Bank, even though the application is too risky for approval under the Bank's lending criteria) in order to make a decision on a loan application.  Even if the Bank's policies contemplate exceptions and provide guidance with respect to the same, the HLU still must decide whether an exception is appropriate in each case.

The fact that Plaintiffs can place stipulations on a file, flag suspicious loans without approving them, and make exceptions to the Bank's lending criteria shows that the Bank's "guidelines and procedures contemplate independent judgment calls or allow for deviations," *Renfro II*, 497 F.3d at 577, which supports the Court's conclusion that Plaintiffs meet the "discretion and independent judgment" requirement of 29 C.F.R. § 541.200(a)(3).  Plaintiffs argue that, because HLUs are expected to make exceptions in appropriate circumstances, they "do not have a choice (i.e., the discretion) on whether to use an available exception."  (ECF No. 71, at 18.)  But that argument confuses authority with judgment.  Plaintiffs have the *authority* to

make exceptions, and they are expected to exercise that authority where appropriate.  But there is

no special formula that dictates when an exception is appropriate.  Instead, HLUs must use their

*judgment* to determine whether to exercise their exception authority.

This point highlights another problem with Plaintiffs' argument.  Plaintiffs argue that

they were expected to apply their skills to reach the "right" loan decision, but, as stated above,

that concept would only make sense if there were an objectively "right" answer on every loan

application.  But that is not the case: in the examples discussed above, there is no way to verify

whether the "right" decision is to approve a loan with or without a stipulation, whether to

approve an elderly customer's application or question it further and risk losing the loan, or

whether to make an exception for a repeat customer that would not otherwise qualify for the loan

he or she is requesting.  The fact that HLUs are given an opportunity to defend their decisions in

response to internal and external audits only supports the Court's conclusion that there is not

necessarily one "right" course of action on every loan application.[12]

Plaintiffs' additional arguments are equally unpersuasive.  Plaintiffs again belittle their

qualifications and suggest that the Bank would not vest discretion and independent judgment in

employees with only a high school education and 1–3 years of underwriting experience.  But the

Court's focus, as stated above, is on the type and nature of the work performed, not the

qualifications required to perform that work.  Plaintiffs also argue that HLUs are required to

make decisions "objectively," but the Bank's policies state: "[l]ending personnel are expected to

exercise their *judgment* regarding credit decisions objectively."  (ECF No. 65-2, at 13 (emphasis

---

[12] Plaintiffs assert that "the parties agree there is only one acceptable answer on a file," (ECF No. 65, at 42 n.7), but cite deposition testimony in which Defendants stated: "The underwriter's goal is to make the right loan decision . . . [t]he underwriter has a goal to find the right solution for the customer and the right answer for the customer for their borrowing need."  (Cline Depo., ECF No. 58, at 78:21–79:2.)  This testimony parallels the Court's earlier comments that insurance claims adjusters and financial advisors undoubtedly want to make the "right" decision but, because the "right" decision is not objectively verifiable, they still use discretion and independent judgment within the meaning of 29 C.F.R. § 541.200(a)(3).

added).) An HLU is not foreclosed from using his or her judgment simply because he or she must apply that judgment consistently across loan applications.

In short, despite the fact that HLUs operate in a heavily-regulated environment, their primary duties still include the exercise of discretion and independent judgment within the confines of those regulations. That discretion and independent judgment clearly relates to "matters of significance" within the meaning of 29 C.F.R. § 541.200(a)(3). Plaintiffs have authority to approve loan applications valued between $250,000 and $1,000,000—meaning that their everyday responsibilities consist of binding the Bank to significant financial commitments. Plaintiffs' ability to disapprove loans also has a significant impact on the customer, which affects the Bank's customer service and long-term business interests.

Plaintiffs' argument on this point is without merit. Section 541.202(f) of the Regulations, which states that "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly," does not apply in this case because Plaintiffs' decisions have a significant impact on the Bank regardless of whether or not they are performing their job properly. 29 C.F.R. § 541.202(f). The facts that Plaintiffs do not determine the Bank's risk policies, do not develop loan products, and are not evaluated based on default rates are irrelevant to the conclusion that Plaintiffs' loan decisions have a significant impact on the Bank.

For those reasons, the Court concludes that Defendants have met their burden in demonstrating that Plaintiffs qualify for the administrative exemption under the third and final prong of 29 C.F.R. § 541.200(a). Accordingly, Plaintiffs are "bona fide administrative employees" that are exempt from the overtime requirements of 29 U.S.C. § 207(a)(1). See 29

U.S.C. § 213(a)(1).  The Court therefore **GRANTS** Defendants' motion for summary judgment with respect to Plaintiffs' FLSA claim (Count One).

The Court need not consider the parties' remaining arguments regarding Plaintiffs' claim for straight time wages, whether the Bank acted in good faith, and whether the Bank willfully violated the FLSA.  The Court also need not consider Defendants' alternative request that the Court decertify the FLSA collective action class.

### C.  State Law Claims (Counts Two, Three, and Four)

In addition to their FLSA claim, Plaintiffs Lutz and Becker also bring a claim for overtime wages under Ohio Revised Code § 4111.03, which is the state-law equivalent of the FLSA's overtime provisions.  Pursuant to § 4111.03, employees are exempt from Ohio's overtime requirements to the same extent they are exempt from the FLSA's overtime requirements.  Ohio Rev. Code § 4111.03(A).  Accordingly, having found that Plaintiffs Lutz and Becker are exempt from the FLSA's overtime requirements, the Court concludes that they also are exempt from Ohio's overtime requirements.  The Court therefore **GRANTS** Defendants' motion for summary judgment with respect to Count Two.  Because Plaintiffs Lutz and Becker's claim for willful withholding of wages pursuant to Ohio Revised Code § 4113.15 is dependent upon their § 4111.03 claim, the Court similarly **GRANTS** Defendants' motion for summary judgment with respect to Count Three.

In their fourth claim for relief, Plaintiffs Lutz and Becker allege that Defendants are liable for failing to keep accurate wage and hour records of their hours worked.  Presumably, this claim also is dependent upon Plaintiffs' arguments that they were not paid overtime wages to which they were entitled.  Because the Court finds that Plaintiffs were not entitled to overtime wages, it **GRANTS** Defendants' motion for summary judgment with respect to Count Four.

Having found that Defendants are entitled to summary judgment on Plaintiffs' state law claims, the Court **DENIES AS MOOT** Plaintiffs' motion to certify an Ohio state-law class pursuant to Federal Rule of Civil Procedure 23.  (ECF No. 63.)

### III.     CONCLUSION

For the foregoing reasons, the Court takes the following actions with respect to the three pending motions in this case:

- **GRANTS** Defendants' motion for summary judgment on all claims (ECF No. 62);

- **DENIES** Plaintiffs' cross-motion for summary judgment on all claims (ECF No. 65); and

- **DENIES AS MOOT** Plaintiffs' motion to certify a state-law class pursuant to Federal Rule of Civil Procedure 23 (ECF No. 63).

The Clerk is **DIRECTED** to enter judgment accordingly and remove this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

  /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE